N6CQGOE1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              22 CR 396(PKC)

5                                          Trial

6  BRIJESH GOEL
              Defendant.
7  ------------------------------x

8                                          New York, N.Y.
9                                          June 12, 2023
                                           9:35 a.m.
10 Before:
                    HON. P. KEVIN CASTEL,
11
                                           District Judge
12                                         – and a jury –
                         APPEARANCES
13
   DAMIAN WILLIAMS,
14      United States Attorney for the
        Southern District of New York
15 BY:  JOSHUA A. NAFTALIS
        SAMUEL P.  ROTHSCHILD
16      ANDREW M. THOMAS
        Assistant United States Attorneys
17
   FORD O'BRIEN LANDY LLP
18      Attorneys for Defendant
   BY:  ADAM C. FORD
19      ANJULA PRASAD
        NICOLETTE BEUTHER
20 –and–
   GIBSON, DUNN & CRUTCHER, LLP
21      Attorney for Defendant
   BY:  REED M. BRODSKY
22

23 Also Present:  MATTHEW MAHAFFEY, FBI
                   MADELINE SONDERBY, Paralegal Specialist (USAO)
24

25

N6CQGOE1

```
1                    (In open court; case called)

2              DEPUTY CLERK:  For the government.

3              MR. NAFTALIS:  Good morning, your Honor.  Joshua

4    Naftalis, Sam Rothschild, and Andrew Thomas for the government.

5              THE COURT:  Good morning to you all.

6              DEPUTY CLERK:  For the defendant.

7              MR. FORD:  Good morning, your Honor.  Adam Ford,

8    Anjula Prasad, Reed Brodsky, and Nicolette Beuther on behalf of

9    Mr. Goel.

10             THE COURT:  Good morning to you all.

11             MS. PRASAD:  Good morning, Judge.

12             THE COURT:  First order of business is I wanted to

13   address the medical records which I have reviewed, and will

14   say, first off, they cover a period of visits from December 20,

15   2021 to February 2, 2023.  And in July of 2022, the treating

16   psychiatrist stated that the individual has a diagnosis of

17   bipolar disorder NOS and cannabis use disorder in remission.

18             NOS is a well-known abbreviation for "not otherwise

19   specified" and which is consistent with the records which

20   refers to it as unspecified.

21             In the course of treatment, the doctor's notes

22   indicate, and, in context, one would assume that it came from

23   the patient.  It says, literally says, "Taking openly" but I

24   take that to mean "talking openly about insider trading and

25   this investigation is causing him stress, and that the patient
```

N6CQGOE1

1  reports a friend who he looked up to as a mentor gave him

2  information several years ago.  He reports he was "-- it says

3  "NW," I take that possibly" "new to finance and the information

4  was non-specific."

5        That concludes what I covered from the records which

6  appeared to me potentially of use to the defense and not

7  otherwise invasive of the witness's right to confidentiality

8  surrounding medical records.  So that concludes that issue.

9        Now, with regard to the correspondence of recent days,

10 I want to understand a few things about the chronology here

11 with regard to when it was that the government -- and I know

12 there's a chronology that was furnished by the defense.  I've

13 seen it, but I want to hear from the government what was the

14 chronology on its efforts to secure a stipulation with regard

15 to the text messages of Mr. Niranjan, specifically the review

16 of his phone on June 2, 2022, and then the second review of his

17 phone on June 10, 2022 after the purported events in a

18 stairwell.

19        So what happened?  How did you go about seeking to

20 authenticate this or raise the issue of authentication or raise

21 the issue of a stipulation?  Give me the rundown on that, and

22 I'm going to ask the defense whether they agree with that

23 chronology.

24        MR. ROTHSCHILD:  Yes, your Honor.

25        So on May 28 of this year, we sent for the defense's

N6CQGOE1

1    consideration a proposed stipulation as to, among other things,

2    the authenticity of particular WhatsApp messages between

3    Mr. Niranjan and the defendant that we wished to offer into

4    evidence at trial marked as Government Exhibits 200 through

5    207.  All of those ultimately derived from Government Exhibit

6    253, which has been the subject of the recent papers.  Those

7    are messages, your Honor, that we intend to use affirmatively.

8    They are not messages that were deleted.

9            THE COURT:  All right.  A question about that is, I

10   read, and I think we've had this discussion about this subject

11   before, that there was some offer by the government as to when

12   it was going to disclose witnesses and exhibits.  I don't think

13   I ordered that, but I think the government volunteered that.

14   Is that accurate and when was that by?

15           MR. ROTHSCHILD:  So our exhibits were due on May 31.

16   So we furnished this proposed stipulation before the exhibit

17   list.

18           THE COURT:  Was there an understanding to disclose

19   witnesses?

20           MR. ROTHSCHILD:  Yes, your Honor.

21           THE COURT:  By when?

22           MR. ROTHSCHILD:  Our witness list was due, I believe

23   May 12, your Honor.

24           THE COURT:  So let's take it back to May 12.  How were

25   you going to get these text messages into evidence?

N6CQGOE1

1          MR. ROTHSCHILD:  Your Honor, I think the answer to

2     your question is that in retrospect, we ought to have put

3     somebody on our witness list with respect to this topic.  What

4     I will say is we did not know the name of the individual or

5     individuals --

6          THE COURT:  No, I'm okay with that.  You didn't know

7     Tappeto at that point or Tappeto, is that it?

8          MR. ROTHSCHILD:  That's correct, your Honor.  We

9     didn't know which vendor the cooperator had used.

10          THE COURT:  In that sense it makes it a little bit

11     more puzzling; not less puzzling, but more puzzling.  But okay.

12          And you had disclosed the June 2 output and the

13     June 10 output at a much earlier point.  When was that?

14          MR. ROTHSCHILD:  In August 2022 in our initial

15     production of discovery.

16          THE COURT:  And as I understand it -- and I'm just

17     doing the first overview yet.  I don't want you to argue the

18     point.  But I understand that the argument has been raised by

19     the defendant that this is in the nature of expert testimony

20     and expert disclosure need to have been made.

21          You were of the position that it is fact testimony,

22     and not expert testimony, and no expert disclosure needed to be

23     made, correct?

24          MR. ROTHSCHILD:  That's correct, your Honor.

25          THE COURT:  All right.  So the issues that I think I'm

N6CQGOE1

1    called upon to decide -- and I'm going to ask the defense to go

2    over this territory; we will take a time out just to see if the

3    judge has this framed correctly -- but the issues I'm being

4    asked to decide are whether you can, may, whether you have

5    leave to belatedly designate the witness and whether the

6    witness is expert or lay.

7         Now, maybe you could take those questions in reverse

8    order.  Is the witness expert or lay, and can you belatedly

9    designate, and that probably makes more sense because the

10   standard would be different for an expert than it would be for

11   a lay person.

12        Are those the issues that I am -- and then, of course,

13   we have the subpoena issue.  And on the subpoena issue, this is

14   my takeaway from my reading yesterday, and at various hours I

15   think three letters came in yesterday, but my understanding is

16   the government took the position that the subpoena directed to

17   Tappeto and his company called for production of a broad

18   universe of text messages, including family messages, things

19   that under no sense or no threat could be relevant to this

20   case.

21        And the defense came back and said, not so.  We are

22   not seeking text messages.  We are seeking instructions given

23   to Tappeto, and we are seeking any reports or analyses done by

24   Tappeto or his firm or maybe given to Tappeto and his firm by

25   somebody else.

N6CQGOE1

1          And then I think the next thing I read, if I have this

2     correctly, is that the government was saying, oh, we did not

3     quite understand that.  Nobody is at fault here.  This is

4     happening at lightening speed.  We didn't understand that, and

5     that we may be able to work out any issue relating to the scope

6     of the subpoena.  That's the bid and the ask as I remember it

7     on the subpoena issue.

8          Am I leaving something material out of that

9     chronology?

10          MR. ROTHSCHILD:  No, your Honor.  I'm not sure it was

11     so much that the government didn't understand what the subpoena

12     was requesting.  I think here the phrase "report," which they

13     asked for the June 2 report, the June 10 report, is a term of

14     art that in fact means the content of the report.

15          THE COURT:  So, again, this is neutral of any

16     criticism here.  It's just you maybe, quite reasonably, thought

17     it included the text, and it was clarified that it didn't

18     include the text.  Is that about right?

19          MR. ROTHSCHILD:  Fair enough, your Honor.

20          THE COURT:  And have you come to some understanding on

21     the scope of the Rule 17 subpoena?

22          MR. ROTHSCHILD:  The parties have not conferred on

23     that.

24          THE COURT:  So now let me turn to the defense, and so

25     far we are not arguing the issues.  We're arguing the framing

N6CQGOE1

1    of the issues.  Go ahead, Mr. Brodsky.

2              MR. BRODSKY:  Your Honor, I would add to the framing

3    of the issues that the stipulation that we focused on was

4    provided to us, and it's Exhibit 1 to our June 8 letter, and it

5    does not ask for authenticity of any particular text messages,

6    but rather states that they're asking us to stipulate that a

7    consultant on June 2 extracted data from Mr. Niranjan's

8    cellphone, then a consultant extracted data on June 10, and

9    then marked a marked Exhibit 216 which they called a

10   discrepancy report.  And that --

11             THE COURT:  The discrepancy report is now off the

12   table.  The government isn't going to offer, right?

13             MR. BRODSKY:  They replaced the discrepancy report

14   with the same thing except now what they did, Mr. Tappeto,

15   apparently will take the discrepancy report, they will focus on

16   the first 13 messages which they care about, which we wrote

17   that that's what they cared about.

18             It appears to be that they eliminated other messages,

19   and it's still fundamentally the same thing.  It is a

20   comparison.  So what I would say to it, it's not about

21   authenticity of text messages.  It is rather about the use of a

22   particular technology and about the comparison.

23             THE COURT:  Let me pause.  I'm going to ask a

24   question, and I'm going to let you finish, Mr. Brodsky.  So

25   when I interrupt, hold your thought and get back to it.

N6CQGOE1

1          But when I sit here reading this, I understand there's

2     such a thing as, I don't know if it's pronounced Cellebrite or

3     Cellebrite, however it's pronounced.  It's a piece of software,

4     and it's commonly used.

5          But here is the question I have:  If you had time and

6     paralegal muscle, could not one look at what was on the phone

7     on June 2 and then look at what was on the phone on June 10 and

8     say the following text messages were not there on June 10 that

9     were there on June 2?

10          MR. BRODSKY:  The only person who can do that today is

11     at TransPerfect.  The defense cannot do it even though we have

12     two exhibits which contain over 80,000 messages, and even if I

13     had the 40 or so summer associates at Gibson Dunn working

14     overtime --

15          THE COURT:  Because you don't have the phones.

16          MR. BRODSKY:  Because we're told the technology

17     doesn't -- you cannot compare the two without having the

18     metadata and without knowing where the file system was.  So,

19     for example --

20          THE COURT:  Okay.

21          MR. BRODSKY:  So that's what we're told because we

22     don't have the phones.

23          THE COURT:  All right.  Okay.  Mr. Brodsky, could I

24     impose on you to just let me let the government respond on that

25     simple point?

N6CQGOE1

1          Could not a team of paralegals with the two phones --
2     you can stay at the podium -- with the two phones in front of
3     them simply do a comparison?
4          MR. ROTHSCHILD:  So, your Honor, yes -- the answer is
5     yes, a comparison of the two --
6          THE COURT:  June 2 versus June 10.
7          MR. ROTHSCHILD:  Correct, your Honor.  The
8     spreadsheets that were produced back in August of 2022, those
9     can absolutely be compared.  And I was rising, your Honor, just
10    to note two -- I know we're just getting the facts straight
11    here.  I know we're not arguing.
12         The stipulation Mr. Brodsky refers to is a different
13    stipulation than the one I was referring to.  It was sent the
14    next day, and Mr. Brodsky is correct it's reflected in the
15    discrepancy report, and your Honor is quite right, that's off
16    the table.  But I wanted to note we are not intending to call
17    Mr. Tappeto to offer any testimony about comparison about what
18    was on the phone on June 2 and what was on the phone on
19    June 10.
20         THE COURT:  Oh, then I'm lost.  So what --
21         MR. ROTHSCHILD:  Your Honor, we anticipate Mr. Tappeto
22    to testify about collecting data from the phone on June 2,
23    producing a report of messages on June 2.  We are going to ask
24    him to take Government Exhibit 253, which is what was produced
25    to us by Morvillo and what we produced to the defense in

discovery, and to confirm that Government Exhibit 253 comes

from or is data that's in his June 2 report that he made of the

phone.

And we intend to do the same thing with Government

Exhibit 254 and say that that data is a subset of data from the

June 10 report that he created.

We will then call an agent from the FBI --

THE COURT:  Okay.  And the agent does the comparison.

MR. ROTHSCHILD:  Correct, your Honor.

THE COURT:  Thank you.

Go ahead, Mr. Brodsky.

MR. BRODSKY:  Yes, your Honor.  Respectfully, I

compliment the ingenuity and the creativity, but it doesn't get

around the fundamental problem of what the government has put

themselves in the position after outsourcing.

So just to frame the issues, I agree, your Honor --

and we're happy to argue the issues -- but whether or not there

was a belated designation I think has been stipulated.  Whether

it's expert or lay I think is in dispute, and I think there is

a question about that.

I would an add to that, even if whether they're expert

or lay, the third issue would be the sword-shield issue.  Can

you call somebody who extracted data, whether they're expert or

lay, on one date using the Cellebrite technology of a

particular method.

1          There are multiple methods to do it.  And can you do

2     it on June 10, and then call that person but shield them from

3     answering questions about what instructions they received, what

4     reports they ran, what statements Mr. Niranjan made or what

5     counsel made on his behalf, what they advocated or didn't

6     advocate for him.

7          THE COURT:  Well, that in my mind -- and this is where

8     framing is the right way to be discussing this.  In my mind,

9     that's a subpoena issue.  You want to know what did the

10    Morvillo firm tell Tappeto, what were his instructions, what

11    limitations, if any, were placed on him.

12         MR. BRODSKY:  Yes, your Honor.  And I would add to

13    that, on June 2 they chose one of three methods to extract data

14    from the phone.  Cellebrite has three.  The most narrow of the

15    three is the one they chose.

16         I would add to that that even the narrow method that

17    they chose allows you to extract from the phone whether

18    information was deleted but recovered, or found in a deleted

19    section of the phone, or otherwise attempted to be deleted.

20    That would all, of course, be something had the FBI had the

21    phone, we'd have access to.  And that we think we would be

22    entitled to that information in cross-examining Mr. Tappeto.

23         The final and fourth issue is even assuming we get

24    these reports, our argument, your Honor, is without the access

25    to the actual extraction and doing the challenging and the

testing, we believe the probative value, which is very minimal,

is outweighed by the unfair prejudice.

THE COURT:  I think that's a good job of framing, and

I think we have the issues framed, and I think I was right to

amend my response.  I think the first issue, is it expert or is

it lay, because that goes to whether it be appropriate to

exercise my discretion or how to exercise it.

So I'm going to give you a choice, Mr. Brodsky, to go

first or second on that issue.

MR. BRODSKY:  I'm happy -- since I'm standing, I'm

happy to go first, your Honor.

THE COURT:  Okay.

MR. BRODSKY:  What I would say to it is I would refer

to the case *United States v. Ray* case of Judge Liman.

THE COURT:  I've read it.

MR. BRODSKY:  I think Judge Liman does a very good job

of essentially saying it is a close question.  There are

courts, we've cited to your Honor, not in this district, which

have definitely said it's expert testimony.

I think if you look at the cases, the trend, is that

it is appropriate for specialized knowledge outside the average

lay person's understanding.  I think in today's times,

especially the ones we live in, when people hear extraction by

a forensic digital examiner, they think, oh, that person has

specialized knowledge; that person has something that they know

1      that I don't know.

2              I think it's fairly apparent that if you ask the

3      average person, do you know how to extract data from the phone?

4      What are the different methodologies?  What are the limitations

5      what are the flaws?  What are the deficiencies?  What are the

6      different sections of a phone?  I think most people don't know

7      that.  I certainly don't.  I had to read up on it over the last

8      few days.  But what Judge Liman said was it's a close question,

9      and the *Marsh* case which the government cites is very different

10     than here because in the *Marsh* case --

11             THE COURT:  He's an FBI agent.

12             MR. BRODSKY:  An FBI agent, and they confirmed the

13     actual data from the phone.  They looked at all the messages,

14     not just the ones that were purportedly deleted.  The

15     government doesn't surmount this problem by having somebody

16     say, oh, I read the report and I can identify those messages,

17     and I called Mr. Niranjan.  And he says, oh yeah, those

18     messages aren't on my phone now.

19             That is far different than what happened in *Marsh*.

20     It's far different than what happened in the SEC case that they

21     rely on, which relies on *Marsh*, and the government had choices

22     here.  They decided not to take possession of Mr. Niranjan's

23     phone.  They made the choice to allow a third party under

24     Mr. Niranjan's control and direction to access and extract and

25     decide what to do with the phone.

N6CQGOE1

1          The reason it's expert knowledge is fairly simple.  It

2     requires specialized knowledge.  Even if they try to narrow his

3     testimony and say we're just going to ask him what he took out

4     of the phone, it's still beyond the knowledge of an average lay

5     person.

6          So I think Judge Liman appropriately said in that

7     case, regardless of expert or not, even if it's a close line,

8     here are all the difference disclosures you're going to be

9     required to make well in advance of trial.

10          THE COURT:  Of course, Judge Liman was clear he wasn't

11    deciding the question of whether it was expert or fact

12    testimony.  Disclosures in that concept were kind of the legal

13    version of chicken soup:  What's the harm, make the

14    disclosures, I'll decide this down the road, and noted it was a

15    close question.

16          MR. BRODSKY:  That's right, your Honor.  That's why we

17    would turn to *Daniels* and *Belosi*, which are court cases that

18    said, yes, the process here is beyond the ken of a lay jury,

19    and, you know, *United States v. Belosi* was the Eastern District

20    of New York*, United States v. Daniels*, of course, is a Southern

21    District of California.  None of the government cases I think

22    do much other than say those are situations where the agents

23    themselves had the data, extracted the data, and provided

24    information presumably about how they did it to the defense.

25    We haven't been able to find a single case, your Honor, and

N6CQGOE1

they don't cite any, in which this issue has come up.

THE COURT:  Let me hear from the government.  Thank
you.

MR. THOMAS:  Judge, I will at least begin on this
topic.  Mr. Rothschild will surely pop up at some point to
assist.  I think the basic issue is also a framing issue here,
which is what is it we intend to elicit from the witness by way
of evidence.  It is possible one could put Mr. Tappeto on the
stand and ask him all manner of questions about the operation
of Cellebrite forensic technologies.  We aren't doing that.

What Mr. Tappeto will say essentially to answer the
question do these messages come from that device on a specific
day, and he'll say yes.  And if explored on cross-examination,
the answer to why is he'll say, "I used a piece of software to
take the messages out."  That's a subject that every juror who
has a cellphone, which is every juror, will readily understand,
they could be understood, and that the weight of which, which
is essentially the challenge Mr. Brodsky is making, could be
challenged to whatever degree he sees fit on cross-examination.

Are there different techniques?  Sure.  Ask the
witness; you could.  But the availability of different
techniques doesn't make the testimony that he has personal
knowledge that these messages derived from that phone on one
day any more expert than it would be for any other witness.

The argument about it being an FBI agent or not an FBI

N6CQGOE1

agent really is neither here nor there on the expert issue.

It's of no moment whatsoever who employs or pays the witness

who has the personal knowledge to make them an expert or not.

The gravamen of the issue is the testimony.

          Mr. Tappeto will not be offering opinion testimony.

He'll be offering personal knowledge testimony, which 901 says

is the basis for authenticity to say these messages came from

that phone on that date, and it's in fact I think now pretty

clear that the date is really the crux of the dispute here.

There's not a serious dispute that these messages weren't on

the phone or they were not messages between the defendant and

Mr. Niranjan.  It's just were they on the phone on that day,

and I think that draws special focus to the lay nature of the

testimony because it's not a theoretical digital metaphysics

dispute about what kind of file this is or what it means.  It's

just asking Mr. Tappeto were these messages on the phone on the

2nd, were these other messages on the phone on the 10th.  And

the Court rightly pointed out, an agent here compared the two

files, and will say:  Here are 13 messages in file one that

cannot be found in file two.

          Now, the degree to which there were other sets of data

or limitations to the sample set for that comparison fruitful

grounds for cross-examination, but the essence of the testimony

is just did the messages come from the phone, and did these

messages come from the same phone on the second day?

N6CQGOE1

1      THE COURT:  All right.  Anything else on the expert

2  issue?

3      MR. THOMAS:  No, your Honor, other than to say I think

4  *Marsh*, while being a different set of facts, makes plain that

5  this kind of thing can be within the ken of the average person,

6  which now years after *Marsh* in a world of cellphones is more

7  true than it was then.

8      THE COURT:  At this point, I am ready to rule on the

9  expert versus lay testimony situation, and I've looked at the

10  *Belosi* case, the *Daniels* case, the *Ray* case, as well as *Marsh*,

11  *Chavez* or *Lopez* -- and I'm trying to discern my own

12  scribbling -- the Ninth Circuit case, which I think is *Berry* if

13  my scribble is correct.

14      And I think the *Marsh* decision, which is a summary

15  order, was very close to point and remarkably thorough in its

16  description of the issue.  It was the use by a special agent of

17  the FBI of the Cellebrite universal forensic extraction device

18  to download and review the contents of two cellular phones

19  belonging to *Marsh*'s girlfriend.

20      And the argument on appeal was that was the improper

21  elicitation of expert opinion testimony, and the Court notes

22  that the federal rules allow the admission of fact testimony so

23  long as the witness has personal knowledge, while opinion

24  testimony can only be presented either by a lay or expert

25  witness, "a witness's specialized knowledge" -- this is quoting

N6CQGOE1

the *Rigas* case which was a reported case of the Second Circuit -- "or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise...'"  And the special agent in that case explained his training in Cellebrite technology to retrieve text and other data from a cellphone, described how he used Cellebrite to do so, and testified that he confirmed the results by checking the message on the phone itself.

"He did not purport to render an opinion based on the application of specialized knowledge," says the Court, "to a particular set of facts, nor did his testimony turn on or require a technical understanding of the programming or internal mechanics of the technology," and, therefore, the Court affirmed the district court's evidentiary ruling in *United States v. Marsh*, 568 F.App'x 15.

Now, subsequent to that, the Fourth Circuit in *Chavez Lopez* had a Cellebrite case and cited *Marsh* and came out the same way, again, in an unreported decision of the Fourth Circuit.  And I thought Judge Liman got it right, did it right in *Ray*.  There were many issues other than cellphone extraction including interpretation of metadata, analysis of images from laptops, external storage drives and cellphones.  It included

N6CQGOE1

1    an issue here.  And Judge Liman decided that he didn't need to

2    decide whether it was expert or lay.  It was a close question

3    on the facts presented to him, and so he required an expert

4    disclosure leaving the issue for another day.

5          So I conclude on balance that this testimony as

6    described to me on the record is more akin to fact testimony

7    rather than expert and, therefore, an expert disclosure was not

8    required.  There remains the question of whether or not the

9    government should be given leave to call this witness though

10   it's after the date by which it said it would disclose

11   witnesses.

12         Is there anything further, Mr. Brodsky, you want to

13   say on that issue?

14         MR. BRODSKY:  No, your Honor, I just would note -- and

15   I know you know this, your Honor, it puts the defense in a

16   difficult position, I would just say, because I know the

17   government is going to call Mr. Tappeto, and he can say, "I

18   just did this to this phone."  If we cross-examine effectively,

19   we run a very substantial risk of turning him into an expert,

20   and I understand your Honor knows that, and it's a challenge

21   that we have on the defense.  I'm just open with your Honor

22   about it.

23         THE COURT:  I know what you're saying, and I have to

24   do what a judge does, is listen to the question, listen to the

25   testimony, and rule at that time.

N6CQGOE1

1          It seems to me that what happened here was suboptimal

2     and should not have happened.  It did happen.  And I think the

3     interests of justice are served by allowing the testimony in,

4     and it sounds like it will be -- the direct will be brief.

5     We'll see what happens with the cross.

6          MR. BRODSKY:  Your Honor, if I may be heard just on

7     the witness list.  The government has had this discrepancy

8     report, because they gave it to us over a year ago.  They asked

9     for these deadlines.  You so ordered the deadlines.  Deadlines

10    are deadlines.  And they are weeks over the deadline.  They

11    don't have good cause.  What they say is it doesn't cause us

12    unfair prejudice.

13         THE COURT:  Well, this is what I invited you to argue

14    just a second ago.

15         MR. BRODSKY:  Well, no, I thought we were arguing the

16    expert opinion.

17         THE COURT:  No.  I ruled on that.

18         MR. BRODSKY:  Right.

19         THE COURT:  Then I said anything you want to say on

20    the timing.

21         MR. BRODSKY:  I apologize, your Honor.

22         THE COURT:  That's what I've asked you, and now I've

23    ruled on the timing, and I'm going to allow it because I

24    believe the good cause, it's in the interest of justice and

25    because of the narrow frame of the witness's testimony the fact

N6CQGOE1

1    that the two extraction reports were produced in August of

2    2022.  I understand, you know, you say, well, this is good

3    news, it wasn't -- they didn't designate a witness.  I'm not

4    hearing argument.  I've ruled --

5              MR. BRODSKY:  Sorry, your Honor.

6              THE COURT:  -- on the timing issue.  I gave you

7    opportunity to argue on the timing issue.  We're not having a

8    debate on this or anything in this.

9              I will say this, that I will also consider the 403

10   issue that you did raise.  You raised 403.  So far it looks to

11   me like the probative value is not substantially outweighed by

12   the danger of unfair prejudice.  I reserve the right to change

13   my mind on that based on what I learn in the course of the

14   trial.

15             This, of course, still leaves open the subpoena issue.

16   I will frame this a little differently because I have a

17   viewpoint in mind.  Why should I not order that any written

18   embodiment of a communication between Tappeto and the Morvillo

19   firm be produced pursuant to that subpoena, at least that part

20   of the subpoena ought to be enforced?

21             MR. THOMAS:  Judge, I think as long as that's with

22   respect to these two reports and not other engagements he may

23   have had with Morvillo, the government has no objection.

24             THE COURT:  Well, it would be engagements relating to

25   their client here, Mr. Niranjan.  And because, you know, I

1    don't know what's in there.  I don't know what they might have

2    said globally in engaging Tappeto that could reflect on this

3    issue.  It could be broad enough that it would be an

4    instruction whatever you do, don't look at the X.  You know,

5    and that's for this project and three other projects, whatever

6    you do, don't consider X.  It seems to me that's fair game to

7    know about.

8                MR. THOMAS:  Your Honor, we take the Court's point.

9                THE COURT:  Okay.  Mr. Brodsky, I just issued the

10   government an order to show cause.  They've responded.

11   Anything you want to say?

12               MR. BRODSKY:  No, I appreciate it, your Honor, and I

13   thank you for that.

14               And just for point of clarity, would that include --

15   again, I don't want reports of content, but would that include

16   if they send a report that says, you know, here's the content,

17   here are the categories, I'd like to know if, for example,

18   without having the actual messages, are there things in the

19   unrecovered or deleted, there are all sorts of categories when

20   they extract from a phone.

21               THE COURT:  In other words, were there other

22   categories, so we know extracted, not extracted, and you're

23   saying there could be a third or a fourth category.

24               MR. BRODSKY:  Well, within the extraction, apparently

25   Mr. Tappeto told us there are like 20 or 30 categories of

N6CQGOE1

1    information:  Unrecovered, recovered but in deleted, you know,

2    various sections.

3        THE COURT:  Why shouldn't that be produced?  Let me

4    hear from the government.

5        MR. THOMAS:  Well, your Honor, the -- if Mr. Brodsky

6    is envisioning some kind of cover page that says 23 files

7    deleted, 52 files unrecoverable, no objection to that being

8    produced.  But as the Court knows, those -- the way these

9    typically work is there's a hyperlink then to the 53 messages,

10   and those messages may be --

11       THE COURT:  The content of the messages is that it's

12   beyond the scope of the subpoena.  That I've said.  But

13   otherwise it seems to me that which bears on the work he did

14   and what he found ought to be fair game.  So if he had, again,

15   deleted, non-deleted and maybe deleted comes in three flavors,

16   I think the defense is entitled to know that.  And if

17   non-deleted comes in four flavors, I think the defense is

18   entitled to know that.  I have no idea what the flavors are,

19   but...

20       MR. THOMAS:  Your Honor, we once again take the

21   Court's point, but just to make sure we effectuate the Court's

22   intention.

23       THE COURT:  Yes.

24       MR. THOMAS:  The idea is for any historical reports of

25   that nature, not for Mr. Tappeto to undertake to generate new

N6CQGOE1

1    work.

2              THE COURT:  No.  This is production of that -- what I

3    believe the defense is entitled to know is, was there anything

4    in the interaction which infected the authenticity of what the

5    witness did.  And if there is, the defense wants to know it,

6    and I want to know it.  I think that's absolutely fair game.

7              MR. THOMAS:  Yes, your Honor.

8              THE COURT:  So I'm waiting on our jury.  Is our jury

9    ready.

10             DEPUTY CLERK:  I'm waiting.

11             THE COURT:  We're still waiting?

12             DEPUTY CLERK:  No, I'm waiting on you.

13             THE COURT:  We'll defer on the transcript issue to

14   another time.  We've done quite enough.  Thank you.

15             I'm going to have marked right now and hand out to

16   counsel what I call an aid to memory, and we will mark it as

17   Court Exhibit Number 1.  And what I mean by an aid to memory,

18   it will at some point in this process be given out to jurors,

19   and so that when they go through the questioning, I can say,

20   well, what did you have your hand up on?  Question 13 or 12 or

21   11?  Or if there's a juror who hasn't been spoken to, and I

22   need to make sure that they understand what I was asking, they

23   may reference that.

24             It also has the schedule -- do you have another one

25   for Mr. Brodsky, please?

N6CQGOE1

1        And that's all it is.  It's not a questionnaire.

2    Nobody fills it out.  And it by no means is -- we don't have to

3    give one to everybody.  Two to a side is fine.  It is by no

4    means the voir dire.  The voir dire will include many followup

5    questions that do not appear on this document, but it is a

6    start, so...

7        DEPUTY CLERK:  Ten minutes, Judge.

8        THE COURT:  So now let's turn to transcripts while

9    we're dealing with waiting for our jurors.

10        So on the rule of completeness, this is actually

11    territory that is often traveled in criminal prosecutions where

12    there's a transcript, and the government says we want to offer

13    these statements of the adverse party as evidence against the

14    adverse party, and the rules of evidence allow us to do that.

15    There are other things in the transcript that might be useful

16    or helpful to the defendant.  And, of course, they're entitled

17    to know the entirety of what's in the transcript.

18        But the law of evidence does not mean that the fact

19    that the government is using a portion of a recording, that the

20    defense may offer other portions of the recording that are

21    helpful.  The rule of completeness does require that where in

22    fairness, it's necessary to offer at the same time -- or where

23    in fairness, another portion of the transcript should be

24    offered at the same time so as to not leave a misleading

25    impression.

1          So I will give you an example.  There is a

2     conversation about paying money for the thing, and there's

3     repeated conversation about "the thing."  Elsewhere in the

4     transcript it's clear that the thing is a red Corvette

5     convertible.  The defense can compel and I can compel, and I

6     should compel, the government to offer that portion at the same

7     time.  But what it does not mean is that if there are

8     exculpatory statements also in the transcript, that they get to

9     be offered under the rule of completeness.

10          Now, I took from the correspondence before me that

11    there are ongoing discussions on the application of the rule of

12    completeness.  So, therefore, I'm going to hands off that one

13    for the time being and allow you to continue with your

14    discussions on that rather than my trying to referee something

15    that isn't ripe for refereeing.

16          Now, there is a second issue which I understand

17    Niranjan reviewed, if I'm correct about this, Hindi portions of

18    the tapes and made handwritten markings on the Hindi portions

19    of the translations.  Do I have that wrong?  Do I have that

20    right?

21          MR. NAFTALIS:  Your Honor, it's both the English and

22    Hindi.

23          THE COURT:  Both English and Hindi.  All right.

24          Now, the government has a nifty stipulation which says

25    we're going to give you drafts of the tapes, of the transcripts

N6CQGOE1

of the tapes, and you swear on your youngest child that you

will never refer to them in any way, shape or form because

they're only draft.  Fine.

       But they also live in a different world, and the world

that they live in is they're 3500 material and possibly *Giglio*

material.  Now, I have no idea, but it would seem to me that if

the witness in his own handwriting, his own handwriting is

injecting a biased and baseless version of what's on the tape

writing it in, making up stuff that's not there.  I'm not

saying this happened.  I'm just trying to analyze an issue as

the judge.

       If that happened, I don't see why the defense can't

use that in cross-examination despite the stipulation because

that existed as a transcript subject to the stipulation but it

also existed as 3500/*Giglio* material.  That's how I approach

this, and I put this out here, and I give both sides the

opportunity to tell me why I'm wrong.

       MR. NAFTALIS:  Your Honor, we agree that when

Mr. Niranjan made edits on the drafts, that's 3500 *Giglio*,

which is why we turned it over, but it's very common for a

participant in a conversation, whether a wiretap or consensual

recording, to listen and try to confirm.  And in this case the

drafts that were initially prepared were prepared days after

the recording to get ready to charge the case; not for trial.

And we are not using Mr. Niranjan as the person to authenticate

1    the transcript.

2          We're calling an independent court certified

3    translator.  So what we think they're trying to do is not to

4    impeach the transcript that's coming in.  It's to impeach

5    Mr. Niranjan in some way about something that is really outside

6    his testimony.  So the idea that he was injecting bias, we

7    understand it could be proper ground for cross-examination.

8          The fact that these may be difficult to hear is what

9    it is, but the idea that there is going to be competing

10   transcripts flying around, I think is meant to effectively

11   cross-examine the court certified interpreter.  And sort of

12   stepping back, what we don't quite understand if the defense

13   wants the entire transcript to come in, they're presumably not

14   challenging the authenticity or accuracy of them.  We don't

15   quite understand what the relevance is of cross-examining

16   Mr. Niranjan.

17         THE COURT:  Well, we're going to find out.

18         MR. NAFTALIS:  Other than to effectively say the

19   transcripts aren't really accurate because over a period of

20   trial preparation, they evolved, which, as your honor knows,

21   happens all the time when you are getting ready for trial.

22         That's the purpose, to step back, of the stipulation,

23   which is what the Eastern District cases say is:  Listen, we're

24   going to give them to you early, but you can't just then show

25   up and say, aha, some words came and went.

1          THE COURT:  No, I fully agree with that.  But what

2     changes the dimension is that it's in the hand of the witness,

3     and we're talking about cross-examination of the witness.  I

4     want to -- I'm going to let Mr. Brodsky or one of his

5     colleagues just without -- I'm not asking for a full preview of

6     the cross-examination, but on what areas where you think it's

7     permissible for you to use the transcript with Niranjan.

8          MR. BRODSKY:  Your Honor, we agree with your analysis

9     and comments, and, that is, if Mr. Niranjan made statements in

10    a draft transcript in his handwriting days after recorded

11    conversation which he participated and which he had access to

12    the recording, because he did, and he made, you know,

13    hypothetically, let's say -- I'm not saying this is what he

14    did, but let's say hypothetically he made something up that's

15    not there or let's say he said something that was just so

16    untrue, then I think we're entitled to cross-examine him

17    regarding his credibility.

18         We don't know what Ms. Shah, that's a totally separate

19    issue.  We don't believe the stipulation covers Mr. Niranjan's

20    3500 material with his comments.

21         THE COURT:  I think what I'm inclined to do in

22    addition to allow you to elicit testimony bearing on

23    Mr. Niranjan's credibility, what I'm prepared to do is before

24    or when you launch into this area of cross-examination, have an

25    instruction to the jury.  I've allowed this cross-examination

N6CQGOE1

1    not on -- this is not on the accuracy of the transcripts.  This

2    is on whether there is anything in relation to Mr. Niranjan's

3    handwritten comments on a draft that should bear on his

4    credibility and that's why I'm allowing this cross-examination

5    and for no other purpose.

6              What do you think of that, Mr. Brodsky.

7              MR. BRODSKY:  One second, your Honor.

8              (Pause)

9              MR. BRODSKY:  That's fine, your Honor.

10             THE COURT:  All right.  And what's the government's

11   position?  Beyond you can't do any of this because of the

12   stipulation.

13             MR. NAFTALIS:  Your Honor, final instruction, we'll

14   see how the cross-examination develops, but --

15             THE COURT:  I think what I'm going to ask is if the

16   government could take a look at this transcript of today and

17   work with Mr. Brodsky on something nice and clean, okay, and

18   acceptable to both sides.

19             MR. NAFTALIS:  Yes, your Honor.

20             THE COURT:  With that, I'm going to luxuriate for a

21   few minutes before the jury is ready.  We are in recess.

22             (Continued on next page)

23

24

25

N6C6GOE2                      Opening - Thomas

1          (Voir dire occurred)

2          THE COURT:  Who will be opening for the government?

3          MR. THOMAS:  I will, your Honor.

4          (Jury present)

5          THE COURT:  Please be seated.  I understand Mr. Thomas

6    will be delivering an opening statement for the government.

7    Whenever you're ready, sir.

8          MR. THOMAS:  Thank you, your Honor.

9          About one year ago in an apartment building just

10   blocks from where we are right now, this man, Brijesh Goel,

11   huddled in a stairwell with his friend destroying evidence.

12   Together, Goel and his friend scrolled through his friend's

13   phone, selecting messages to delete.

14         Why did Goel do that?  So he could erase evidence of

15   the other crime he had committed:  A criminal insider trading

16   scheme.  A scheme where Goel took information about big

17   business deals from Goldman Sachs, his employer, and shared

18   that information with his friend for stock trades, a scheme

19   where Goel shared that inside information six times.  Six

20   times.  So that he and his friend could make an illegal profit

21   in the stock market.

22         That day when the defendant was in the stairwell

23   deleting messages, he was doing that because he was afraid that

24   he might have been caught.  See, just two weeks earlier, the

25   FBI knocked on his door, visited Goel, and asked him about

1    stock trading.  Goel lied to those agents, to hide what he had

2    done, and now in the stairwell, as he and his friend clicked

3    through and deleted messages, they deleted the ones that would

4    show their trading, and it was because Goel hoped to erase

5    anything, anything, that might reveal what he had done, but it

6    did not work.  The evidence was there whether Goel tried to

7    delete it or not.  And those messages, the very ones that he

8    tried to destroy in that stairwell, only confirmed what you

9    will learn from the proof at this trial:  Goel stole

10   confidential information and used it as part of an insider

11   trading scheme.  And that is why we are here today.

12        Goel has been charged with insider trading, and he's

13   been charged with obstruction of justice for destroying the

14   evidence of his scheme.

15        So some background on how we got here.

16        In 2017 and 2018, Goel worked at an investment bank,

17   Goldman Sachs.  Investment banks like Goldman Sachs assist in

18   mergers and acquisition, sometimes called M&A, when one company

19   buys another or two companies consolidate.  As part of his job

20   at Goldman, Goel received memos — lengthy, detailed writeups

21   about those deals.  Those memos included important, sensitive,

22   and secret information, like the names of the companies that

23   might be planning to merge, information about how much one

24   company might be willing to pay to buy another, projections

25   about when a deal like that might happen.

1        Those details, the who, the when, the what price,

2   those were details the average investor did not have.  They

3   were secret, and Goldman Sachs treated those memos as highly

4   confidential.  They even stamped them on every page with the

5   words "internal use only."  But in 2017, Goel decided to betray

6   Goldman Sachs, and to use the "internal use only" memos, the

7   inside information, for himself.

8        Goel decided to take confidential information about

9   those M&A deals that he learned from his job and use that

10  information illegally by trading in the stock market.

11       To put his plan into action, however, Goel needed

12  help.  Specifically, he needed an account that was secret from

13  his bosses.  That's because Goldman Sachs monitors its

14  employees' accounts to prevent improper trading.  That's when

15  Goel turned to his close friend Akshay Niranjan.  Niranjan

16  worked at a different bank, and that bank had similar rules,

17  but Goel's friend Niranjan decided to already break those

18  rules.

19       Niranjan had his own brother create a brokerage

20  account, and Niranjan used that account for his own stock

21  trades.  That meant the defendant had secret inside information

22  from Goldman Sachs, and the defendant's friend had an account

23  set up for secret trading.  And so Goel and his friend worked

24  out an arrangement to help them both.

25       Goel would give Niranjan stock tips.  Niranjan would

1    make those trades in the account that he secretly controlled.

2    And if the trades made money, the men would agree they would

3    split the profits.

4          Beginning in 2017, that is what happened.  In

5    February, Goel gave his friend a tip, and his friend traded.  A

6    few months later in April, Goel gave his friend another tip,

7    and his friend traded again.  A few months after that, in

8    September, Goel gave his friends still another tip, and the

9    friend traded yet again.  In 2017, in 2018, Goel and Niranjan

10   made lots of the trades in this way.  You will learn of six

11   time these stock trades were based on information stolen from

12   the Goldman Sachs memos.  Six times.  Six times Goel stole

13   secret information from work, and tipped his good friend by

14   telling him which securities to buy for the secret account.

15   And each of those six times, Niranjan used Goel's tips to

16   trade.

17         Some of those trades turned a decent profit, some

18   didn't.  But each time Goel knew where to place their bets

19   because Goel knew something no one else knew:  He knew that

20   inside information.  So unlike the average investor, Goel knew

21   exactly which pitches to swing at.

22         One trade they made with that secret information

23   turned into a home run.  Goel had obtained a memo at Goldman

24   about a billion-dollar takeover of a company called

25   Calgon Carbon.  Within hours, he told Niranjan about Calgon.

N6C6GOE2                         Opening - Thomas

With this one, he said, make sure you don't miss out.  And

within days, Niranjan made $53,000 in trades in that secret

account.  When the Calgon deal happened, the stock shot up, and

Goel and his friend turned $53,000 into $300,000 — nearly a

600 percent return in less than a month.

        Now, of course Goel did not want to get caught, so he

carefully avoided sharing his tips in writing or even by phone.

Goel even once used a code to hint at what's going on without

saying it outright, but for the most part, Goel just shared

these tips in person when he met Niranjan, like when they met

to play squash or to grab something to eat.

        Eventually, Niranjan switched to a job in London.

Goel could no longer meet with his friend, and the insider

trading stopped.  That's where things stood until 2021, when

Goel asked to settle up to get his cut of the profits from the

secret trading.  At first, Niranjan hesitated because sending

tens of thousands of dollars to Goel might attract attention.

So Goel proposed that they use a cover story, say that the

payment is just a loan.  And with that, with the cover story in

place, Niranjan sent $85,000 straight into Goel's bank account.

        Not long after that, the FBI showed up at Goel's front

door asking questions about Niranjan, about trading.  And

during that interview, Goel admitted some unavoidable facts.

He admitted that he knew Niranjan.  He admitted he had received

confidential memos at Goldman Sachs, and Goel admitted he was

1    not supposed to share what he learned at work with others.

2          But Goel also misled the FBI.  He offered up the cover

3    story about needing loans.  He denied that he ever gave

4    Niranjan any information from Goldman Sachs.  Within days,

5    however, Goel realized he might need more than a cover story.

6    He needed a coverup.  So Goel called Niranjan to arrange a

7    meeting like old times.  But this meeting, though, Goel didn't

8    simply pick up the cell phone, call his friend, send him a text

9    message.  Instead, he went down to the gym in his apartment

10   building and had an attendant call Niranjan, hoping to avoid a

11   record of a call to the same person who had tipped him with

12   inside information just days after the FBI had stopped by.

13         Now, by that time, Niranjan had moved back from London

14   to New York.  And they literally lived in the same apartment

15   building, a high-rise just a few blocks this way.  But the

16   defendant didn't ask Niranjan to come over it his apartment.

17   He didn't say, I'll come meet you at your place.  He didn't say

18   let's talk in the lobby.  This time, now that the FBI was onto

19   him, Goel arranged to meet Niranjan in the building's empty

20   stairwell.

21         When they met in this stairwell, Goel decided the

22   subject was so sensitive he had to whisper to his friend, even

23   though there was no one around.  And what the defendant

24   whispered was they should delete any messages that would reveal

25   what they had done.

N6C6GOE2                        Opening – Thomas

1              They met again two weeks later, once more hiding in

2      the stairwell.  And at that meeting at the end, Goel told

3      Niranjan that when he and Niranjan spoke about what happened to

4      anyone, they had to be consistent.  His words were, they must

5      be the same from day one.  There should not be a break in our

6      story.  The message was simple.  We need to get our stories

7      straight.

8              A few days later, they met yet again, a third time.

9      And again, they met in a stairwell.  And during that meeting,

10     Goel and Niranjan clicked through messages on Niranjan's phone,

11     identifying the ones that might reveal what they had done, and

12     they deleted them.

13             Now, Goel's stairwell meetings, his hushed directions,

14     the deletions from the phone, that might have worked, but what

15     Goel didn't realize was that by the time of that third meeting,

16     his friend Niranjan had decided to help the FBI.  In fact,

17     Niranjan had already met with the FBI, and Niranjan had already

18     preserved the messages on his phone.

19             When Goel told him in the empty stairwell what to

20     delete, Goel just revealed exactly which messages he most

21     wanted to hide.  And when Goel whispered in the stairwell to

22     avoid anyone overhearing him, to avoid his words coming back to

23     him in the future, all he did was make clear that he was

24     destroying evidence.  Because in the stairwell that day, Goel

25     was being recorded.

1          At this trial, you will hear the defendant's whispers,

2     you will hear when this man here tells his friend "delete."  By

3     the end of this trial, you will know why Goel tried to delete

4     evidence that day because he engaged in a scheme to commit

5     security fraud, and he didn't want to get caught.

6          We will prove all of this to you through a combination

7     of witnesses, records, photographs, and recordings.  For

8     example, you'll hear from someone from Goldman who will explain

9     investment banking and the importance and secrecy surrounding

10    these deal memos.  You'll hear someone who can explain how

11    securities trades work and walk you through the accounts.

12    You'll hear from the FBI agent who spoke to Goel, and you'll

13    hear from Niranjan himself.

14          As you listen to that testimony, there are a few key

15    pieces of evidence you may want to look out for.

16          First, you're going to see examples of the

17    confidential deal memos that Goel received.  You can see on

18    yourself, they're stamped in big red letters "for internal use

19    only."

20          Second, you're going to see messages between Goel and

21    his friend Niranjan where Goel and Niranjan arranged to meet,

22    including messages sent the same day or the day after Goel

23    received the confidential deal memos.

24          Third, you're going to see stock trading records from

25    the hidden account, the one that Niranjan controlled.  Those

N6C6GOE2                    Opening - Thomas

1   records will show stock option trades in the same companies

2   discussed in the Goldman memos.

3        Fourth, you're going to see bank records that show a

4   wire transfer from Goel's friend, Niranjan, to Goel in the

5   amount of $85,000.

6        The memos, the messages, the trading, and bank records

7   will allow you to see that Goel received secret deal

8   information, set up meetings with his friend, and shared in the

9   profits of the trading.  And as I said, you will hear directly

10  from Niranjan himself.

11       Niranjan will tell you how Goel supplied him with

12  trading tips, and he used those tips to trade in an account

13  that he had hid in his brother's name.  He will tell you that

14  he and Goel traded a lot in securities from many companies, and

15  Niranjan will tell you that for six of those trades, Goel's

16  tips were so good, Niranjan asked if the tips were based on

17  inside information from Goldman Sachs, and Goel denied it.  But

18  you'll hear that as Goel's tips about deal possibilities kept

19  coming true, Niranjan concluded that he and Goel were not just

20  trading in a secret account, they were trading on inside

21  information.

22       Now, Niranjan will take the stand pursuant to an

23  agreement that requires him to testify in order to avoid being

24  prosecuted.  And his testimony about his good friend will be

25  personal.  So listen carefully to it, scrutinize it, see how it

1  stacks up against the evidence.

2          I expect you will see that some trades he mentions,

3  the same ones show up in the trade records.  You will see the

4  meetings that he referenced in the text messages.  And you will

5  hear that even though the defendant took great pains to hide

6  and to whisper in the stairwell about deleting messages, some

7  of what he said was captured on tape.

8          As all of that proof comes in, we ask that you just do

9  three things:

10          First, pay close attention to the evidence.

11          Second, follow Judge Castel's instructions.

12          And third, use your common sense.

13          If you do those three simple things, you will find

14  that Goel received inside information.  You will find that Goel

15  gave that information to his friend so they could place illegal

16  stock trades.  And you will find that when the FBI came

17  knocking, Goel tried to cover up what he had done.  That's why

18  at the end of this trial, you will find the defendant

19  Brijesh Goel is guilty as charged.

20          THE COURT:  Thank you very much, Mr. Thomas.

21          Mr. Ford, you're going to deliver an opening

22  statement?

23          MR. FORD:  I am, your Honor.

24          THE COURT:  All right.  Whenever you're ready.

25          MR. FORD:  May I proceed, your Honor?

1          THE COURT:  You may.

2          MR. FORD:  Brijesh Goel was framed.  He's been framed.

3     Brijesh Goel should not be sitting at that table right now.

4     Someone else should be.  Here's what I mean:

5          This is a case about disloyalty and deception.  You

6     heard that one friend turned on another.  I'm not talking about

7     the type of disloyalty where two people do something wrong and

8     a friend turns on the other.  That's not the disloyalty I'm

9     talking about.  I'm talking about the type where one person,

10    Akshay Niranjan, does something wrong and tries to pin it on

11    his friend, Brijesh Goel, who, in fact, did not commit any

12    crime.  That is the ultimate betrayal.  And that, ladies and

13    gentlemen, is what this case is actually about, and for that

14    reason, at the end, we're going to ask that you acquit

15    Brijesh Goel.

16         Before I go any further, let me just quickly introduce

17    myself.  You heard my name.  I'm Adam Ford.  It's an honor to

18    represent Mr. Goel.  I'm here with my colleague, Reed Brodsky,

19    Anjula Prasad, and Nicolette Beuther.

20         The evidence in this trial is going to show that

21    Niranjan has fabricated this story that you just heard.  And he

22    fabricated it in exchange for him not to be prosecuted himself.

23    And he fabricated it in exchange for him not to be deported,

24    which was his biggest fear.  Had he not done that, he would

25    have been charged, and if convicted, faced lying to the SEC,

1    insider trading, his own obstruction of justice, but he made a

2    deal.

3            You did hear the government tell you about

4    Akshay Niranjan.  He'd be the witness.  What they didn't tell

5    you is he's pretty much the only witness.  The government might

6    call some other witnesses from Goldman Sachs, but they weren't

7    there.  They don't know about the facts at issue.  They'll give

8    some background facts, most of which we'll probably agree with.

9    And they are going to ask you to convict Brijesh on the words

10   of this one man.

11           We believe that at the end of this trial, you don't

12   have to believe it now, but by the end when you've heard the

13   evidence, you are going to conclude that this one and only

14   witness is just not reliable.

15           Indeed, the government's theory of the case, the one

16   that Niranjan has told them, it's riddled with flaws.  And it

17   might take us a little bit of time to unravel each of them.

18   Bear with us.  Give us the time.  Stay with us.  Because we're

19   going to march through this over the next week, and we're going

20   to get to the truth.

21           Now, as I understand the government's opening and what

22   Mr. Niranjan is expected to testify to, he's going to come here

23   and he's going to say, I didn't want to receive any secret

24   inside information from my friend, Brijesh.  I didn't know I

25   was receiving any inside information.  I kept asking him, are

1    you sure this isn't inside information from Goldman Sachs?  And

2    Brijesh would assure him, it's not inside information.

3            He would have you believe, Mr. Niranjan, that he is a

4    rather gullible, unlucky, lots of words, to have a friend

5    having tricked him into engaging in an inside trading scheme

6    upon repeated requests to confirm that he is not actually

7    engaged in insider trading.  This story, we submit, does not

8    make sense.  And the evidence is going to show that it's

9    actually not what happened.

10            The government talked about this secret account.  We

11    talked a little bit more about it.  It wasn't really a secret.

12    It was a secret to Brijesh.  He didn't know that Niranjan was

13    trading out of his brother's account.  Other people knew.

14    Niranjan obviously knew, and Niranjan's brother obviously knew.

15    Niranjan's family obviously knew.  But Brijesh never had access

16    to this account.  Never saw it.  Never had any idea what trades

17    were being placed in it.  And he most certainly never got any

18    of the money from that account.  That money went elsewhere, to

19    Niranjan and his family.

20            Now, as the government mentioned, four years after the

21    alleged inside trading scheme ended, everyone, the point of --

22    the government will acknowledge 2018 it ends, and then they

23    point to this $85,000 payment.  It was a loan.  We're going to

24    talk a little bit more about that, but it had no connection to

25    these trading profits that Niranjan himself made from trading

N6C6GOE2                        Opening - Ford

in his brother's account.  And there's going to be evidence
that's going to show this.  So what we are in for?  This next
week is literally a once-in-a-blue-moon insider trading case.

We're going to have the person who traded, who kept
all the money, who was in control of all the trades, come here
and say he was tricked.  And then we've got the insider who is
accused of passing this information on, not having any idea
about the trades or the money or the account.

Now, when Niranjan comes in and takes the stand, he's
going to sound polished.  He might even sound convincing the
first go-around.  He's been practicing.  He's got a script.
He's been meeting with the government often to prepare, to tell
you this story that he wants to convince you of.

What we'd ask is that you reserve judgment.  Wait.
Wait until we have a chance to question him on some of these
points and pull back the facade.  Other than Niranjan's story
that he's going to come and tell, there's practically no other
evidence of this insider trading scheme.

The government claims that because the men were
careful — but we're talking about what the government alleges
to be a five-year insider trading conspiracy, during which time
the only pieces of evidence that references this alleged
insider trading scheme are three text messages, two of which
are, did you book the court?  And the other one, you alone?
That is the evidence they are going to point to that these men

N6C6GOE2                          Opening - Ford

1    were engaged in insider trading.

2              How about this one?  Did you book the court?  These

3    men played squash together two, three, four times a week, all

4    through the relevant time period, and were constantly texting

5    each other.  Did you book the court?  Yes, I booked the court.

6    The men were also close friends.  And because of that,

7    sometimes they had personal things to discuss.  Not trading.

8    Personal.  And so they would each use, you alone?  Nothing

9    nefarious about that.

10             With respect to the obstruction of justice charge, the

11   government opened on the scrolling of the phone, deleting

12   evidence he's trying to hide.  The evidence is actually going

13   to show that there was no attempt to obstruct justice.  There

14   was no obstruction of justice.

15             Now, Brijesh did utter the words on the tapes, we

16   should delete this, or delete, or words to that effect.  The

17   government is right about that.  But they didn't tell you what

18   he said moments later, which is, I've gotten a subpoena so I

19   should not delete, let me ask my lawyer.  And then they didn't

20   say what he said right after that, which is, listen, don't

21   delete this, let me check with my lawyer.  And then they didn't

22   say that it was Niranjan who was doing the deleting while he

23   was cooperating with the government, while he was trying to get

24   this non-prosecution agreement, while he was trying to

25   implicate Brijesh in any crime.

N6C6GOE2                        Opening - Ford

1          So at the end of this trial, we don't think the

2     government is going to be able to meet their burden of proof on

3     the obstruction of justice charge either.

4          Let me just take a step back and tell you a little bit

5     more about Brijesh because it's really important to the story,

6     and it's going to play into it.

7          Brijesh was born and raised in Haryana, India.  He

8     grew up in a modest family, but he worked really, really hard.

9     And he eventually got into the Indian Institute of Technology,

10    which is one of India's most prestigious universities.  If you

11    don't know much about, it's pretty much Harvard on steroids,

12    trying to get into it.  The only way to get in is through hard

13    work, and he got in, and he graduated with honors.  And

14    afterwards, he came to the United States where he attended the

15    University of California at Berkeley, where he graduated with a

16    master's in finance in 2013.

17         Afterwards, he started working for Goldman Sachs —

18    obviously, a well-known and prestigious financial institution

19    here in the city.  He worked there until 2021, during most of

20    the time that's relevant here.

21         He left Goldman Sachs in the middle of 2021, and he

22    started working at another well-known financial institution

23    called Apollo, where he is still employed.  He's on leave, but

24    in both his places of work, he enjoyed a reputation of having

25    honesty and integrity.  And Apollo, to its credit, is taking a

1    wait-and-see approach before deciding on any employment.

2                MR. THOMAS:  Objection, your Honor.

3                THE COURT:  Let me see you at sidebar, Mr. Ford.

4                (Continued on next page)

1              (At the sidebar)

2              THE COURT:  Let me have a proffer on how you intend to

3     prove the defendant's reputation.

4              MR. FORD:  We've listed a number of witnesses on our

5     witness list that can act as character witnesses.

6              THE COURT:  You intend to call character witnesses?

7              MR. FORD:  Yeah.

8              THE COURT:  Okay.  And you intend to call the

9     defendant, is that what you're telling the jury, with giving

10    his background?

11             MR. FORD:  We don't know yet.

12             THE COURT:  Well, how are you getting his background

13    in?

14             MR. FORD:  I thought I was just doing a general

15    background.

16             THE COURT:  No, no, no, no.  You have to have a

17    good-faith belief it's going to be in the evidence.  How is it

18    going to be in the evidence?

19             MR. FORD:  The government is attaching exhibits, his

20    resume.  All of this information is in the exhibits that we've

21    talked about; where he worked, where he went to school.

22             THE COURT:  So you expect that this evidence is going

23    to be offered by the government; is that what your answer is?

24             MR. FORD:  Yes.

25             THE COURT:  I understand.  That's why I'm asking the

N6C6GOE2                    Opening - Ford

1    questions.

2            Any objection?

3            MR. THOMAS:  Your Honor has asked him for his

4    representation to Apollo, in particular, Apollo's wait-and-see

5    approach and invoking Apollo's --

6            THE COURT:  How are you going to get his reputation at

7    Apollo?

8            MR. FORD:  We have someone on our witness list who

9    works within Apollo.

10           THE COURT:  How would that be admissible evidence, his

11   reputation at Apollo?

12           MR. FORD:  His reputation -- I'm not certain, your

13   Honor.  His reputation within his community for where he works.

14           THE COURT:  Well, that would be the reputation in the

15   community, and your position is that would include his

16   reputation at Apollo?

17           MR. FORD:  Yes.

18           THE COURT:  Okay.  And reputation for what?

19           MR. FORD:  For honesty and integrity.

20           THE COURT:  Because I wasn't sure what you meant by

21   reputation.

22           Okay.  Anything else?

23           MR. THOMAS:  Your Honor, I heard Mr. Ford at the end

24   ascribe assessments to Apollo as an entity.  I don't think any

25   representative could speak on behalf of Apollo.  That's what

1     ultimately --

2                 MR. FORD:  Apollo --

3                 THE COURT:  Somebody is going to testify from Apollo

4     that he's on a leave of absence?

5                 MR. FORD:  Well, no.  But he is on a leave of absence.

6     He's on -- I have a good-faith basis to say I know that --

7                 THE COURT:  But have --

8                 MR. FORD:  -- paid leave.

9                 THE COURT:  But there are a lot of things that you may

10    know to be true, but the question is, will they be of evidence?

11                MR. FORD:  I'm happy to --

12                (Defense counsel confer)

13                MR. FORD:  Yeah.  The person that we have on our list,

14    who I just met with this week, is working at Apollo and is

15    familiar with everything --

16                THE COURT:  He knows that he's on a leave of absence.

17    I have that.  But how are you going to get that into evidence?

18    How would that be relevant, admissible evidence?

19                MR. FORD:  Well, it's relevant, part of his character.

20    It's part of his character.

21                THE COURT:  That he's on a leave of absence.  I don't

22    think so.  I don't get that.  I don't see how when you say,

23    tell me his employment status at Apollo, and there's an

24    objection raised, why wouldn't that objection be sustained?

25                MR. FORD:  Well, I -- my -- I don't want to just keep

1    repeating myself.  I thought I was completely in bounds.  I

2    wasn't trying to push the limits.

3           THE COURT:  I'm not accusing you of misconduct.  I'm

4    ruling on objections to an opening statement.

5           MR. FORD:  Yeah, in my argument is that we have

6    someone from Apollo who is able to testify as to his honesty

7    and integrity and able to testify as to the fact that he's on

8    leave.  And Apollo was not --

9           THE COURT:  I know he's able to.  That's not the

10   point.  I accept that he's able to.  That isn't what I'm asking

11   you.  He may know a lot of things.  He may know about the

12   defendant's wife, his background, his kids, his parents.  He

13   may know many, many things that he won't be able to testify to.

14   I'm asking you, why would it be relevant and admissible that

15   Apollo has him on a leave of absence?

16          MR. FORD:  I think it's relevant and admissible, your

17   Honor, because he has such a good reputation at Apollo that

18   they have not -- they're just taking a wait-and-see approach.

19   They don't know what to do here.

20          MR. BRODSKY:  Your Honor, I'm just going to add since

21   the government was putting in his resume, which included

22   Apollo, and included "through the present," it's fair for us to

23   argue that that's in evidence and that he hasn't been fired.

24          THE COURT:  Okay.  All right.  Continue.

25          (Continued on next page)

1             (In open court)

2             THE COURT:  Please, whenever you're ready.

3             MR. FORD:  Thank you, your Honor.  Thank you,

4    everyone.

5             Brijesh was married in 2014 to his girlfriend,

6    Natasha Garg.  Natasha is a doctor, worked at Mount Sinai, and

7    now at Jamaica.  She, unfortunately, is not present in the --

8             MR. NAFTALIS:  Objection.

9             THE COURT:  Let me see Mr. Ford at the sidebar,

10   please.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N6C6GOE2                          Opening - Ford

1              (At the sidebar)

2              THE COURT:  The objection, please, sir.

3              MR. NAFTALIS:  Your Honor, the personal circumstances

4    of the defendant are irrelevant.  It's not clear how they're

5    coming in because they have not committed to the defendant

6    testifying, and they are trying to curry favor with the jury up

7    front.

8              THE COURT:  Well, let's say the defendant was

9    testifying, and the defendant said I'm now going to tell you

10   about my wife.  Would that be admissible?

11             MR. NAFTALIS:  No.

12             THE COURT:  So it really doesn't turn on whether he

13   testifies or not.  Go ahead.  What's the basis for getting into

14   evidence?

15             MR. FORD:  Again, we thought they were just doing

16   basic background stuff, but his wife --

17             THE COURT:  I don't understand what that means.  What

18   you open on is admissible evidence.

19             MR. FORD:  Yes, and --

20             THE COURT:  And you think his marital status and what

21   his wife does for a living is admissible evidence?

22             MR. FORD:  Well, I think it's part of the story

23   because it goes to the two of them buy a house upstate, and the

24   wife and Niranjan's wife are good friends, and his wife is an

25   integral participant of the story because it's a group of them

1    and his wife is not --

2                THE COURT:  You're here because of her employment

3    history specifically.

4                MR. FORD:  Oh, that was -- because I said she worked

5    at a hospital?

6                MR. THOMAS:  I think Mr. Ford was about to tell the

7    jury that his wife is unable to be here today because she has a

8    pending visa overseas.

9                THE COURT:  Is that what you're planning on going?

10   Because I think you said the word "unable," didn't you?

11               No, no, no.  Answer me, Mr. Ford.

12               MR. FORD:  Yes.

13               THE COURT:  You said the word "unable."

14               MR. FORD:  Yes.  We were going to explain that she's

15   unable to be here.

16               THE COURT:  How is that relevant, admissible evidence,

17   sir?

18               MR. FORD:  Well, to the extent that -- Judge, the

19   answer is, to the extent that the jury can draw a negative

20   inference because the government plans on talking about the

21   defendant's extramarital affairs, they've told us that, and

22   they are going to pull that out in their evidence, and so we

23   need to be able to respond as to why his wife is not here, and

24   it doesn't have anything to do with what their allegations are.

25               THE COURT:  How would you prove that?

 1              MR. FORD:  How would I prove?

 2              THE COURT:  What you just said you were going to

 3   prove?

 4              MR. FORD:  Why she can't get in?

 5              THE COURT:  Yes.

 6              MR. FORD:  If my client testifies, that would be one

 7   way it could come in.

 8              THE COURT:  That's why I'm asking.  I've asked you

 9   this already.

10              MR. FORD:  I'm not -- obviously, I can't commit to

11   having my client testify.

12              THE COURT:  I understand that.  So how are you going

13   to get it into evidence?

14              MR. FORD:  One of the other witnesses who we've named

15   also knows about the friend group and the relationship, and

16   they talked about it, and indeed Mr. Niranjan would also talk

17   about it, and we'd get him to admit to these facts as well.

18              THE COURT:  But the wife's immigration status, how is

19   that probative of anything?

20              MR. FORD:  It's probative if the government --

21              (Defendant counsel confer)

22              MR. FORD:  I'll withdraw.

23              THE COURT:  Thank you very much.  Let's move on.

24              (Continued on next page)

25

1          (In open court)

2          MR. FORD:  May I continue, your Honor?

3          THE COURT:  You may.

4          MR. FORD:  Let's talk about Akshay Niranjan, the

5    government's sole cooperating witness.

6          You are going to hear a lot that Akshay Niranjan and

7    Brijesh Goel were very close friends during the relevant time

8    period.  Niranjan referred to Brijesh as like an elder brother,

9    and I think that was an apt description.

10         They first met at the University of California

11   Berkeley, although they weren't particularly -- they didn't

12   become friends at that time, but they both wound up in New York

13   City several years later, and they became quite close.  In

14   fact, on two occasions Niranjan follows Brijesh into the same

15   apartment building, to move in the same apartment building,

16   including with their girlfriends, and then later wives.

17         Notwithstanding this friendship, which I think was

18   true, Niranjan had a festering, deep-seated jealousy over

19   Brijesh.  He would frequently comment about Brijesh being more

20   successful, making more money, and the evidence is going to

21   show that this jealousy ultimately contributed to Niranjan's

22   betrayal.

23         Now, Niranjan as a witness, he has done a lot of --

24   strike that.  Niranjan has done a lot of things wrong.  He has

25   lied to the government in connection with the SEC, and the SEC

N6CQgoe3                        Opening - Mr. Ford

1    in connection with this investigation.  Now he's going to come

2    up here and he's going to try and tell you, look, yes, I lied a

3    lot before.  I lied a lot.  But now I'm telling you the truth.

4    And he's going to ask you to believe that he was only lying

5    before; not lying now.  But we think the evidence is going to

6    show that he's lying now.

7            And one of the things you all are free to consider,

8    and you should consider, is that Niranjan is coming here and

9    testifying under a non-prosecution agreement.  Now the

10   government mentioned it, but let me talk a little bit more

11   about it.

12           This means that he will never be charged for any of

13   the crimes that he committed, and, in exchange, he comes in and

14   gives his testimony, but -- and in addition to not being

15   prosecuted, he won't be deported.  And so he made a trade,

16   which was protecting himself coming in and telling you the

17   story that he's going to tell, and you are all free to consider

18   that when weighing his credibility and his bias as a witness.

19           Now, you might be thinking, okay, even if the

20   government's only witness, contemporary factual witness has

21   bias, has motive to lie, is untrustworthy, what will the

22   evidence show about the other investigation, you know, the rest

23   of the investigation the government did before indicting

24   Brijesh.  And I wish the answer were different, but the truth

25   is that the government relied extensively on Niranjan's story

1    in deciding to indict Brijesh.  They did not go and collect all

2    of the records that were available, and they indicted him --

3    they indicted Brijesh only six weeks after Niranjan first comes

4    into the office.  That is a very fast time.  So the

5    investigation that they did prior to this indictment was not as

6    fulsome as it could have been.

7          Let me talk a little bit about the allegations.  This

8    case really comes down to allegations that there were six tips

9    passed between February 2017 and the middle of '18.  And let's

10   talk a little bit about that.

11         First off, obviously, when people work in jobs that

12   they come in contact with confidential material nonpublic

13   information or other privileged communications, a lot of people

14   receive it:  Doctors, lawyers, bankers, accountants.  People

15   know that at your job and in connection with your work, you

16   receive confidential information, but sometimes that

17   information becomes public.  Lawyers certainly see this all the

18   time.  We work on something, and then there's a public filing,

19   and you're free to talk with your friends and family about the

20   public filing.  So you are going to see text messages where

21   Brijesh is texting public news articles on deals that he worked

22   on, particularly when he was winning awards for his excellence

23   in his job.  And so we're going to see that.  And he was doing,

24   frankly, what I assume most people do when talking about their

25   work is that they can talk about what's public, but not what's

confidential, which brings me to this -- the Goldman Sachs

memos, the confidential memos.

He was on an email distribution list with a somewhat

large group of people at Goldman Sachs, and he would receive

these memos:  FWCC, CMCC.  It doesn't matter if you remember

the acronym.  He got these memos.  They contain confidential

information.  They will contain material nonpublic information.

I don't know all of them, but they were confidential, but

Brijesh knew everything in all of those memos was confidential

and can't be shared outside of Goldman Sachs.  It's not in

dispute.  He knows that.  Of course it's confidential.  He knew

he couldn't share it.

Now, Niranjan is going to come in, and he's going to

tell you a story about what he claims Brijesh told him about

these memos; and if he says what he said in the past, he's

going to get it very wrong, and this is going to be something

for you to consider and weigh.

Now, will you have reasonable doubt as to this core of

the case, the seven -- the six ticker symbols.  At the end of

this trial, I think there is going to be a lot of evidence to

give you that reasonable doubt.  Let me just talk about three

of them.

First, there were six trades, only two of which made

money.  The other four lost money.  That can give you a little

bit of pause.  Maybe that doesn't decide it for you, but two

people, two highly sophisticated individuals are engaged in

insider trading, and we pause on why only two of the six

trades, seven actually, were successful.  Brijesh never

receives any of the money.  I mentioned this, but it bears

repeating.  He doesn't receive any of the money at the time or

later.  We'll talk about the loan.  And yet Niranjan's family

gets a lot of the money.  His younger brother gets some of it.

His father gets some of it.  Niranjan has said that he has

given all of them -- either gave the money away to family

members or lost it in other legal trades unconnected to

Brijesh.  That's the second reason.

        The third is that Niranjan can't even keep his story

straight with respect to these tips.  The first alleged tip was

a company called Lumos.  This was the first time that there was

supposedly this passing of inside information.  When Niranjan

spoke with the government, not on one occasion, but on two

separate occasions, he says unequivocally Lumos is not from

Goel.  He tells the government that twice.  It's only much

later that he just remembers the first time he started in

insider trading he could remember that Lumos was from Goel.  He

changes his story on that.  He changes his story with respect

to just about all of the other tips as well.

        He says two of them happened when they were in a

swimming pool.  Then he his comes back and says never mind;

they weren't in a swimming pool.  They were out on a street

corner.  And then he says, no, it was not a street corner

either.  It happens in a diner.

So you would think that if in fact Niranjan was in an

inside trading scheme with Brijesh that makes them net

$240,000, that results in $240,000 in profit, that he'd be able

to remember this.  I mean, people, you know the way memory

works:  You remember things that -- big events in your life.

But he doesn't.  He keeps changing his story, and we'll see

what story he tells on the stand.

Now, Niranjan has said, and we expect him to repeat,

that this inside trading scheme ends in 2018, the middle of

2018, pretty much when he moves to London.  He moves to London

for about a year.  So you might be thinking tell me how much

money, what is the evidence going to show about how much money

Brijesh receives.  And the answer is zero.  He does not receive

any of the money from these trades.

By the middle of 2018, there's $240,000 of profit net

from these alleged trades.  What that means -- and I want you

to keep this in mind for a little bit -- is that if we are to

believe Niranjan's story, by this time, the middle of 2018,

Brijesh is owed $120,000, that would be 50/50, which he says

was the agreement.  So let's keep that in mind because the

government said the eventual loan that is said to take place

two years later is about for $75,000, there is no way to

reconcile these two numbers.

1          Now, after Niranjan moves back to New York in 2019, I

2     should say there's a period of time where there's sort of

3     nothing happening, just life.  There's no allegations of any

4     wrongdoing.  The men remain friends.  They travel together

5     throughout Europe.  There's bachelor parties.  Their wives and

6     their group and everyone is getting together, and there's sort

7     of nothing happening.

8          However, in 2020 in connection, frankly with the

9     pandemic, the two men actually do have conversation.  They do

10    actually agree to engage in trading together.  This is legal

11    trading, lawful trading in big ticker stocks:  Lyft, Uber,

12    Moderna.  No one is going to suggest that there was anything

13    illegal or unlawful about this arrangement between Brijesh and

14    Akshay.  They were friends and they decided to do this.

15         Now, here is the thing.  In fairness, while certainly

16    not illegal at all, Brijesh trading in single stocks while he

17    was employed with Goldman Sachs was a violation of Goldman

18    Sachs policy.  And he did it.  And he engaged in conduct that

19    violated Goldman Sachs policies.  But not for very long, just

20    for three months.  It started in about October of 2020.  There

21    were some trades in November 2020, December, and then just a

22    little bit in January.

23         And what's so critical about this part of the story is

24    that when he starts trading, this legal trading in 2020 with

25    Niranjan, he sends Niranjan $12,000 so that Niranjan can put

1   some of these trades on Lyft, Moderna.  Let me say that again.

2   Brijesh sends Niranjan $12,000 so that Niranjan can put these

3   trades on.  Now remember, as of the middle of 2018, Niranjan

4   owed Brijesh, if we believe Niranjan, $120,000.  If we believe

5   Niranjan, they did an inside trading scheme, and each man gets

6   $120,000.  Brijesh never gets any money.  And then, what is it,

7   two years later Brijesh is sending the money to Niranjan.  Now

8   I guess he's owed $132,000 if we believe Niranjan.  We would

9   submit that the fact that Niranjan is accepting this money

10  suggest that his story is not accurate.  In fact, we think the

11  evidence is going to show that this $12,000 payment is evidence

12  that Brijesh didn't understand at the time that there was

13  $120,000 in trading profits or any money in trading profits in

14  this account.

15          So let's talk about 2021.  As I said, this legal

16  trading lasted two months.  And what happens in January 2021

17  Brijesh realize is I'm sort of doing this trading with

18  Niranjan, it's not big ticket stuff, the total profits are

19  several thousand dollars, but he realizes it is a violation.

20  He doesn't feel right about it, and so he exits this sort of

21  understanding.  And by the end of January he says, I'm out, and

22  there is evidence and there's text messages to show that as of

23  the end of January, middle, he's completely out of all trading

24  understandings with Niranjan.  So at this point, Niranjan --

25  I'm sorry, and what he says was when he's ending it is, you

1    know, I shouldn't, you know, the trading, I sort of don't want

2    any profits from it.  Let's just treat the $12,000 as a loan.

3    So that's sort of the understanding as we go into 2021, is that

4    actually Niranjan just owes Brijesh the $12,000.

5            A few months later, as I mentioned, Brijesh leaves

6    Goldman Sachs, moves to another financial institution, and he

7    becomes extremely busy and starts seeing less of Niranjan.

8    Also by the summer, Niranjan's life comes to be a bit

9    disordered.  He separates from his wife.  He actually moves in

10   with Brijesh and Natasha, is sleeping on their couch during his

11   separation.  He starts hanging out with people who are sort of

12   not a great influence.  He starts doing a lot of illicit drugs.

13   And in fact he winds up doing so much at a certain point he

14   winds up getting diagnosed with something called cannabis use

15   disorder and that sort of exacerbates another mental disorder

16   that he has that could impair cognitive function and memory.

17           Brijesh asks for his $12,000 back in the middle of

18   2021.  The men meet, and there is a discussion about a

19   repayment of the money, of the loan, and then Brijesh also asks

20   for a loan because they bought a house Upstate.  Brijesh and

21   Natasha bought a house Upstate and sort of overextended

22   themselves.  Now Niranjan doesn't know this, but Brijesh also

23   took out loans from other people, one other friend and a

24   commercial lender during this time because he needed a loan.

25           So he winds up receiving what's effectively $85,000 in

1    the summer of 2021.  $12,000 was to repay the amount that he

2    had given him in the trading, and then $73,000 was the loan.

3    That's the $85,000.  Now, again, this 85,000 doesn't connect

4    with any of the trading records and was just a loan.  There's

5    nothing nefarious about it.

6         Let me talk about the recordings.  You're going to

7    hear recordings in this case.  There were two.  Niranjan, while

8    he was attempting to cooperate, cooperating, he made two

9    recordings:  One on June 5, one on June 10.  The one on June 5

10   he stops halfway through.  So only half the conversation is

11   recorded.  The one on June 10 is about 45 minutes long.  Both

12   of them are very, very hard to hear.  I understand that we are

13   going to try and get you headphones to help.  But they're going

14   to be hard to hear.  They're also half in Hindi, but we are

15   going to try to listen to them, and I want you to listen to

16   them.  The government is going to just play parts of them for

17   you, snippets.  We think that you should again sort of reserve

18   judgment until you can hear the full context of these

19   recordings because in context, and if you listen to them, these

20   recordings are great for Brijesh.  They prove, they're evidence

21   of his side of the story.  So we would ask with these

22   recordings that you really listen to them.

23        Let me end on a final note.  I get it's late, after

24   5:00.  I apologize for that, but this is important.

25        I was trying to put myself in your shoes.  Trying to

1    think about how difficult it is for you, sitting there when you

2    get your jury duty notice.  You sit here all day.  It's 4:00

3    and now you have to hear two competing stories of, frankly,

4    dense, opaque material and to try and make sense of it.  And I

5    was thinking of how do we sort of think about this, and let you

6    know that we are going to get through it, and we are going to

7    get through it.

8         It happened to be last week when we had the wild fires

9    up in Canada.  And I'm sure everyone remembers the sky down

10   here was hazy and gray, and one day it was sort of that freaky

11   burnt orange.  You couldn't see anything.  That might be how

12   we're all feeling right now in terms of trying to figure out

13   what's going on here.

14        But like last week where we sat, we waited, took about

15   a week, right?  And then all of a sudden, we got back to our

16   nice New York City blue skies.  It's the same thing here.  Give

17   us about a week.  Everything might seem complicated and opaque,

18   but I can guarantee you in a week, the evidence is going to be

19   out.  Things are going to be clear.  The skies are going to be

20   blue again, and when they are, we hope that you all vote to

21   acquit Brijesh Goel.  Thank you.

22        THE COURT:  Thank you, Mr. Ford.

23        Ladies and gentlemen of the jury, it's been a long

24   day.  I want you to go home, put the case out of your mind.

25   Remember that you are not to discuss it with anyone, not to do

1    any research of any kind, and we will be back tomorrow morning.

2              Now for tomorrow morning, what you want and I want is

3    getting a 10:00 sharp start with the testimony.  In order to

4    have a 10:00 start, you really have to be at the courthouse 20

5    to 10:00, quarter to 10:00 to go through security.  Otherwise

6    we can't have that 10:00 start.

7              And if we can get a full trial day in, that means that

8    we are that much further through the case.  This case is going

9    to be tried fairly and the parties are going to have the

10    opportunity to put on the evidence they want.  But to get that

11    done efficiently and get you back to your regular lives, a full

12    day would be appropriate.

13              So have a very pleasant evening.  Do not discuss the

14    case among yourselves or with anyone.  I will have some

15    preliminary instructions for you tomorrow morning.

16              Good night, ladies and gentlemen.  Please stand for

17    the jury.

18              Please exit through the jury room.  Thank you.

19              (Jury not present)

20              THE COURT:  Please be seated.  Tomorrow morning what I

21    propose to do is deliver the standard preliminary instructions

22    to the jury on such things on what is and is not evidence, the

23    presumption of innocence, the government's burden and

24    credibility of witnesses.  And I thought it was appropriate to

25    add the following instruction:

N6CQgoe3

| | |
|---|---|
| 1 | Ladies and gentlemen, there is no legal requirement |
| 2 | that law enforcement agents investigate crimes in a particular |
| 3 | way or that the government prove its case through any |
| 4 | particular means.  While you are to carefully consider the |
| 5 | evidence introduced by the evidence, you are not to speculate |
| 6 | as to why the government used the techniques they did or why |
| 7 | they did not use other techniques.  The government is not on |
| 8 | trial.  Law enforcement techniques are not your concern.  Your |
| 9 | concern is to determine whether on the evidence, or lack of |
| 10 | evidence, the defendant's guilt has been proven beyond a |
| 11 | reasonable doubt. |
| 12 | Any objection from the government? |
| 13 | MR. THOMAS:  No, your Honor.  That sounds like an |
| 14 | accurate recitation of the law. |
| 15 | THE COURT:  Any objection from the defendant? |
| 16 | MR. FORD:  No, your Honor. |
| 17 | THE COURT:  Thank you all very much.  Have a very |
| 18 | pleasant evening.  And I'll see you all tomorrow morning. |
| 19 | Thank you. |
| 20 | (Adjourned to June 13, 2023, at 10:00 a.m.) |
| 21 | * * * |
| 22 | |
| 23 | |
| 24 | |
| 25 | |