N6DD6GOE1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
               v.                          22 CR 396(PKC)
 4                                         Trial
     BRIJESH GOEL,
 5
                    Defendant.
 6
     ------------------------------x
 7
                                           New York, N.Y.
 8                                         June 13, 2023
                                           10:05 a.m.
 9   Before:

10                   HON. P. KEVIN CASTEL,

11                                         District Judge
                                           – and a jury –
12                         APPEARANCES

13
     DAMIAN WILLIAMS,
14        United States Attorney for the
          Southern District of New York
15   BY:  JOSHUA NAFTALIS
          SAM ROTHSCHILD
16        ANDREW M. THOMAS
          Assistant United States Attorneys
17
     FORD O'BRIEN LANDY LLP
18        Attorneys for Defendant
     BY:  ADAM C. FORD
19        ANJULA PRASAD
          NICOLETTE BEUTHER
20
     –and–
21
     GIBSON, DUNN & CRUTCHER, LLP
22        Attorney for Defendant
     BY:  REED M. BRODSKY
23

24   Also Present:
     Madeline Sonderby, Paralegal Specialist – USAO
25   Matthew Mahaffey, Special Agent – FBI
```

1          (Trial resumed; jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  I

3    hope you had an easy trip home, and thank you for being here on

4    time so we can get a good start.

5          I told you as we left yesterday that I would have some

6    preliminary instructions for you.  And that's what I want to do

7    now.  You've heard from me now multiple times that my job is to

8    instruct you as to the law that governs or controls this case,

9    and you will get those instructions at the end of the case.

10         Now, I think it might be appropriate for me to review

11   what I did during jury selection, and I gave you an idea of

12   what the case was about.  So let me turn to my binder and pull

13   that up one more time for you.

14         As I told you yesterday, an indictment is an

15   accusation.  It's proof of nothing.  It's the means by which a

16   criminal case is commenced.  The defendant has denied the

17   charges made by the government and has pleaded not guilty to

18   the indictment.

19         Count One charges that Mr. Goel conspired or agreed

20   with another individual to violate the federal laws that make

21   it unlawful to commit securities fraud and tender offer fraud.

22   A conspiracy is an agreement between two or more people to

23   commit an unlawful act, and the law punishes that as a separate

24   crime from committing the unlawful act.  The agreement to

25   commit it can be a separate crime.

1          Count Two, Three, and Four each charge that Mr. Goel

2     violated the federal securities laws that make it unlawful to

3     engage in securities trading based on material nonpublic

4     information.

5          Now, each of these Counts, Two, Three, and Four,

6     involve information and trading regarding a separate deal, a

7     separate stock, separate transaction.  So that's why there are

8     three counts there.  That's what the government is alleging.

9          Count Five charges that Mr. Goel violated a federal

10    law that makes it unlawful to commit securities fraud by

11    providing another individual with material nonpublic

12    information that the defendant obtained from his employer

13    Goldman Sachs so that the other individual could execute

14    securities transactions.

15         Count Six charges that Mr. Goel violated a federal law

16    that makes it unlawful to obstruct justice by deleting and

17    causing another individual to delete electronic communications

18    related to the insider trading scheme.

19         Mr. Goel has denied the charges and entered a plea of

20    not guilty.  The law presumes him innocent of all charges until

21    such time, if ever, as the government proves each element of

22    the charge by proof beyond a reasonable doubt.

23         So the indictment is not evidence.  The presumption of

24    innocence remains with the defendant throughout the trial

25    unless and until after hearing and considering all of the

N6DD6GOE1

evidence and my final instructions on the law, you as jurors

are unanimously convinced of his guilt beyond a reasonable

doubt.

Until it is time to deliberate at the conclusion of

the case, it's important that you keep an open mind.  You must

pay close attention to all the evidence.  Evidence consists

only of the testimony of witnesses, documents, and other things

admitted as evidence or stipulations agreed to by the

attorneys.

Certain things are not evidence and must not be

considered by you.  I will list them for you now.

Statements, arguments, and questions by lawyers are

not evidence, nor are my own statements to you.  They are not

evidence.  I'm not a witness, the lawyers are not witnesses.

So what they said to you yesterday in openings is not evidence.

It's a preview of the evidence.  What they say to you in

closings is not evidence.  My instructions on the law are

instructions on the law, they are not evidence.  They are

instructions.

Now, what do I mean when I say a question is not

evidence?  It's the question together with the witness' answer

that makes it evidence.  So let's say the witness is asked,

were you in the owner's box at Yankees Stadium on August 12,

2017, when Derek Jeter came in and said the following.

Derek Jeter, owner's box, 2017, what is this about,

N6DD6GOE1

1    what does this mean, et cetera.  It's a question.  If the

2    witness says no, there's no evidentiary value to the fact that

3    the question was asked.  When I say no, if he denies it, that

4    has evidentiary value in itself.  But you are to infer nothing

5    from the question that may have a factual statement in it

6    because that's just coming out of the lawyer's mouth.  So you

7    listen to the question and the witness' answer and in

8    combination they become evidence.

9         Objections to questions are not evidence, lawyers have

10   an obligation to their clients to make an objection when they

11   believe evidence is being offered for an improper reason under

12   the rules of evidence.  These are technical rules and not

13   things that you need to be concerned with.  You should not be

14   influenced by the objection or the Court's ruling on it.

15        If the objection is sustained, then ignore the

16   question and any answer that may have been given before the

17   Court sustained the objection.  If it's overruled, treat the

18   answer like any other.

19        If you're instructed that some item of evidence is

20   received for a limited purpose, you must follow that

21   instruction.  Something else that is not evidence is testimony

22   that is stricken or excluded.  It happens sometimes in a

23   trial -- it may not happen in this trial -- that an answer will

24   be given or testimony will be given, and then on further

25   reflection and application, the Court may decide to strike that

N6DD6GOE1

1    testimony.  You then have to put it out of your mind and I'll

2    give you an instruction on that if that should happen this in

3    this trial.

4         Something else that is not evidence is anything you

5    may have seen or heard outside the courtroom.  You are to

6    decide the case solely on the evidence presented here.  If you

7    or your family members were involved in a trial, you would want

8    jurors who followed that instruction.

9         So I have a few rules that I'm going to give you to

10   guide you and to keep this case on a fair track.

11        First, do not discuss the case among yourselves or

12   with any other person.  You'll have the opportunity to do so at

13   the end of the case when all the evidence is in and you've

14   heard my instructions.  And as I told you yesterday, that means

15   even going back in the jury room and sawing, wow, that was

16   interesting or, wow, that was boring, or what did you think of

17   that person, that's talking about the case.  That's off limits.

18   Shut it down.  It's not permissible.  It's as simple as that.

19   Plenty of other things in life to talk about this time of year.

20        You're not to read anything in the newspapers or

21   elsewhere about the case, any reporting about the case through

22   any media source.  You're not to conduct any research on the

23   case.  That means you don't Google the lawyers or law firms,

24   the judge, the witnesses, terms that you are unfamiliar with.

25   Oftentimes, and you've probably experienced this, you see

N6DD6GOE1

1    something on the Internet, and if somebody had an opportunity

2    to address it or explain it, you would find out, well, it's not

3    true or it's misleading or it doesn't apply here.  And you're

4    depriving one side or the other of the opportunity to do that,

5    where there may be a simple explanation by going off on your

6    own and doing research.

7            Now, it's a violation of your oath as a juror and a

8    violation of the Court's order to seek out your own information

9    about any matter touching upon the trial.  Your consideration

10   of this case must be on what you observe.

11           Another rule is do not send or receive any electronic

12   communications about the case.  This includes texting,

13   e-mailing, blogging, posting on social media platforms or using

14   other electronic communications to discuss or even mention the

15   case.

16           For example, you may not even post that you're a juror

17   in this case.  This also means no communication with fellow

18   jurors about the case or any lawyer or any witness or any other

19   human being.

20           Now, sometimes in the course of the trial, there may

21   be a circumstance that occurs that requires you to inform the

22   Court of something, maybe you saw or heard something, and

23   you're not sure what to do about it.  Send me a note.

24           If you're in the jury room and you see a fellow juror

25   writing a note, they are doing the right thing by not

N6DD6GOE1

1    discussing it with everybody else.  They're not trying to keep

2    secrets.  That's because if, whatever the circumstances are,

3    requires that juror to withdraw from the case, it will not

4    otherwise pollute or infect other members of the jury.  So the

5    juror is doing the right thing in writing a note and not

6    discussing it and giving it to my deputy to give to me.

7        You're not allowed to speak to anyone about the case.

8    If you're approached by anyone, politely tell them the judge

9    has directed you not to do so.  If any person seeks to contact

10   you about the case, you're required to report the incident to

11   me promptly and I don't expect that will happen in this case.

12       Also, if someone you know comes into the courtroom,

13   send me a note.  This is a public courtroom.  It may be that

14   you're meeting someone for lunch.  There's nothing wrong with

15   that.  But it's important that you not hear anything that goes

16   on in the courtroom while all the jurors are not present.  It

17   becomes necessary for a judge to talk to the parties about

18   issues in the case and these are not issues that are submitted

19   for your consideration as part of the case.

20       The attorneys, the defendant, the witnesses are not

21   permitted to talk to the jury outside the courtroom, not even

22   to offer a friendly greeting.  So if you happen to see them

23   outside the courtroom, they will not and should not speak to

24   you.  Please take no offense at it.  They're going to treat you

25   like a perfect stranger and you should treat them like a

N6DD6GOE1

perfect stranger.  In doing so they will be following and you will be following my instructions.

Now, in deciding the facts of the case you'll have to decide the credibility of the witnesses.  How truthful and believable they are.  Now, how do you decide what to believe and what not to believe?  Well, you're going to listen to the witnesses.  Watch them and observe them and then decide as you would decide questions in your ordinary life.

Did they know what they were talking about?  Were they candid, honest, open and truthful?  Did they have a reason to falsify, exaggerate or distort their testimony.

Sometimes it's not what a witness says, but how he or she says it that may give you a clue as to whether or not to accept that witness' versions of an incident or an event, as credible or believable.  In short, the way a witness testifies may play an important part in your reaching a judgment as to whether or not you can accept the witness' testimony as reliable.

You will use your common sense and good judgment to evaluate their testimony based on all of the circumstances.  I cannot emphasize too strongly that you must keep an open mind until the trial is over.  A case can be presented only step by step.  Witness by witness.  And it would be unfair to one side or the other if you made up your mind before you heard all of the evidence.  We know from experience that frequently we'll

N6DD6GOE1

hear a person give his version of an event which sounds

impressive, even compelling and then you hear another person's

version of the same event or maybe even a later version told by

that first person and what was so compelling at first has been

weakened or dissipated.

Now, there's no legal requirement that law enforcement

agents investigate crimes in a particular way, or that the

government prove its case through any particular means.  While

you are to carefully consider the law enforcement evidence

introduced by the government, you are not to speculate as to

why they used the techniques they did or why they didn't use

other techniques.  The government is not on trial, law

enforcement techniques are not your concern.  Your concern is

to determine whether on the evidence or the lack of evidence,

the defendant's guilt has been proven by the government by

proof beyond a reasonable doubt.

Finally, let me say a few words about the trial

procedure.  Now that openings are concluded, witnesses will be

called.  There is a direct examination and if it's a

government -- if the government calls a witness, the defendant

need not cross-examine that witness.  The defendant has no

burden to do anything in a criminal trial.  But the defendant's

counsel may choose to cross-examine a witness.  And then the

party who called the witness has the opportunity to conduct a

redirect examination.  There are no further examinations beyond

1   the redirect examination except in extraordinary circumstances,

2   the Court may allow it.

3            So as I said, at the end of the case, I will give you

4   detailed instructions on the law, I'm going speak them and I'll

5   also give you a typed set of the instructions which you'll have

6   in the jury room at the end of the case.

7            With that, I turn to the government and invite it to

8   call its first witness.

9            MR. NAFTALIS:  Thank you, your Honor.  The government

10  calls Wendy Gorman.

11   WENDY GORMAN,

12       called as a witness by the Government,

13       having been duly sworn, testified as follows:

14            THE COURT:  All right.  Mr. Naftalis, you may examine.

15            MR. NAFTALIS:  Thank you, your Honor.

16  DIRECT EXAMINATION

17  BY MR. NAFTALIS:

18  Q.  Good morning, Ms. Gorman.  Can you tell the jury where you

19  went to school?

20  A.  Sure.  I did my undergraduate at NYU, and I did my graduate

21  degree at George Washington University.

22  Q.  And since you finished your graduate degree, what graduate

23  degree do you have?

24  A.  I have a master's in business administration.

25  Q.  Since you received that degree, what have you generally

1    done for work?

2    A.  I have been in credit risk for the entirety of my career.

3    Q.  Let's break that down.  When you say "credit," can you

4    explain to the jury what credit is?

5    A.  Sure.  So credit, you extend credit.  So effectively you're

6    making a loan.  And so credit risk is making sure that you get

7    repaid.

8    Q.  And what types of companies have you worked at?

9    A.  Banks.

10   Q.  Why, if at all, is credit risk important to a bank?

11   A.  Sure.  So we make a lot of loans and in our case we make

12   hundreds of billions of loans.  If you don't get repaid, the

13   company wouldn't be solvent and could not exist if you make a

14   bunch of bad loans.

15   Q.  Where do you currently work?

16   A.  I work at Goldman Sachs.

17   Q.  What is Goldman Sachs?

18   A.  We're a global financial institution.  We do banking

19   services and advisory.

20   Q.  Is one of the services that Goldman provides investment

21   banking?

22   A.  Yes.

23   Q.  Can you explain to the jury what investment banking is?

24   A.  So investment banking normally does two services.  You do

25   advice for mergers and acquisitions, so for a company that

1    wants to buy themselves or sell themselves.  And then the other

2    thing we primarily do is offer to raise capital.  That can be

3    debt like a loan, or a bond or it could be equity like you're

4    going to raise stock, public or private.

5    Q.  And when you say advise, they're representing the company?

6    A.  Correct.

7    Q.  Where is Goldman's headquarters?

8    A.  We're in Manhattan, downtown.

9    Q.  What's your current title at Goldman Sachs?

10   A.  I'm a partner and head of credit.

11   Q.  Head of credit.

12          So let's start with your -- are you the chief credit

13   officer?

14   A.  Yes.

15   Q.  Can you tell the jury what that means you do?

16   A.  Sure.  So we talked about credit risk.  So my team is

17   responsible for making sure we make good loans and that we

18   manage and monitor their portfolio until we get repaid.

19   Q.  Do you sit on any committees at Goldman Sachs?

20   A.  I do.

21   Q.  Which ones?

22   A.  I am cochair of a firm-wide capital committee.  I'm on our

23   firm-wide risk governance committee.  I'm on our allowance for

24   loans and losses committee.  I'm on our credit investment

25   committee.  There might be one or two others.

1   Q.  Let's talk about the firm-wide capital committee.

2          Can you explain to the jury what that committee is?

3   A.  Sure.  That committee is responsible for arranging debt

4   financing, so loans, bonds.  Whether we underwrite it or if we

5   do it, it's called best efforts.  So we just help arrange it.

6   Q.  So when you say arranging debt financing, debt financing is

7   what?

8   A.  So debt financing can be a loan, it can be a bond, it's

9   used to raise -- if you want to build a plant, it could be to

10  buy another company, it could be to do a dividend.  They're

11  looking to raise money and we provide a commitment for them to

12  do so.

13  Q.  When you say "they," do you mean companies that are looking

14  to raise money?

15  A.  Yes.

16  Q.  Do you have any particular role on this firm-wide capital

17  committee right now?

18  A.  Yes, I'm cochair currently.

19  Q.  And when did you join the committee itself?

20  A.  I joined in 2017 as a member.

21  Q.  Can you explain to the jury who sits on the committee?

22  A.  Sure.  So it's our firm-wide capital committee, so it tends

23  to be the most senior.  So it's myself as cochair and then I'm

24  with the cohead of global financing and then we also have

25  representatives managing directors from legal, controllers,

1    compliance, other members of the business and other members of

2    credit.

3    Q.  Are any people who are not employed by Goldman Sachs

4    members of this committee?

5    A.  No.

6    Q.  You referred to this a little bit at the beginning of your

7    testimony.  In very rough numbers approximately how many loans

8    does this committee consider a year?

9    A.  So the committee, if I'm including -- we have called child

10   committees, three underneath, which we're responsible for and

11   get posted on what goes, all in we do more than 2,000 loans a

12   year.

13   Q.  Again, in rough numbers, what are the typical sizes of

14   these loans to companies?

15   A.  Sure.  As it goes from firm wide it's hundreds of millions

16   of dollars, could be in multiple billions as well.

17   Q.  Per loan?

18   A.  Correct.

19   Q.  How would you describe the committee's importance at

20   Goldman Sachs?

21   A.  It's very important.  It -- we are responsible for the

22   capital of the firm.

23   Q.  When you say the "capital of the firm," what do you mean?

24   A.  So if I say the credit, so we're extending the credit as I

25   said before.  So if our job is to make sure those are safe and

1    sound loans, our job is holistically to make sure that we're

2    protecting our client's information, and that as we extend

3    those, we're protecting our clients and the firm.

4    Q.  And when you say protecting Goldman Sachs, what do you mean

5    by protecting Goldman Sachs?

6    A.  Making good loans.

7    Q.  What happens if Goldman makes bad loans?

8    A.  The firm would go out of business.

9    Q.  You said that you're also a partner at Goldman Sachs?

10   A.  I am.

11   Q.  What does that mean?

12   A.  So at Goldman it's the highest title you can receive at the

13   firm.

14   Q.  When did you become a partner?

15   A.  2020.

16   Q.  When did you first join Goldman Sachs?

17   A.  2017.

18   Q.  And what was your role when you first joined the firm?

19   A.  I was a managing director and I was responsible for

20   investment banking and credit risk.

21   Q.  So same general responsibilities but just for the

22   investment bank?

23   A.  Correct.

24   Q.  And now it's for the entire company?

25   A.  Correct.

1  Q.  When did you become the chief credit officer?

2  A.  Two years ago.

3  Q.  We're not going to go through the rest of your biography,

4  but have you worked at other banks before joining

5  Goldman Sachs?

6  A.  I worked at two others.

7  Q.  Ms. Gorman, during your career, have you become familiar

8  with mergers and acquisitions transactions?

9  A.  Yes.

10  Q.  Is that sometimes called M&A?

11  A.  Yeah.

12  Q.  Yes?

13  A.  Yes.

14  Q.  Can you tell the jury what M&A is?

15  A.  Sure.  So M&A is mergers and acquisition, you provide

16  advice.  So if a company wants to buy another company, either

17  the buy side, the company that wants to buy it, or the sell

18  side, the one that's being sold, they're looking for advice.

19  And that would include what price to pay, how to negotiate, how

20  to approach them, how to negotiate the document, when to do it.

21  And so it's all that, and that's M&A advice.

22  Q.  And when Goldman is providing M&A advice, what is its

23  position typically called?

24  A.  An M&A adviser.  You can be a buy side or a sell side.

25  Q.  Buy side, you referenced -- when a company is buying a

N6DD6GOE1                    Gorman – Direct

1  company, is that called the acquirer?

2  A.  Correct.

3  Q.  What is buy side?

4  A.  What is buy side?

5  Q.  Yes.

6  A.  So they're buying the company, so it's the acquirer, you're

7  representing the acquirer who wants to buy the company.

8  Q.  And when -- the company that's being purchased, what is

9  that company sometimes referred to as?

10  A.  Simply called a target.  So the target of the acquisition.

11  And so whoever is advising them would be sell side.

12        THE COURT:  Just repeat what you just said, please.

13  The last words.

14        THE WITNESS:  Sure, so if the target company, if they

15  seek advice, that's typically the M&A adviser is called the

16  sell side because they're selling the company.

17        THE COURT:  Thank you.

18  BY MR. NAFTALIS:

19  Q.  And you've referenced this a little.  What types of clients

20  does Goldman typically represent in M&A deals?

21  A.  We can represent a company, we can represent private

22  equity, we can represent a family office, represent an

23  individual.  But typically, its companies are private equity.

24  Q.  Are the companies sometimes publicly traded?

25  A.  Yes.

N6DD6GOE1                    Gorman - Direct

1    Q.   What is a publicly traded company?

2    A.   It's where they trade on a public stock exchange, like the

3    Google on the New York Stock Exchange, or they may be on the

4    NASDAQ.

5           THE COURT:  You have to keep your voice up at the end

6    of the sentence.  We have to get this all down and hear it.

7    The last three words I didn't hear.

8           THE WITNESS:  Okay.  I will do better.

9           THE COURT:  Thank you.  That's all right.

10          THE WITNESS:  So a public company is a company that

11   is -- has public stock.  So I was using an example it can be

12   like Google is on, I think it's on the New York Stock Exchange

13   or NASDAQ, but that's a public company.

14          THE COURT:  Thank you.

15          THE WITNESS:  Mm-hmm.

16   BY MR. NAFTALIS:

17   Q.   And you referenced the term "private equity"?

18   A.   Correct.

19   Q.   What is a private equity firm or private equity company?

20   A.   It can also be called a financial sponsor.  It tends to be

21   a private entity that has investors that are involved like an

22   investment fund.

23   Q.   Let's talk about the basic steps of M&A.  I don't want to

24   go through all the details, but can you walk the jury through,

25   from Goldman's perspective, how an M&A deal could go.  Just

N6DD6GOE1                          Gorman - Direct

1    step by step?

2    A.   So, in essence, a company decides they want to buy a

3    company or it could be an M&A adviser goes to them and says we

4    think this would be a good idea.  You get hired by them, you

5    would talk to them about what are they looking to do, talk

6    about what purchase price makes sense.  You would talk about

7    how to approach the company, you talk about when to do it to --

8    you know, you're cognizant of earnings dates and how they're

9    going to be performing.

10             You would then make an offer.  That can be early on

11   and just say are you interested in being acquired.  It could be

12   as much as sending a letter to the board saying we're willing

13   to acquire you.  And then the M&A adviser would help negotiate

14   because this all ends up with a merger agreement that would be

15   signed with the two companies.

16             THE COURT:  And when you refer to M&A, you are

17   referring to mergers and acquisitions.

18             THE WITNESS:  Yes, correct.

19   BY MR. NAFTALIS:

20   Q.   Now, you said a merger agreement.  What is a merger

21   agreement?

22   A.   A merger agreement, as you do all these negotiations, is at

23   the end.  So the two parties both sign an agreement.  So it's

24   like if you're going to sell your house.  The mortgage

25   agreement at the end you agree to sell your house to this

N6DD6GOE1                    Gorman – Direct

1    person.  You sign a document and it's a binding document that

2    you're selling and buying.

3    Q.  And in connection with a merger agreement, does Goldman

4    sometime provide financial commitments to a company?

5    A.  We do.

6    Q.  Explain how that works.

7    A.  So alongside this, if you're going to buy a company,

8    they're going to say, well, how are you going to pay for the

9    company if you're going to buy it, and it could be debt or

10   stock.  And so if it's going to be on debt commitments, you

11   provide a commitment that goes alongside it.

12   Q.  Is a debt commitment a commitment to give a loan to one

13   company?

14   A.  Yes.

15   Q.  Kind of like a mortgage?

16   A.  Correct.

17   Q.  After those documents are signed what, if any,

18   announcements are made?

19   A.  So typically the next day you're making a public

20   announcement.

21   Q.  And how, if at all, is that public announcement typically

22   made?

23   A.  So there typically is a press release as well as they are

24   required to file with the Securities and Exchange Commitment,

25   what's called an 8-K.  So when something material is happening

1    and they'll announce the acquisition, how much they're paying

2    for it and they'll typically attach the press release with it.

3    Q.   Is the 8-K just the name of the firm that the SEC uses?

4    A.   Yes.

5    Q.   Now, let me just ask you some questions and these are all

6    based on your experience working at Goldman Sachs and at other

7    investment banks.

8             Before the public announcement of an M&A transaction,

9    is the fact the two companies are talking to each other

10   considering a transaction public or nonpublic information?

11   A.   It is nonpublic information.

12   Q.   Before the public announcement of an M&A transaction, are

13   the potential terms that the parties are considering, such as

14   the price, is that public or nonpublic information?

15   A.   Nonpublic.

16   Q.   Before the public announcement of an M&A transaction, is

17   the potential signing of the merger agreement public or

18   nonpublic information?

19   A.   Nonpublic.

20   Q.   Can you explain to the jury why those different types of

21   information are nonpublic?

22   A.   Sure.  So if we think about the information that would be

23   in there, who you're buying, the price that you could be

24   buying, when you would announce it, it's termed material

25   nonpublic information.  And effectively, it's information that

1    other people shouldn't have and could act on.  I use the

2    example of it's like someone gives you the answer key to a test

3    for the next day.  And what's in all that information is

4    essentially the answer key.

5    Q.  Ms. Gorman, in your experience after a transaction is

6    publicly announced, what generally happens to the share price

7    of the target company, the company that's getting acquired?

8    A.  Sure.  It would go up to what the offer price is.

9    Q.  And can you explain why that typically happens?

10   A.  Let's say your stock is at $10 a share, I'm going to buy

11   you at $15 a share.  If I announce that, the stock is going to

12   rise to what you're being purchased as because someone is

13   willing to buy that price because you know you're going to get

14   that amount of money.

15   Q.  Now let's go back to this firm-wide capital committee.  I'm

16   just going to call it "the committee" to make it easier, is

17   that okay?

18        You testified earlier that this committee does what?

19   A.  So we approve debt commitments.

20   Q.  Including when Goldman is lending company to one company in

21   an M&A deal?

22   A.  Correct.

23   Q.  What, if any, documents are provided to the committee when

24   it's considering whether to approve one of these debt

25   commitments?

N6DD6GOE1                         Gorman - Direct

1    A.   Sure.  So we get a memo normally 24 to 48 hours before and

2    the memo is the approval document that we read to make our

3    decisions.

4    Q.   Who typically drafts this memo?

5    A.   What's called the deal team, so the team that's working,

6    the investment banking team that's working on the transaction.

7    Q.   We're going to look at some of these memos, but before we

8    do, can you tell the jury what types of information are

9    generally in them?

10   A.   Sure.  So it starts off with the deal team, like who's on

11   it and who is responsible for it.  And then it talks about what

12   the transaction is, so who's buying, who's selling, what the

13   purchase price would be, when we think it would be announced.

14           It gives projections, so financial information of how

15   they think it would perform over time.  Essentially, the whole

16   point of it, how if we're going to -- we might hold the

17   commitment or we might try to sell it and how you would

18   distribute that commitment.  How we think the stock will

19   perform.  It's essentially to help us make what I call a good

20   loan, a safe and sound loan.

21   Q.   Is this type of information that's in these memos public or

22   private at the time the memos are sent to the committee?

23   A.   Private.

24   Q.   Does Goldman Sachs restrict access to these memos within

25   the firm itself?

1    A.   Yes.

2    Q.   Why?

3    A.   Because it has material nonpublic information.

4    Q.   In general, when during the deal negotiation process is

5    approval typically sought for a loan in an M&A deal?

6    A.   So if you're going to do a commitment for it, it's

7    typically anywhere between a couple days or two weeks before

8    where they'll finalize a financing commitment.

9    Q.   Couple days or couple of weeks before what?

10   A.   Sorry, the merger agreement is signed and it's publicly

11   announced.

12   Q.   Fair to say it's one of the last steps of the deal?

13   A.   It is.

14        MR. NAFTALIS:  Your Honor, at this time I'd like to

15   read a stipulation between the parties.

16        THE COURT:  Is it a stipulation of fact or of

17   testimony?  Or both?

18        MR. NAFTALIS:  This one is testimony.

19        THE COURT:  Pardon me?

20        MR. NAFTALIS:  Testimony.

21        THE COURT:  Okay.  Ladies and gentlemen, a stipulation

22   is an agreement between the parties to the case.  A stipulation

23   as to testimony is a stipulation that if called, a witness

24   would testify to a certain set of facts or circumstances.  You

25   must accept that if called, such a witness would testify in

1    that manner.  The weight, if any to give -- to give to that

2    testimony, however, is entirely for you, the jury to decide.

3              Now, Mr. Naftalis, I'm going to give you the

4    opportunity to read the preamble to the stipulation, but going

5    forward for both sides, you'll get right to the heart of the

6    agreement.  But for the first time, the jury can hear the

7    preamble.

8              MR. NAFTALIS:  Yes, your Honor.

9              THE COURT:  Which is, I don't know want to say it's

10   just lawyer talk, but you might decide that's just what it is.

11             Go ahead.

12             MR. NAFTALIS:  It's a lot of mention of lawyers in

13   this one.

14             The preamble says:  It is hereby stipulated and agreed

15   by and among the United States of America, by Damian Williams,

16   United States Attorney for the Southern District of New York,

17   Joshua N. Naftalis, Samuel P. Rothschild, and Andrew Thomas,

18   Assistant United States Attorneys, of counsel, and

19   Brijesh Goel, the defendant, with the consent of his attorneys,

20   Reed Brodsky, Adam C. Ford, and Anjula Prasad, that:

21             Number 1, if called as a witness, an employee of the

22   Goldman Sachs Group, Inc., referred to as Goldman Sachs, would

23   testify as follows:

24             A.  The records reflected in Government Exhibits 100

25   through 141 and 143 were retrieved from Goldman Sachs' files or

1   created by a person with knowledge of or created from

2   information transmitted by a person with knowledge of the

3   information shown, were created at or near the time the

4   information became available to Goldman Sachs and were created

5   and maintained by Goldman Sachs as part of its regularly

6   conducted business activities;

7           B.  Between April 24, 2017, and June 20, 2018,

8   Brijesh Goel was a member of the Goldman Sachs e-mail

9   distribution list for Goldman Sachs' firm-wide capital

10  committee, the address being

11  GS-FWCC-distribution@internal.e-mail.GS.com, which included

12  only Goldman Sachs employees;

13          C.  On February 12 and 13, 2017, Brijesh Goel was a

14  member of the Goldman Sachs e-mail distribution list for

15  Goldman Sachs' credit markets capital committee with the

16  address FW-CMCC-distribution@internal.e-mail.GS.com, which

17  included only Goldman Sachs employees;

18          And D.  As a member of Goldman Sachs' firm-wide

19  capital committee and credit market capital committee internal

20  e-mail list, Goel received the e-mails reflected in Government

21  Exhibits 103 through 141.

22          2.  It is further stipulated and agreed that this

23  stipulation and government exhibits 100 through 141 and 143 may

24  be received in evidence as government exhibits at trial.

25          THE COURT:  And you're offering them now?

N6DD6GOE1                      Gorman – Direct

1              MR. NAFTALIS:  Yes, your Honor.  We offer Government

2     Exhibit 500, which is the stipulation, and we offer

3     Exhibits 100 through 141 and 143.

4              THE COURT:  Any objection?

5              MR. FORD:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibits 500, 100 through 141, 143

8     received in evidence)

9              (Continued on next page)

1    BY MR. NAFTALIS:  (Continued)

2    Q.  Can we please bring up Government Exhibit 116 in evidence.

3         Ms. Gorman, in front of you there's a binder with

4    these exhibits in case that's easier for you to go through.

5         We are going to get to the specifics in a second.

6    Just to orient the jury, can you tell them what type of a

7    document we're looking at here?

8    A.  Sure.  So this is what's referred to as like a top sheet.

9    It tells you what the memo is going to be about.

10   Q.  Is this an email?

11   A.  Yes.

12   Q.  And what is attached to this email?

13   A.  The memo I referred to earlier.

14   Q.  So let's walk through the top of the email.  Who is this

15   email sent to?

16   A.  It's sent to the GS Firmwide Capital Committee FWCC –

17   distribution.

18   Q.  In September of 2017, were you on the committee at the

19   time?

20   A.  I was.

21   Q.  And you received this email?

22   A.  I did.

23   Q.  To your recollection, in September of 2017, what types of

24   people were on this email list?

25   A.  So it would have been the members of the committee, and

N6DQgoe2                           Gorman - Direct

1   then it would also include other people who were felt to know

2   on a need-to-know basis were on there.

3            MR. NAFTALIS:  Your Honor, for reference, Government

4   Exhibit 500 reflects that Government Exhibit 116 was received

5   by Mr. Goel in the stipulation.

6   Q.  What is the date of this email?

7   A.  September 1, 2017.

8   Q.  It's at 9:26 a.m.?

9   A.  Correct.

10  Q.  What is the first line of the email?

11  A.  For Internal Use Only - Do Not Forward Externally.

12  Q.  That's what's in red bold and caps?

13  A.  Correct.

14  Q.  What do you understand this to mean?

15  A.  It's telling you that this information has to remain

16  internal because, I mean, from what our training is, it has

17  material nonpublic information.

18  Q.  In your experience, do these top sheet emails have a

19  similar format?

20  A.  Yes, they all do.

21  Q.  Do they all include this warning at the top?

22  A.  Yes, they do.

23  Q.  Let's walk through the rest of the email.

24           It says the committee is the Firmwide Capital

25  Committee, right?

1   A.  Correct.

2   Q.  It then says committee date, and it says September 6, 2017.

3   What does committee date mean?

4   A.  That's the date the committee would have met to discuss a

5   transaction.

6   Q.  To approve whatever's being asked for?

7   A.  Correct.

8   Q.  And the memo –– excuse me –– the email is dated

9   September 1, right?

10  A.  Correct.

11  Q.  So the committee is meeting a few days later?

12  A.  Yes.

13  Q.  There is then a section called Management Committee Summary

14  paragraph?

15  A.  Mmm–hmm.

16  Q.  Generally, what's in this paragraph?

17  A.  So this describes what the commitment is going to be, and

18  that we're providing finance commitment, like to who, to buy

19  what.

20  Q.  It's like a summary what's in the memo behind it?

21  A.  Yes.

22  Q.  Can you read the first line in this paragraph?

23  A.  Sure.  "This transaction has not been publicly announced."

24  Q.  When the memos say a transaction has not been publicly

25  announced, what does that mean?

1    A.  It means it has -- there's been no 8K.  It's not been

2    leaked to the press.  It's confidential.

3            THE COURT:  No form 8K has been filed with the SEC.

4    Is that what you mean?

5            THE WITNESS:  Correct.

6            THE COURT:  Thank you.

7    Q.  So the deal is secret at this point?

8    A.  Yes.

9    Q.  It then says, "Goldman Sachs to provide financing

10   commitments for $1.3 billion bridge loan to support Kuraray

11   Company Limited's tender offer to acquire Calgon Carbon

12   Corporation," right?

13   A.  Mmm-hmm.

14           THE COURT:  You have to answer in words.

15   A.  Yes.

16   Q.  Let's go through the sentence just so the jury follows

17   along.  It says -- first, what kind of company was Kuraray?

18   A.  They were a chemical company.

19   Q.  What kind of company was Calgon Carbon?

20   A.  A different type of chemical company.

21   Q.  Afterwards, it says in parentheses CCC.  Do you see that?

22   A.  Yes.

23   Q.  Was Calgon Carbon a publicly traded company at the time, do

24   you recall?

25   A.  Yes.

N6DQgoe2                          Gorman - Direct

1   Q.   And CCC is what?

2   A.   What's referred to as their ticker, their stock ticker.

3   Q.   It says Goldman to provide financing commitments for a

4   $1.3 billion bridge loan.

5          The sentence says Goldman Sachs to provide financing

6   commitments for a $1.3 billion bridge loan.  What does that

7   mean Goldman was being asked to do here?

8   A.   So Goldman was providing a loan of $1.3 billion to Kuraray.

9   Q.   And it says, to support Kuraray's tender offer to acquire

10  Calgon Carbon.  In very basic terms, what is a tender offer?

11  A.   A tender offer is a public announcement of what you're

12  willing -- the price you're willing to offer to buy the shares

13  and a period of time when you're willing to offer them.

14  Q.   Is it a way that one company can buy another, effectively?

15  A.   Yes.

16  Q.   Let's go back to the full email.  If we could zoom out

17  entirely.

18          What's written at the very bottom of this page, the

19  last line on the email?

20  A.   Not for Distribution Outside Goldman Sachs.

21  Q.   Let's go to the next page of this exhibit.

22          This is the attachment.  Is that correct, Ms. Gorman?

23  A.   Yes.

24  Q.   What's the title of the document?

25  A.   Confidential Capital Committee memo.

N6DQgoe2                          Gorman – Direct

1    Q.  Before we go through the memo, what is written in red caps

2    and bold at the top?

3    A.  Sure.  It's For Internal Use Only – Do Not Forward

4    Externally.

5    Q.  If you could just flip through the memo, how many pages is

6    this memo?

7    A.  28.

8    Q.  What, if anything, is written at the top of every page?

9    A.  Every page would say For Internal Use Only – Do Not Forward

10   Externally.

11   Q.  Let's go back to the first page of the email -- the first

12   page of the attachment, excuse me.  Let's look at the bottom of

13   the email.  Where it says, "Please be aware."  Zoom in on that.

14         It says in italics and bold, "Please be aware that, to

15   the extent this memorandum contains material nonpublic

16   information, the use of this information is restricted by law

17   (including, but not limited to, provisions of the U.S.

18   securities laws) and the firm's policies.  Inappropriate use or

19   disclosure of this information could have serious consequences

20   for you and the firm, including potential criminal liability."

21         What's your understanding of what this sentence means?

22   A.  It's made very clear that if you use material nonpublic

23   information, you're violating the firm's policies as well as

24   breaking the law.

25   Q.  Now, we talked about how the top sheet email has a

1    consistent format.  In your experience, do the memos sent to

2    the committee also have a consistent format?

3    A.  Yes, they do.

4    Q.  Do they each include the bold red warning at the top of

5    every page?

6    A.  Yes.

7    Q.  Do they each include this black italicized warning?

8    A.  Yes, they do.

9    Q.  We are not going to go through the entire memo, but what

10   types of information are generally in these memos?

11   A.  So it would have what the purpose of the loan is.  So it

12   would have who -- if it was a merger and acquisition

13   transaction, it would have who the purchaser, who the target

14   is, the price they would buy it, the debt they needed,

15   projections, when they think the announcement would be made,

16   and a timetable on there as well.

17   Q.  The parties?

18   A.  Yes.

19   Q.  The terms of the deal?

20   A.  Yes.

21   Q.  The timing of the deal?

22   A.  Yes.

23   Q.  And analysis?

24   A.  Yes.

25   Q.  Let's go to the fifth page of this exhibit, which is the

1  fourth page of the memo.  This is the executive summary

2  section?

3  A.  Yes.

4  Q.  In general, what is an executive summary?

5  A.  So it is essentially giving you an overview of what's in

6  the memo.

7  Q.  The first phrase of the second paragraph says what?

8  A.  "Due to the sensitivity of confidentiality, Kuraray has

9  requested GS to provide a bridge commitment letter in

10  connection with the acquisition."

11  Q.  Let's go down to process, which is right below that

12  paragraph.  It says in the first sentence, "Kuraray and CCC" --

13  that's Calgon Carbon, right?

14  A.  Yes.

15  Q.  -- "have reached a nonbinding agreement on price and are

16  currently in the stage of confirmatory due diligence."

17          What is a nonbinding agreement on price?

18  A.  It means the two parties have agreed on the price, but no

19  one has signed the final merger agreement because there's still

20  more work to do to make sure they feel comfortable with the

21  price.

22  Q.  We'll skip confirmatory due diligence for now.

23          As of the date of this memo, which is September 1,

24  2017, was the fact that Kuraray had reached a nonbinding

25  agreement to buy Calgon Carbon public or nonpublic information?

1    A.   Nonpublic.

2    Q.   Now, in the next sentence it says, "Anticipated signing of

3    merger agreement is around September 21, 2017 at the earliest."

4            What does that mean?

5    A.   So it means we expect them to sign the merger agreement and

6    then publicly announce on September 21, 2017.

7    Q.   And that's about -- we saw the memo was dated the 1st?

8    A.   Mmm-hmm.

9            THE COURT:   Again --

10   A.   Yes.

11           THE COURT:   Thank you.

12   Q.   That's about three weeks away?

13   A.   Yes.

14   Q.   As of the date of this memo September 1, 2017, was the fact

15   that a deal between Kuraray and Calgon Carbon could be

16   announced as early as September 21, 2017 public or nonpublic

17   information?

18   A.   Nonpublic.

19   Q.   Let's go to the 16th page of this Exhibit, which is page 15

20   of the actual memo.  Let's look at the left side of the page

21   and zoom in on the assumption section.

22           In the fourth line, it says, "Acquisition price per

23   USD," and then it says, "$21.50."  What is USD?

24   A.   U.S. dollar.

25   Q.   What does this mean?

N6DQgoe2                    Gorman - Direct

1    A.  So this is the price that we expect them to offer for

2    Calgon Carbon.

3    Q.  And it says -- when it says $21.50 per share, that's per

4    share of what?

5    A.  Of stock.

6    Q.  As of September 1, 2017, the date of the memo, was the fact

7    that the agreed-upon sale price was $21.50 a share public or

8    nonpublic information?

9    A.  Nonpublic.

10   Q.  Now, below the $21.50 line, it says, "CCC's stock price as

11   of 8/21/17, $12.50," then it says, "premium percentage

12   72 percent."

13           Can you explain what those lines mean?

14   A.  Sure.  What they're saying is on the date of August 21, the

15   stock was actually trading at $12.50, and then the premium

16   refers to how much more the company is willing to pay, which in

17   this case was 72 percent more than $12.50, or $21.50.

18   Q.  Now, Ms. Gorman, did there come a time when Kuraray and

19   Calgon formally agreed to a transaction?

20   A.  Yes.

21           MR. NAFTALIS:  Can we bring up for identification

22   Government Exhibit 334?

23           Your Honor, I've consulted with Mr Ford.  We offer

24   Government Exhibit 334 in evidence.

25           THE COURT:  No objection?

```
 1              MR. FORD:  No objection.

 2              THE COURT:  Received.

 3              (Government's Exhibit 334 received in evidence)

 4   Q.  Ms. Gorman, you see at the very top of this page it says a

 5   8K?

 6   A.  Yes.

 7   Q.  Is that the document you were referring to earlier?

 8   A.  Yes.

 9   Q.  Let's go to -- this one says Calgon Carbon on the front.

10   Yes.  Let's go to page 8 of this document.

11              So this is an attachment to the SEC filing?

12   A.  Correct.

13   Q.  What are we looking at here?

14   A.  This is the public announcement about the transaction.

15   Q.  Is this the press release?

16   A.  Yes.

17   Q.  What is the title of the press release?

18   A.  Calgon Carbon Corporation Announces Agreement To Be

19   Acquired by Kuraray.

20   Q.  And if you look below the bold, it says, "Pittsburgh,

21   Pennsylvania; Tokyo, Japan."  What is the date of the press

22   release?

23   A.  September 21, 2017.

24   Q.  And right above that, it says, "Calgon Carbon stockholders

25   to receive cash of $21.50 a share," right?
```

1    A.   Yes.

2    Q.   Those are the terms of the deal?

3    A.   Yes.

4    Q.   Can we bring up Government Exhibit 116 side by side with

5    this.  Let's look at the first page.

6            The press release is a press release announcing a deal

7    between Calgon Carbon and Kuraray.  Is that right?

8    A.   Yes.

9    Q.   And the internal memo was with regard to what companies?

10   A.   Kuraray and Calgon Carbon.

11   Q.   Let's go to page 5 of Government Exhibit 116.  And zoom in

12   on the process section.

13           What date does the memo say that the merger agreement

14   was anticipated to be signed by?

15   A.   September 21, 2017.

16   Q.   What is the date on the press release again?

17   A.   September 21, 2017.

18   Q.   Let's go to page 16 of Government Exhibit 116.

19           Looking at the left side again, the acquisition price

20   set forth in the memo is what?

21   A.   $21.50.

22   Q.   What does the press release say the actual acquisition

23   price was?

24   A.   $21.50.

25   Q.   We can take that down, please.  Can we bring up Government

1    Exhibit 108 in evidence?

2              Ms. Gorman, what are we looking at here?

3    A.  This is an email with the top sheet describing the

4    transaction.

5    Q.  Who was it sent to?

6    A.  GS FWCC Distribution.

7    Q.  Is that the committee, the Firmwide Capital Committee

8    internal email address?

9    A.  Correct.

10             MR. NAFTALIS:  Your Honor, pursuant to Government

11   Exhibit 500, the parties have stipulated that Mr. Goel received

12   this memo.

13             THE COURT:  Is that correct?

14             MR. FORD:  Yes, your Honor.

15             THE COURT:  Thank you.

16   Q.  Ms. Gorman, what's the date on this email?

17   A.  April 24, 2017.

18   Q.  Again, what's the first line of the email?

19   A.  For Internal Use Only – Do Not Forward Externally.

20   Q.  And in the management committee summary paragraph, what's

21   the first sentence again?

22   A.  This transaction has not been publicly announced.

23   Q.  Let's look at the memo itself.  Let's go to page 5, please,

24   of the Exhibit, which is the fourth page of the memo.  Let's

25   look at the top paragraph titled transaction.

N6DQgoe2                                Gorman – Direct

1          The first sentence reads, "Thermo" –– that's an

2     abbreviation for what company?

3     A.   Thermo Fisher Scientific.

4     Q.   "Thermo has engaged Goldman Sachs as lead financial advisor

5     and lead financing bank for the potential acquisition of

6     Patheon, an NYSE-listed Netherlands, Inc. contract development

7     and manufacturing organization."

8          Let's step back.  Look under value considerations.

9     What is the first sentence under value considerations?  Can you

10    read that?

11    A.   Sure.  So "On March 24, Thermo submitted to Patheon a bid

12    with the range of $33 to $36 per share equating to an equity

13    valuation and total EV or enterprise value of $4.8 billion to

14    $5.3 billion and $6.8 billion to $7.3 billion, respectively."

15    Q.   Let's look at the first part.  It says March 24, that's

16    2017, right?

17    A.   Yes.

18    Q.   Thermo submitted to Patheon a bid with a range of $33 to

19    $36 per share?

20    A.   Yes.

21    Q.   Explain what that means happened in practice?

22    A.   So what happened, they went to –– Thermo Fisher went to

23    Patheon and said are you willing to entertain a bid for us to

24    buy you for $33 to $36 a share.

25    Q.   The next sentence says, "Initial feedback from the seller."

1    That's Patheon, right?

2    A.  Yes.

3    Q.  "Was that a final bid would need to be at the high end of

4    the range or higher in order to come to a final agreement."

5              So in terms of the deal negotiation process, what does

6    that mean?  What's going on?

7    A.  So the seller, or Patheon, has said we're willing to talk

8    to you about an acquisition, but it's not going to be $33.  It

9    needs to be closer to $36 or higher.

10   Q.  What's your understanding of whether this potential

11   transaction involving Thermo Fisher and Patheon was public or

12   nonpublic at the time?

13   A.  It was nonpublic.

14   Q.  And what about the potential terms of the deal?  Was that

15   public or nonpublic at the time?

16   A.  Nonpublic.

17   Q.  Let's go to the 20th page of this Exhibit, which is page 19

18   of the memo.  This section is called timetable.  We haven't

19   looked at this type of a section yet, right?

20   A.  Correct.

21   Q.  When it says timetable, what does that mean?

22   A.  So this is a timetable that we've made a loan.  And we're

23   making a loan of $8 billion, and the firm's intention is to

24   sell it down.  And so it's a timetable of when we signed the

25   commitment letter and when the acquisition closes, and when we

N6DQgoe2                         Gorman – Direct

1  get down to our final hold of how much debt we would want to

2  hold.

3  Q.  When you say "sell down and final hold," what do you mean?

4  A.  So sell down, we could sell to other banks who come into

5  this commitment, we could sell to bondholders or debt holders,

6  whatever the ultimate end financing that the company would be

7  looking to do.

8  Q.  Let's look at the very first line in terms of where it says

9  Events, it says "Sign commitment letters" and then it says "8

10 May 2017."  What does that mean?

11 A.  So that means for Goldman and the company, we would sign a

12 commitment letter.  There's a single sign where we sign, and

13 then the company would countersign which would make it a

14 binding agreement.

15 Q.  In your experience, after a commitment letter is signed,

16 what, if any public, disclosures are typically made?

17 A.  Typically very shortly thereafter a deal.

18 Q.  A deal?

19 A.  Correct.

20 Q.  And this memo was dated April 24 of 2017.  Is that right?

21 A.  Yes.

22         MR. NAFTALIS:  Your Honor, we are going to offer

23 without objection, I believe, Government Exhibit 332.

24         THE COURT:  Any objection?

25         MR. FORD:  No objection, your Honor.

1              THE COURT:  Received.

2              (Government's Exhibit 332 received in evidence)

3    Q.  What type of document are we looking at here, Ms. Gorman?

4    A.  This is a form 8K.

5    Q.  It says Thermo Fisher Scientific on the cover?

6    A.  Correct.

7    Q.  Let's look at page 7, please.

8              What's the attachment that we're looking at here?

9    A.  This is a press release announcing the transaction.

10   Q.  Let's just go through it.

11             What's the title of it?  It says kind of below the

12   contact information, what's the title?

13   A.  Sure.  "Thermo Fisher Scientific to acquire Patheon, a

14   leading contract development and manufacturing organization."

15   Q.  And below the bullets, it says, "Waltham, Mass and Durham,

16   North Carolina."  And then what's the date of the press

17   release?

18   A.  May 15, 2017.

19   Q.  I'll read what comes after it.  It says,

20   "Thermo Fisher Scientific, Inc. (NYSE TMO) the world leader in

21   serving science and Patheon N.V., (NYSE PTHN), a leading global

22   provider of high-quality drug development and delivery

23   solutions to pharmaceutical and biopharma sectors today

24   announced that their boards of directors have approved Thermo

25   Fisher's acquisition of Patheon.  Thermo Fisher will commence a

N6DQgoe2                          Gorman – Direct

1  tender offer to acquire all of the issued and outstanding

2  shares of Patheon for $35 per share," right?

3  A.  Yes.

4  Q.  Can we please bring up Government Exhibit 108, which we

5  were just looking at, side by side with this press release.

6          If we just zoom in on the management committee summary

7  paragraph again.

8          What was the transaction being discussed in this

9  internal memo?

10  A.  It was for Thermo Fisher Scientific to buy Patheon.

11  Q.  And what transaction was announced on -- in the press

12  release?

13  A.  The same.

14  Q.  Let's go to page 5 of the Government Exhibit 108.  In the

15  value consideration section, we went over this paragraph, and

16  this was the paragraph that said the initial bid was in a range

17  of $33 to $36 a share, right?

18  A.  Correct.

19  Q.  And the feedback was you got a bid at the high end of the

20  range, right?

21  A.  Yes.

22  Q.  What was the ultimate agreed-upon price in the press

23  release?

24  A.  $35 a share.

25  Q.  Is that at the high end of the $33 to $36 share range?

1    A.  Yes.

2    Q.  Can we please go to page 20 of the memo, which is

3    Government Exhibit 108.  What was the indicative date to sign

4    the commitment letters?

5    A.  May 8, 2017.

6    Q.  What's the date of the press release?

7    A.  May 15, 2017.

8    Q.  Now, Ms. Gorman, in your experience, when these memos

9    predict an anticipated announce date, do they always stick?

10   A.  No.

11   Q.  Why not?

12   A.  Because people -- they're negotiating the merger agreement,

13   they're negotiating the finance commitment.  So those things we

14   expect could take -- it could be on the date, but it could also

15   take some time.

16   Q.  In this case, it took a week longer?

17   A.  Correct.

18   Q.  Let's bring up Government Exhibit 103 in evidence.  Let's

19   zoom in on the top third, please.

20            Again, what kind of an email are we looking at here?

21   A.  This is FW CMCC-distribution.

22   Q.  We haven't talked about the CMCC yet.  What does that stand

23   for?

24   A.  It's the Credit Market Capital Committee.  That's a --

25   Firmwide Capital Committee has three what we call children

1  committees.  You have CMCC.  Then you have an Asia committee.

2  Then you have a different type of lending committee called

3  Structured Finance Capital Committee.  So the parent committee

4  is Firmwide Capital Committee, and this is a child committee.

5  Q.  So the jury follows it, you're the co-chair of the Firmwide

6  Capital Committee?

7  A.  Yes.

8  Q.  And there are three subcommittees?

9  A.  Correct.

10 Q.  One of which is this Credit Market Capital Committee?

11 A.  Correct.

12 Q.  What's the relationship, if any, between the Credit Market

13 Capital Committee and the Firmwide Capital Committee?

14 A.  So Firmwide Capital Committee is still responsible for

15 everything that happens in Credit Market Capital Committee, but

16 there are different people that are involved in the committee

17 and it tends -- the way it is determined is the size of the

18 committee.  So over a certain amount, it would go to Firmwide

19 Capital Committee or if anyone had any concerns, risks,

20 reputational, they could send it up to Firmwide.

21 Q.  So smaller deals go to the child committee?

22 A.  Yes.  Better way to say it.  Yes.

23 Q.  Bigger deals go up to the top?

24 A.  Yes.

25 Q.  As co-chair of the Firmwide Capital Committee what, if any,

1  oversight do you have over the Credit Market Capital Committee?

2  A.  So we're ultimately held responsible, and we get a posting

3  before any of the committees of what's going to the other

4  committees, so that we're aware of them.

5  Q.  How does the process, the internal Goldman approval process

6  for the Capital Markets Capital Committee compare to the

7  Firmwide Capital Committee's process?

8  A.  So other than the people on the committee, it's identical.

9  Q.  Let's go back to the memo, which is Government Exhibit 103.

10  It's to this internal distribution list FW CMCC-distribution,

11  and the parties have stipulated in Government Exhibit 500 that

12  Mr. Goel received this memo.

13            What's the date of the memo?

14  A.  February 12, 2017.

15  Q.  Again, this one has the For Internal Use Only – Do Not

16  Forward Externally legend?

17            THE COURT:  Keep your voice up.

18            MR. NAFTALIS:  Sorry, your Honor.

19  Q.  This much memo has the For Internal Use Only – Do Not

20  Forward Externally legend, right?

21  A.  Yes.

22  Q.  Let's look at the attachment, please.  We'll go to page 4

23  of the Exhibit, which is page 3 of the memo.

24            Let's look at the top where it says the transaction.

25  It says, "Goldman Sachs has been invited by EQT Partners

1   (Sponsor) to provide committed financing for its bid to acquire

2   Lumos Networks Corporation (Lumos or the Company) for total

3   consideration of approximately $1 billion."

4           So if you could just break down what is being proposed

5   here.

6   A.   Sure.  So EQT is a sponsor, so instead of a company

7   purchasing another company, it is a financial sponsor

8   purchasing a company.  And they've asked us to provide

9   committed financing so that they can buy Lumos Network for a

10  billion dollars.

11  Q.   When you say a financial sponsor, is that like a private

12  equity firm?

13  A.   Correct.

14  Q.   When you say committed financing, that's a loan?

15  A.   Yes.

16  Q.   In the memo when it says "for total consideration of an

17  approximately $1 billion," what does total consideration mean?

18  A.   It means how much that they have to pay to buy the company.

19  Q.   So EQT is bidding a billion dollars for Lumos?

20  A.   Yes.

21  Q.   Let's go down a couple paragraphs to the --

22          THE COURT:  All right.  We're going to take our

23  mid-morning break, ladies and gentlemen.  Please do not discuss

24  the case among yourselves or with anyone.  Please keep an open

25  mind.  We'll be back in action in ten minutes.

N6DQgoe2                          Gorman - Direct

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. BRODSKY:  Your Honor, I was just going to raise --

3  I have already previewed it with the government -- a few very

4  minor points.  One, the government did.

5          THE COURT:  You may step down.  Do you mind stepping

6  out?  And everybody else may be seated.

7                          (Witness not present)

8          MR. BRODSKY:  Sorry, your Honor.

9          The government let us know this morning, and we

10  appreciated it, that they mentioned in the opening six

11  securities, saying that CBI was not one of the -- they had it

12  seven originally, and then they opened on six, and we asked

13  them which one wasn't in the opening, and they said CBI.  So we

14  just wanted to note that for your Honor.

15         THE COURT:  Thank you.

16         MR. BRODSKY:  The request we had was, your Honor

17  informed us with respect to the healthcare records, specific

18  portions that -- specific language from the healthcare records.

19         Would your Honor consider providing us with a redacted

20  page of those portions -- and I'll explain why I would ask for

21  that -- if we cross-examine on that, and we would preview what

22  we would cross-examine in this area because we know the

23  government may want to have a position on it.  But what we

24  would intend to do, your Honor, if we had to the redacted page

25  or pages that are relevant from the healthcare records, is it

1   is a lot more effective in refreshing a witness's recollection.

2           I'm not suggesting I'm going to be introducing it, but

3   I find it much more effective -- I know you can use anything to

4   refresh recollection.  You can use a paper shoe, paper bag,

5   but -- I could write it down, but that's not as effective to

6   refresh a witness's recollection as a page from somebody's own

7   healthcare records.

8           THE COURT:  Thank you for raising it.  I appreciate

9   that.  It's the right thing to do.  I'll give the opportunity

10  to the government to respond.

11          Anything else?

12          MR. BRODSKY:  The only other thing, if your Honor --

13  it doesn't have to be now, so...

14          THE COURT:  That's fine.  Flo, if you can mark this, I

15  guess as Court Exhibit 2, a note from Juror No. 6.  And I'm

16  directing my deputy to show it to each side, and you will let

17  me know if there is anything you think I need to do about it,

18  okay?

19          MR. ROTHSCHILD:  Your Honor, my apologies.  Just

20  noting for the record that TransPerfect, the vendor to whom the

21  defense had issued the subpoena, produced documents in response

22  to the subpoena last night, both to the defense and to the

23  government.  We, at our urging, TransPerfect's general counsel

24  was present in the courtroom this morning.  We notified the

25  defense of that fact and asked if they had any issues

N6DQgoe2                         Gorman – Direct

1   surrounding TransPerfect's production to bring to the Court's

2   attention.  We heard no issues brought to the Court's

3   attention.

4            THE COURT:  Excellent.  Thank you very much.

5            (Recess)

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury present)

2                THE COURT:  Mr. Naftalis, whenever you're ready.

3                MR. NAFTALIS:  Thank you, your Honor.

4      BY MR. NAFTALIS:

5      Q.   If we could bring back up Government Exhibit 103.  We were

6      on the fourth page of the exhibit.

7                Just to remind the jury, we were looking at a memo

8      regarding EQT Partners' bid to acquire a company called Lumos.

9                Is that right, Ms. Gorman?

10     A.   Yes.

11     Q.   Under the GS Role and Process section, let's just zoom in

12     on that box:  In the second sentence, it says "EQT intends to

13     sign and announce a transaction on Monday, February 13, and has

14     asked GS and other lenders for signed commitment papers with no

15     diligence outs."

16               Can you explain to the jury what that means?

17     A.   So the financial sponsor has asked us to get approval and

18     provide commitment papers with no outs and plans to announce a

19     transaction on Monday, the 13th.

20     Q.   When a commitment paper has no diligence outs, what does

21     that mean?

22     A.   It means we have no outs to get out of that transaction, so

23     it's a binding commitment.

24     Q.   To lend the money?

25     A.   Correct.

N6DQgoe2                          Gorman - Direct

1    Q.  When it says sign and announce the transaction on the 13th,

2    that means publicly announce it?

3    A.  Yes.

4    Q.  Let's go to Government Exhibit 331.

5           We offer Government Exhibit 331, your Honor.

6           MR. FORD:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 331 received in evidence)

9    Q.  Again, Ms. Gorman, what type of a document are we looking

10   at here?

11   A.  This is a form 8K.

12   Q.  Is this for Lumos Networks?

13   A.  Yes, it is.

14   Q.  Let's go to page 7, please.  What type of document is

15   attached to this form 8K?

16   A.  So this is a press release announcing the transaction.

17   Q.  The title of the press release says Lumos Networks enters

18   into definitive agreement to be acquired by EQT Infrastructure.

19   In laymen's terms, what's a definitive agreement?

20   A.  It's an agreement.

21   Q.  It's an agreement.  Okay.  It says "EQT Infrastructure to

22   pay $18 per share, an all cash transaction" right below that?

23   A.  Yes.

24   Q.  And what's the date of the press release?

25   A.  February 20, 2017.

1    Q.  And looking at that paragraph where the date was, it says,

2    "The resulting enterprise value is approximately $950 million."

3    When it says, "The resulting enterprise value is approximately

4    $950 million," what does that mean?

5    A.  It is essentially what they're saying the purchase price is

6    worth, so what they're buying the company for.

7    Q.  So for about a billion dollars?

8    A.  Yes.

9    Q.  Let's bring up Government Exhibit 103 side by side with

10   this, please.  Let's go to page 4.

11           So it was the internal memo we were just looking at

12   earlier, right?

13   A.  Yes.

14   Q.  Let's compare what was in the memo to what was publicly

15   announced.  In the internal memo, it says that EQT was

16   considering a deal to buy what company?

17   A.  Lumos Networks.

18   Q.  In fact, what company did EQT agree to buy?

19   A.  Lumos Networks.

20   Q.  And in the first paragraph of the internal Goldman memo, it

21   says that EQT was considering paying a total of how much for

22   Lumos?

23   A.  Approximately $1 billion.

24   Q.  In the third line.

25           And, in fact, how much did EQT ultimately agree to pay

N6DQgoe2                          Gorman – Direct

1    for Lumos?

2    A.  Approximately —— $950 million.

3    Q.  Looking on the right side, which is GX-103 of the internal

4    memo, when does the memo say that EQT intended to sign and

5    announce the transaction?

6    A.  Monday, February 13.

7    Q.  That's right in the middle.

8          And when was the transaction ultimately announced?

9    A.  February 20, 2017, a week later.

10   Q.  So, again, in your experience, is that unusual for a deal

11   to slip by a week?

12   A.  It's not unusual.

13   Q.  We can take that down.  Let's look at Government Exhibit

14   112 in evidence.  Let's look at the top, please.

15         Is this another one of those top sheets that was sent

16   to the Firmwide Capital Committee?

17   A.  Yes.

18   Q.  What's the date on this email?

19   A.  May 9, 2017.

20   Q.  Who is the email sent to?

21   A.  GS FWCC. distribution.

22         MR. NAFTALIS:  And, your Honor, pursuant to Government

23   Exhibit 500, the parties have stipulated that Mr. Goel received

24   this email.

25   Q.  The first line of this email again says For Internal Use

1   Only – Do Not Forward Externally, right?

2   A.   Correct.

3   Q.   Let's look at transaction description, which is that one

4   sentence.  Can you read what it says?

5   A.   "Goldman Sachs provides committed financing to support

6   KKR's acquisition of PharMerica Corporation."

7   Q.   Again, can you just explain what's being proposed here?

8   A.   So committed financing is a loan.  And to support KKR,

9   which is a financial sponsor, to buy PharMerica Corporation, a

10  public company.

11  Q.   So, put another way, the question for the committee is

12  whether Goldman should lend money to this company KKR so it

13  could buy PharMerica?

14  A.   Correct.

15  Q.   Let's go to page 5 of the exhibit, please, which is page 4

16  of the memo, and we haven't looked at this -- the sources and

17  uses section, let's look on the right side, the uses section,

18  and zoom in on that.

19         The first line says, "Purchase price 30 percent

20  premium" and then it says "$964."  I guess the first question

21  is, is that actually $964?

22  A.   No, it's $964 million.  Everything is in millions on here.

23         (Continued on next page)

24

25

N6D6GOE3                      Gorman – Direct

1    BY MR. NAFTALIS:

2    Q.  And what does the purchase price mean?

3    A.  How much they're willing to buy the company for.

4    Q.  How much KKR would have paid for --

5    A.  PharMerica.

6    Q.  And when it says a 30 percent premium, what does that mean?

7    A.  So that's saying the premium of where the share price

8    trades today versus what they're willing to pay for it.  So

9    30 percent more.

10   Q.  I guess should have asked the question more cleanly.  Total

11   use is about $1.49 billion?

12   A.  Correct.

13   Q.  Is that, in fact, the total purchase price?

14   A.  Correct.

15   Q.  The 964 million is paying for what?

16   A.  That's just the stock and then there are other parts of it.

17   They have to refinance the existing loans that they have, they

18   have to pay fees and then they're putting some small amount of

19   cash to the balance sheet.

20          MR. NAFTALIS:  Your Honor, the government now offers

21   Government Exhibit 333.

22          MR. FORD:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 333 received in evidence)

25

N6D6GOE3                          Gorman - Direct

1    BY MR. NAFTALIS:

2    Q.   Again, Ms. Gorman, what are we looking at here?

3    A.   This is a form 8-K.

4    Q.   For the company PharMerica?

5    A.   Correct.

6    Q.   I think you can guess where we're going to go.  So let's go

7    to Page 7.

8              And, again, what type of a document is this?

9    A.   This is a public press release announcing the transaction.

10   Q.   Can you read the title of the document?

11   A.   Sure.  "PharMerica Corporation enters into a definitive

12   agreement to be acquired by KKR for $29.25 per share in cash."

13   Q.   And the third line it says "transaction valued at about

14   $1.4 billion."  Is that right?

15   A.   Correct.

16   Q.   Let's compare this to Government Exhibit 112, please.

17             That's the internal Goldman memo we were just looking

18   at, right?

19   A.   Yes.

20   Q.   And let's zoom in on the transaction description.

21             Again, according to the internal memo, which company

22   was KKR considering trying to buy?

23   A.   PharMerica Corporation.

24   Q.   And, in fact, according to the press release, what company

25   did KKR ultimately agree to buy?

N6D6GOE3                          Gorman - Direct

1    A.  PharMerica Corporation.

2    Q.  Let's go to the next page of Government Exhibit 112 --

3    excuse me -- Page 5 of Government Exhibit 112.  And looking at

4    the uses section, again.

5             What was the anticipated total purchase price, or

6    total consideration under the total uses section of the memo?

7    A.  $1,490,000,000.

8    Q.  And according to the press release, what was the total

9    transaction valued at?

10   A.  $1.4 billion.

11   Q.  So a little less?

12   A.  Correct.

13   Q.  Is that unusual to you?

14   A.  No.

15   Q.  We can take that down, please.

16            Can we please bring up Government Exhibit 136 in

17   evidence?

18            This e-mail is also sent to the GS FWCC list, right?

19   A.  Yes.

20   Q.  Is this another one of those e-mails containing a memo to

21   the firm-wide capital committee?

22   A.  Yes.

23            MR. NAFTALIS:  Your Honor, pursuant to Government

24   Exhibit 500, the parties have stipulated that Mr. Goel received

25   this e-mail at the time.

1   BY MR. NAFTALIS:

2   Q.  What's the date on this e-mail, Ms. Gorman?

3   A.  May 15, 2018.

4   Q.  Just out of curiosity, it says -- the attachment says "Top

5   Gun."  Do you see that?

6   A.  Yes.

7   Q.  What do you understand Top Gun to be a reference to here?

8   A.  It's the project name.  So whenever you have nonpublic

9   transactions, they come up with the code project name, someone

10  came up with the name Top Gun.

11  Q.  We'll get to the specifics.  Does this memo involve two

12  airlines?

13  A.  Yes.

14  Q.  Okay.  This is when you're having fun as a banker?

15  A.  Okay.

16  Q.  Let's go to Page 4 of this memo -- this exhibit, which is

17  Page 3 of the memo.

18          Let's look at the very top of the exhibit where it

19  says "the transaction."

20          It says:  Goldman Sachs has been invited by Frontier

21  Airlines, Frontier or the company, and Indigo Partners, the

22  sponsor, to provide an HCL for its indicative bid to acquire

23  Spirit Airlines, Spirit or the target company or the company,

24  for a total equity value consideration of approximately

25  $3.3 billion, representing a 30 percent premium to the current

1    share price.

2                 Can you just break that down for us.  What's going on

3    here?

4    A.  So Frontier Airlines is the purchaser.  They've joined up

5    with a financial sponsor called Indigo Partners.  HCL is what

6    stands for a highly confident letter.  So this isn't a

7    commitment letter that's like a firm binding agreement.  It's a

8    highly confident is when a financial institution say we're

9    highly confident that you could arrange this debt, but it

10   clearly states in the letter, but it's not a commitment, we

11   have diligence and other work to do.

12                So this is Frontier.  They have asked us to provide a

13   highly confident so they could bid to acquire Spirit Airlines.

14   Q.  Okay.  Putting a highly confident letter in the terms of a

15   mortgage, is that like getting prequalified for a mortgage?

16   A.  Yes.

17   Q.  And it says that the bid would be for a total equity value

18   consideration of approximately $3.3 billion; is that right?

19   A.  Yes.

20   Q.  Was the fact that Frontier was considering offering

21   $3.3 billion public or nonpublic at the time of the memo?

22   A.  Nonpublic.

23   Q.  To your recollection, did this deal actually go through at

24   the time?

25   A.  I don't recall.

N6D6GOE3                          Gorman - Direct

1   Q.  Sometimes deals don't go through, right?

2   A.  Correct.

3   Q.  Let's go to GX115 in evidence.

4           Again, what type of a -- let's zoom in on the top, the

5   top part.

6           What type of an e-mail are we looking at here?

7   A.  This is the top sheet that goes with the memo.

8   Q.  Is this one sent to the firm-wide capital committee again?

9   A.  Yes.

10  Q.  Who sends this e-mail to the firm-wide capital committee?

11  A.  It can be from the deal team depending on the timing, or it

12  can be from another group in investment banking.

13  Q.  In this case who sends it?

14  A.  Brijesh Goel.

15  Q.  Then it says IBD.  What does that mean?

16  A.  Investment banking division.

17  Q.  Have you ever met Mr. Goel?

18  A.  No.

19  Q.  Let's look at the -- a little further down on this page,

20  the management committee summary paragraph.

21          I'm going to skip to the third sentence of the

22  management committee summary paragraph.  It says:  By the end

23  of this month, Sprint may enter into exclusive M&A related

24  discussions with another company, (undisclosed so far) which

25  may force Sprint into a blackout phase, limiting their ability

N6D6GOE3                    Gorman - Direct

1    to tap public markets for any refinancing or new issuance

2    activity.

3            Break it down for us, what's the memo asking to be

4    approved, and what does this sentence mean?

5    A.  So the memo is -- what they're asking to approve is in the

6    first sentence, that they want an 18-month $3.2 billion loan

7    commitment by the end of August.  Goldman Sachs, JP, that's

8    JP Morgan would commit 45 percent and DB is Deutsche Bank,

9    they'll take the other 10 percent.  And they want to show

10   liquidity as part of -- to their auditor so that they have

11   money to pay their bills and that they're solvent.

12           The highlighted part is saying that Sprint themselves

13   might be entering into a merger-and-acquisition-related

14   discussions with another company we don't know.  That's

15   undisclosed and nonpublic.  Which if they did, it would force

16   Sprint, what's called a blackout phase.  So we underwrite

17   3.2 billion, you saw the timeline of how we look to sell down.

18           What this is saying is we would be limited in our

19   ability to sell down to the public markets because Sprint would

20   be entering into discussions on a merger and acquisition.

21   Q.  And in this case, who was Goldman Sachs' client?

22   A.  Our client is Sprint.

23   Q.  Let's go to the --

24           THE COURT:  When you say "we would be limited in our

25   ability to sell down," you mean Goldman Sachs' customer would

1  lack the ability to issue shares in the public market or issue

2  a security in the public market, would thereby impair their

3  ability to pay you back and pay it down.

4             THE WITNESS:  Correct.

5             THE COURT:  Okay.  Thank you.

6  BY MR. NAFTALIS:

7  Q.  And part of -- in the highlighted sentence, one of the

8  issues is there might be an M&A deal coming down the pike,

9  right?

10  A.  Correct.

11  Q.  Which affects what the judge was asking, whether you could

12  sell it down?

13  A.  Exactly.

14  Q.  Let's go to the first page of the attachment which is

15  Page 3 -- yes, perfect.

16             So this is the first page of the memo, right?

17  A.  Yes.

18  Q.  Let's zoom in on the left-hand side where it says

19  "structured finance."  What is listed here on this first page?

20  A.  So this is an investment banking deal team that worked on

21  the transaction.

22  Q.  Okay.  So these are the actual investment bankers on the

23  deal?

24  A.  Yes.

25  Q.  And who is listed as the fourth name on this memo?

1   A.  Brijesh Goel.

2   Q.  And just so the jury understands, what is structured

3   finance?

4   A.  Structured finance is just a title for a type of

5   transaction, a type of debt financing.  So you could do

6   leverage finance, you could do -- which is when you leverage

7   companies up.  This is structured finance, so there's some type

8   of structure associated with it.

9   Q.  Like a fancy type of loan?

10  A.  Yes.

11  Q.  We can take that one down.

12          Ms. Gorman, last two questions.

13          During your time at Goldman Sachs, have you received

14  training on how to handle material nonpublic information?

15  A.  Yes.

16  Q.  And to your understanding, why do you get that training?

17  A.  It's to protect our clients as well as it's against the law

18  to give out material nonpublic information.

19          MR. NAFTALIS:  No further questions, your Honor.

20          THE COURT:  All right.  You may cross-examine.

21          MR. FORD:  Thank you, your Honor.

22  CROSS-EXAMINATION

23  BY MR. FORD:

24  Q.  Good morning, how are you?

25  A.  Good, thank you.

1    Q.  My name is Adam Ford.  I represent the defendant Brijesh

2    Goel.  You and I have never spoken before; is that correct?

3    A.  Correct.

4    Q.  Just a few preliminary questions.  You just testified

5    you've never -- that you don't know Mr. Goel; is that correct?

6    A.  Correct.

7    Q.  And can I assume you also do not know a man by the name of

8    Akshay Niranjan?

9    A.  No.

10   Q.  I just want to show you a picture of Mr. Niranjan.  I'm not

11   going to accomplish it to the jury, but it's Government

12   Exhibit 38.  If we could just show that to the witness?

13            You can just confirm, you don't know who this

14   individual is, correct?

15   A.  No.

16   Q.  Obviously, you've never been part of any conversations or

17   discussions between Mr. Goel and Mr. Niranjan?

18   A.  No, I have not.

19   Q.  Okay.  I want to ask you a few questions about the 2017 and

20   2018 time period.  You had just testified about a handful of

21   FWCC and CMCC memos, do you remember that?

22   A.  Yes.

23   Q.  And the government showed you several of these memos; is

24   that right?

25   A.  Correct.

N6D6GOE3                          Gorman – Cross

1   Q.  But, in fact, during 2017 and 2018, in fact, there were

2   lots of these types of memos that were being circulated to the

3   distribution list within Goldman Sachs; is that correct?

4   A.  Correct.

5   Q.  Can you give the jury an estimate of about -- well, let me

6   break it down.  About how many deals per week would the

7   committee be considering such that they be in one of these --

8            THE COURT:  Which you committee now?

9            MR. FORD:  I'm sorry, thank you, your Honor.

10  BY MR. FORD:

11  Q.  Let's start with the FWCC, the firm wide?

12  A.  Sure.  It depends on the week, but on average we see

13  anywhere between 400 and 500 deals a year in the firm-wide

14  capital committee.

15  Q.  That's 400 to 500 in the firm wide.  How about in the

16  capital market committee?

17  A.  I don't have that detail, but if you add up firm wide and

18  all the committees it's roughly 2,000 a year.

19  Q.  Okay.  So about 2,000 a year?

20           THE COURT:  Well, 2,000 a year is firm wide all

21  committees, is that your testimony?

22           THE WITNESS:  Yes.

23  BY MR. FORD:

24  Q.  Firm wide, all committees.  And whenever there's deals

25  being considered, there's multiple memos that go out for each

1    deal.  Is that a fair statement?

2    A.  That can be, it can be one memo or if they need to, there

3    could be addendums on top of them.

4    Q.  There could be multiple.  So sometimes there could be two

5    or three memos per deal, is that fair?

6    A.  Typically, it's one but there can be more than one.

7    Q.  Okay.  Now, with respect to the deals being discussed,

8    we'll stick with the FWCC for now, not all of these deals are

9    related to M&A activity?

10    A.  Correct.

11    Q.  And, in fact, some relate to securitizations?

12    A.  Yes.

13    Q.  Can you describe to the jury what securitizations are?

14    A.  So securitization is when you bundle up a bunch of loans

15    and then you sell them, you securitize them and make it into a

16    security that someone can then buy.

17    Q.  These securitizations, don't have anything to do with

18    merger and acquisition activity?

19    A.  They can, depending how a company wants to finance.

20    Q.  So some securitizations might relate to M&A activity?

21    A.  It can.

22    Q.  And some securitizations won't?

23    A.  Correct.

24    Q.  And both of these types of deals are sent around in the

25    FWCC memos?

1    A.  Correct.

2    Q.  I'm going to ask you the same question about loans.  These

3    memos would also discuss just loans as well, right?

4    A.  They're talking about, yes, bridge loans.

5    Q.  Bridge loans, sure.  And, again, these loans don't

6    necessarily relate to M&A activity, correct?

7    A.  They don't have to.

8    Q.  So maybe some do?

9    A.  Some do and some don't.

10   Q.  Okay.  Did you mention -- are there other types of

11   financing that could be discussed in these memos?

12   A.  Someone could want to build a plant, someone could want to

13   recapitalize, someone could just want to do a sovereign -- a

14   country might want to issue a bond.

15   Q.  And in those examples that would also not relate to M&A

16   activity?

17   A.  Correct.

18   Q.  All right.  Do you know about how many people in January,

19   let's say January 2017, were you at Goldman Sachs?

20   A.  In January, no.  I joined in June.

21   Q.  Okay.  Do you have a sense of how many people were on the

22   distribution list for the FWCC, e-mail distribution list that

23   we've been talking about?

24   A.  I don't know.

25          MR. FORD:  Nicolette, if we can pull up DX1260.

1          And, your Honor, the -- if I understand correctly, the

2     government is not objecting to our offering this document.

3     It's --

4               THE COURT:  You're offering it at this point.

5               MR. FORD:  We're offering at this point.

6               THE COURT:  Any objections.

7               MR. NAFTALIS:  No, your Honor.

8               THE COURT:  It's DX.

9               MR. FORD:  1260, 1260.

10              THE COURT:  Received.

11              (Defendant's Exhibit 1260 received in evidence).

12    BY MR. FORD:

13    Q.  So, Ms. Gorman, I'm showing you a document produced by

14    Goldman Sachs which in the top left, it says "GS FWCC

15    distribution."  And the date is 1/1/2017.  Do you see that?

16    A.  Yes.

17    Q.  And so I understand that you were not yet employed, but do

18    you see about how many people were on the distribution list as

19    of this time?

20    A.  43.

21              MR. FORD:  Your Honor, may I approach the witness with

22    a paper copy?

23              THE COURT:  You may.

24    BY MR. FORD:

25    Q.  So, Ms. Gorman, I apologize, I didn't realize you only had

1    the first page before.

2             With the -- and Nicolette, could you scroll through to

3    the last page, please?

4    A.  The number says 268.

5    Q.  Okay.  So is it fair to say that in January 2017, there

6    were 268 people on the FWCC distribution list?

7    A.  Yes.

8    Q.  And you don't happen to know the exact number of recipients

9    during the time you were there, do you?

10            The number of Goldman Sachs employees who were on the

11   recipient list for the FWCC e-mails?

12   A.  This says 268.

13   Q.  Throughout 2017 and '18, is it fair to say that the number

14   was somewhat similar?

15   A.  I'm not sure.

16   Q.  Okay.  And do you have -- do you know about how many people

17   were on the CMCC distribution list?

18   A.  No.

19   Q.  During the time you were there?

20   A.  No.

21            MR. FORD:  Your Honor --

22            THE COURT:  Yes.

23            MR. FORD:  -- the defense offers DX1269 into evidence.

24            THE COURT:  Any objection?

25            MR. NAFTALIS:  No, your Honor.

1              THE COURT:  Received.

2              (Defendant's Exhibit 1269 received in evidence)

3              MR. FORD:  Nicolette, if you could pull it up and

4     publish it.

5     BY MR. FORD:

6     Q.  Ms. Gorman, just to orient you, this is the CMCC on the top

7     left, you'll see e-mail subject line.  CMCC committee memo,

8     this is for Lumos Networks on February 13, 2017; do you see

9     that?

10    A.  Yes.

11    Q.  And this, on the right side, lists all the individuals that

12    would have -- that received this e-mail; is that fair?

13    A.  Yes.

14    Q.  And unfortunately, this document doesn't have the exact

15    number of recipients, but is it fair to say that it's about

16    four landscaped pages of lines of recipients?

17    A.  Yes.

18    Q.  Okay.  Nicolette, you can take that down.

19              I want to ask you, Ms. Gorman, a few questions about

20    the CMCC e-mail regarding Lumos that the government asked you

21    about.

22              Nicolette, can you pull up GX103, which is in

23    evidence?

24              Okay, so Nicolette, can we go to Page 18, please?

25              Okay.  Ms. Gorman, are you able to see that on your

1    screen?

2    A.   Yes.

3    Q.   So you see underneath the timetable, it says "event signed

4    commitment letter."  Do you see that?

5    A.   Yes.

6    Q.   And then the indicative date is February 13, 2017.  Do you

7    see that?

8    A.   Yes.

9    Q.   And can you remind me what the indicative date is?

10   A.   The indicative date is when Goldman Sachs would sign the

11   loan commitment with the company.

12   Q.   Did I hear you say that ordinarily the public announcement

13   would be, you say it was usually the next day after the

14   indicative date?

15   A.   Typically shortly thereafter because they are required to

16   note they have signed a merger agreement in the commitment

17   letter.

18   Q.   Would they ever have publicly announced it the same day as

19   the indicative letter was signed?

20   A.   Depending on the timing, yes.

21   Q.   Because it's fully executed at any time of the day, there's

22   an obligation to promptly publicize it.

23   A.   Correct.

24   Q.   And you testified that sometimes the deal date on the

25   indicative date would slip; is that correct?

1    A.  Yes.

2    Q.  And sometimes it would slip a few days, correct?

3    A.  Correct.

4    Q.  And would it ever slip out farther than that?

5    A.  It can, if the parties don't come to an agreement when they

6    sign the commitment.

7    Q.  But is it fair to say there's nothing in this document that

8    indicates that the deal is going to slip from the indicative

9    date; isn't that correct?

10   A.  Correct.

11           MR. FORD:  Your Honor, I have no further questions.

12           THE COURT:  All right.  Redirect.

13           MR. NAFTALIS:  Very briefly, your Honor.

14           THE COURT:  Sure.

15   REDIRECT EXAMINATION

16   BY MR. NAFTALIS:

17   Q.  If we can pull up DX1260, please, which is our -- it's

18   GX142.  This is the Excel version of this document.

19           Do you see that, Ms. Gorman?

20   A.  I do.

21   Q.  You were asked questions about how many people were on the

22   list?

23   A.  Yes.

24   Q.  Why don't we go to the 91st person on this list?

25           Who is the 91st person on the list?

1    A.  Brijesh Goel.

2    Q.  We can take that down.

3            MR. NAFTALIS:  I think the defense is going to pull up

4    DX1269 for us.

5            I can do the ELMO if you want, do you want me to do

6    the ELMO?

7    BY MR. NAFTALIS:

8    Q.  We're looking at DX1269, which is the other document you

9    were shown, Ms. Gorman?

10   A.  Yes.

11   Q.  If we can go to the second page, please?

12           If you could highlight Brijesh Goel's name, which is

13   right in the middle?  It's just below the middle.

14           Do you see that, Ms. Gorman?

15   A.  I do.

16   Q.  And you testified that all the people on these two

17   exhibits, DX1260 and DX1269 are Goldman Sachs employees,

18   correct?

19   A.  Yes.

20   Q.  Were any of these employees authorized to disclose the deal

21   terms, the names of the companies, the timing of the deals to

22   anyone outside of Goldman Sachs?

23   A.  No.

24   Q.  Including Mr. Goel?

25   A.  Correct.

N6D6GOE3                    Tappeto - Direct

1              MR. NAFTALIS:  Okay.  No further questions.

2              THE COURT:  Thank you.  You may step down.

3              Call your next witness.

4              MR. ROTHSCHILD:  The government calls Andrew Tappeto.

5     ANDREW TAPPETO,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8     DIRECT EXAMINATION

9     BY MR. ROTHSCHILD:

10    Q.  Good afternoon, Mr. Tappeto.

11    A.  Good morning.

12    Q.  How far did you go in school?

13    A.  I just received my master's back in 2019.

14    Q.  What did you get your master's in?

15    A.  Digital forensic science.

16    Q.  Where do you work?

17    A.  At TransPerfect Legal Solutions.

18    Q.  Do you work in a particular subgroup at TransPerfect?

19    A.  Yes, I do.

20    Q.  What group is that?

21    A.  It's the forensic technology and consulting department.

22    Q.  What does that group do?

23    A.  We handle digital collections from various sources of media

24    and then examinations of that data that we collected.

25    Q.  How long have you worked at TransPerfect?

1    A.  Just about five years.

2    Q.  What's your title?

3    A.  Senior digital forensics examiner.

4    Q.  What's your duties and responsibilities as a senior digital

5    forensics examiner?

6    A.  I work on different matters for and collect data from

7    specific devices.  And I also oversee and supervise other

8    teammates on my team and their work as well.

9    Q.  What sorts of devices do you collect data from?

10   A.  Mobile devices, computers, laptops, cloud sources, so your

11   Gmail accounts, your Google Drive accounts, things of that

12   nature.  Anything digital.

13   Q.  When you say you collect data, what do you mean by that?

14   A.  Getting data out of a source and into a format that we can

15   use to examine and report on.

16   Q.  When did you become a senior digital forensic examiner?

17   A.  Back in April of 2022.

18   Q.  What was your title before that?

19   A.  Digital forensics examiner.

20   Q.  When did you become a digital forensics examiner?

21   A.  April of 2020.

22   Q.  What was your title before that?

23   A.  Digital forensics technician.

24   Q.  And you mentioned that as a senior digital forensics

25   examiner your duties and responsibilities include collecting

N6D6GOE3                      Tappeto – Direct

1   data from mobile devices; is that right?

2   A.  That's correct.

3   Q.  Does that mean cell phones?

4   A.  Yes.

5   Q.  Approximately how many cell phones have you collected data

6   from during your time at TransPerfect?

7   A.  Hundreds.

8   Q.  During the course of your duties, did there come a time

9   when you collected data from a cell phone belonging to an

10  individual named Akshay Niranjan?

11  A.  Yes.

12  Q.  Around when did you collect data from Mr. Niranjan's phone?

13  A.  June of 2022.

14  Q.  And did you collect data from that phone on more than one

15  occasion in June of 2022?

16  A.  Yes, I did.

17  Q.  When was the first occasion?

18  A.  On June 2nd of 2022.

19  Q.  And directing your attention to what's been marked for

20  identification as Government Exhibit 381.

21          Do you recognize that, sir?

22  A.  I do.

23  Q.  What is it?

24  A.  This is our chain of custody form.

25          MR. ROTHSCHILD:  Government offers Government Exhibit

1    381?

2            MR. BRODSKY:  No objection.

3            THE COURT:  Received.

4            (Government's Exhibit 381 received in evidence)

5    BY MR. ROTHSCHILD:

6    Q.  Mr. Tappeto, can you please explain to the jury what this

7    document is?

8    A.  Yes.  So this is our chain-of-custody form which is a form

9    that pretty much shows the possession of a device at a specific

10   date and time and who has possession of that device.

11   Q.  And what's the purpose of this document?

12   A.  For internal tracking purposes, to show when either myself

13   or someone else has custody of a device.

14   Q.  And you see at the top where it says "case number"?

15   A.  Yes.

16   Q.  What does that refer to?

17   A.  That is our internal TransPerfect case number.

18   Q.  And you see a little further down where it says

19   "custodian."  Can you read what it says there?

20   A.  Akshay Niranjan.

21   Q.  And who is that?

22   A.  That is the custodian of this phone -- or the owner of this

23   phone.

24   Q.  And do you see a little bit to the right and above that it

25   says "serial number."  What's that refer to?

N6D6GOE3                      Tappeto - Direct

1   A.   That is the serial number of the phone.

2   Q.   And then the bottom half of the document says "chain of

3   custody," right?

4   A.   Yes.

5   Q.   And what's the first name under the "released by" heading?

6   A.   Akshay Niranjan.

7   Q.   And what's the first name under the received by column?

8   A.   Andrew.

9   Q.   Andrew?

10  A.   Myself, Andrew Tappeto.

11  Q.   Okay.  And so what does that signify, Mr. Tappeto?

12  A.   That means on June 2, 2022, at 4:35 p.m. Akshay handed me

13  his mobile device.

14       MR. ROTHSCHILD:   Okay.  We can take that down.

15  BY MR. ROTHSCHILD:

16  Q.   Mr. Tappeto, after you got Mr. Niranjan's phone on June 2,

17  2022, what did you do with it?

18  A.   I used a forensic tool to actually collect data from the

19  device.

20  Q.   What's the forensic tool?

21  A.   Cellebrite.

22  Q.   Can you describe at a high level what is Cellebrite?

23  A.   It's an industry standard mobile device forensic tool that

24  allows us to collect data from various mobile devices.

25  Q.   And what are some of the types of data that you collected

1    from the phone?

2    A.  Text messages, call logs, contacts, calendar entries,

3    photos and videos.

4    Q.  And was there more than one type of message that you

5    collected using Cellebrite?

6    A.  Yes.

7    Q.  What were some of the types of messages?

8    A.  Native iMessages and WhatsApp were two message categories.

9    Q.  Were you able to use Cellebrite to collect each type of

10   message that was on the phone?

11   A.  No.

12   Q.  What type of message couldn't you collect with Cellebrite?

13   A.  Signal messages.

14   Q.  Do you know what Signal is?

15   A.  It is a third-party application used for messaging.

16   Q.  And so how, if at all, did you collect Signal messages from

17   the phone?

18   A.  We used a screenshot method to collect those messages.

19   Q.  After you collected the data from Mr. Niranjan's phone on

20   June 2, 2022, did you return the phone to him?

21   A.  I did.

22   Q.  If we could pull back up Government Exhibit 381.

23        When did you return the phone to him?

24   A.  At 6:34 p.m.

25   Q.  On that same day?

1    A.  Yes.

2    Q.  We can take that down.

3            Once you had the data from Mr. Niranjan's phone, what,

4    if anything, did you do with that data?

5    A.  I was directed to generate reports of the data.

6    Q.  And what's a report?

7    A.  A report is a -- depending on the file format that you

8    choose for a report, it shows data within the phone and the

9    content of that data.

10   Q.  When did you generate the reports from the collection on

11   the June 2, 2022, collection?

12   A.  On June 3rd.

13   Q.  And did you generate a report that included all the

14   messages on the phone except for the Signal messages that we

15   discussed?

16   A.  Yes.

17   Q.  What format was that report in?

18   A.  There were a few different formats.

19   Q.  What was one of them?

20   A.  Microsoft Excel?

21   Q.  You reviewed that report?

22   A.  I have.

23   Q.  And just so we understand each other, is it okay if I refer

24   to that as the June 2, 2022, messages report?

25   A.  Yes.

N6D6GOE3                          Tappeto - Direct

1    Q.  Does the June 2, 2022, messages report have rows and

2    columns?

3    A.  It does.

4    Q.  What are some of the columns?

5    A.  Some of the columns would be a participants column, a

6    message column, and a source column.

7    Q.  What's the participants column?

8    A.  The participants column is going to have all of the

9    individuals that are part of a group chat or a group thread.

10   Q.  So it could be more than two?

11   A.  It can be.

12            MR. ROTHSCHILD:  May I approach, your Honor?

13            THE COURT:  You may.

14            MR. ROTHSCHILD:  Thank you.

15            MR. BRODSKY:  Your Honor, I'd like to look at a copy.

16            THE COURT:  Of course.

17            MR. BRODSKY:  Your Honor, can we see the Court at

18   sidebar?

19            THE COURT:  Ladies and gentlemen, you are welcome to

20   stand up and stretch for a moment.  Let me see everyone at

21   sidebar.

22            (Continued on next page)

23

24

25

1                    (At the sidebar)

2                    MR. BRODSKY:  Your Honor, the government has just

3      marked a series of three exhibits as I understand it.  One of

4      them is a comparison report.

5                    MR. ROTHSCHILD:  No.  255.

6                    MR. BRODSKY:  Yes, I'm told it is.

7                    MR. ROTHSCHILD:  255 is not a comparison report.

8                    THE COURT:  Wait a minute.  If you two want to talk to

9      each other and confer and then come back to me.  That's fine.

10                   (Defendant and counsel confer)

11                   MR. BRODSKY:  Your Honor, may I make a suggestion,

12     your Honor, given the hour, that we clear this up over -- if

13     this is an appropriate time for a lunch break, or do you want

14     me to clear it up now?

15                   THE COURT:  What's involved in clearing up?

16                   MR. BRODSKY:  We're looking at what 255 is, exhibits

17     in 255.

18                   THE COURT:  All right.  I'll take a break.

19                   (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2          MR. ROTHSCHILD:  Your Honor, shall I proceed?

3          THE COURT:  All right.  Ladies and gentlemen, rather

4   than delay you further, because I'm very jealous of your time

5   and its efficient use, we're going to break early for lunch,

6   and I'm going to ask you to be back at 20 minutes to 2:00,

7   which is 1:40, and we'll pick up then.  So you have a full hour

8   for lunch, and we'll be ready to go at 1:40.

9          As always, please do not discuss the case among

10  yourselves or with anyone.  Please keep an open mind.  We'll be

11  back in action then.

12         Thank you.

13

14

15

16

17

18

19

20

21

22

23

24

25

N6D6GOE3                    Tappeto – Direct

1             (Jury not present)

2             THE COURT:  All right.  We're in recess, I'll see you

3    at 1:30, then.

4             (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N6DQgoe4

AFTERNOON SESSION

1:30 p.m.

(In open court)

ANDREW TAPPETO, resumed.

THE COURT:  Please remain standing for our jury.  I understand the issue was worked out.  And you can go to the podium, Mr. Rothschild.

(Jury present)

THE COURT:  You guys are great jurors.  You're back on time.  You're ready to go.  I appreciate that very much.  It's the way to do this, so I appreciate it.  Thank you.

Mr. Rothschild, whenever you're ready.

MR. ROTHSCHILD:  Thank you, your Honor.  May I approach the witness?

THE COURT:  You may.

BY MR. ROTHSCHILD:

Q.  Mr. Tappeto, I've handed you a disk that's been marked for identification as Government Exhibit 601.  Do you recognize that?

A.  I do.

Q.  Have you seen that particular disk before?

A.  Yes, I have.

Q.  How do you know?

A.  My initials are on it.

Q.  Do you see your initials there on that disk?

N6DQgoe4

1    A.  Yes, I do.

2    Q.  Did you review the files that are on that disk,

3    Mr. Tappeto?

4    A.  Yes.

5    Q.  And is one of them called GX-253?

6    A.  Yes.

7    Q.  Have you reviewed GX-253?

8    A.  Yes.

9    Q.  What type of file is that?

10   A.  It's an Excel file.

11   Q.  Is the data that's on GX-253 a subset of the data that's on

12   the June 2, 2022 messages report that you testified about

13   earlier?

14   A.  Yes.

15   Q.  How do you know that?

16   A.  There are a couple of pieces of information that I could

17   look at to make that decision.  The first would be the general

18   layout and format of the Excel report.  It has the same kind of

19   column, same coloring scheme, the same title.

20           On top of that, there's a specific source file

21   information column within both the message Excel report that I

22   generated and then the subset, and the database files that

23   actually house text messages.  Those sizes are the same on the

24   subset report, the 253 report and my main June 2 report as

25   well.

N6DQgoe4

1   Q.  Can you explain what you mean by the database size?

2   A.  Yeah.  So a database file, it's a relational file that

3   houses information.  So, for example, text messages, the

4   database file will have the message body, the participants,

5   timestamps, the source of the message, so on and so forth.

6   Q.  How else did you confirm that the data on Government

7   Exhibit 253 is a subset of the data from your June 2, 2022

8   messages report?

9   A.  So another thing I did was on my June 2 message report, I

10  filtered by participant for an individual named Brijesh Goel

11  and the rows that showed up after I filtered for that search

12  matched the rows in GX-253.

13  Q.  That was using the participants column that you referred to

14  earlier?

15  A.  Yeah, that's correct.

16  Q.  Mr. Tappeto, directing your attention back to the disk

17  that's been marked for identification as Government Exhibit

18  601, is there a file on that disk called Government Exhibit

19  255?

20  A.  There is.

21  Q.  Have you reviewed that file?

22  A.  I have.

23  Q.  What type of file is it?

24  A.  It's an Excel file.

25  Q.  Is the data that's on Government Exhibit 255 a subset of

N6DQgoe4

1     the data that's on Government Exhibit 253?

2     A.  Yes.

3     Q.  How do you know?

4     A.  I was able to individually go through each text message and

5     I found it in 255 -- or 253.

6     Q.  Does that mean that the data that's on Government Exhibit

7     255 is a subset of the data that was in your June 2, 2022

8     messages report?

9     A.  Yes.

10          MR. ROTHSCHILD:  The government would offer Government

11    Exhibit 255.

12          MR. BRODSKY:  Your Honor, may I voir dire a little bit

13    on 255?

14          THE COURT:  Yes.

15          MR. BRODSKY:  Thank you very much.

16    VOIR DIRE EXAMINATION

17    BY MR. BRODSKY:

18    Q.  Mr. Tappeto, Government Exhibit 255, the subset of

19    messages, WhatsApp messages, correct?

20    A.  That's correct.

21    Q.  That's a subset of WhatsApp messages from Government

22    Exhibit 253, you said?

23    A.  Yes.

24    Q.  Government Exhibit 253 has approximately over 80,000

25    WhatsApp messages, do you know?

N6DQgoe4

1    A.  I do not know.

2    Q.  Okay.  With respect to the subset that you were -- that you

3    selected and pulled out, was it your decision to select and

4    pull those out?

5    A.  It was not.

6    Q.  Do you have any idea about personal knowledge about the

7    contents of what was pulled out from Government Exhibit 253 for

8    identification into Government Exhibit 255 for identification?

9    A.  I do not.

10   Q.  You have no idea what any of the messages mean, correct?

11   A.  Correct.

12   Q.  You have no idea whether it has any relevance to this

13   matter?

14   A.  Correct.

15          MR. BRODSKY:  Your Honor, we object to 255 coming into

16   evidence.

17          THE COURT:  All right.  Overruled.  It's received.

18          (Government's Exhibit 255 received in evidence)

19   BY MR. ROTHSCHILD:  (CONTINUED)

20   Q.  Ms. Sonderby, could you pull up Government Exhibit 255,

21   please?

22          Mr. Tappeto, what does it say at the top of the

23   spreadsheet here?

24   A.  Chats.

25   Q.  When you referred to the title or the label as being

N6DQgoe4

1    similar in 253 to what you had reviewed in your messages

2    report, is that what you were referring to?

3    A.  Yes.

4    Q.  Let's scroll over to column AF, please.  What's the heading

5    of that column?

6    A.  Participants.

7    Q.  Is that the participants column you were testifying about

8    earlier?

9    A.  Yes.

10           MR. ROTHSCHILD:  One moment, your Honor.  We can take

11   that down Ms. Sonderby.

12   Q.  Mr. Tappeto, during the course of your duties, did there

13   come a second time when you collected data from the cellphone

14   belonging to Akshay Niranjan?

15   A.  Yes.

16   Q.  Around when was that?

17   A.  On June 10, 2022.

18   Q.  Directing your attention to what's been marked for

19   identification as Government Exhibit 383, do you recognize

20   this, sir?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  It's a chain of custody form.

24   Q.  Is this one that you've reviewed?

25   A.  Yes.

N6DQgoe4

| | |
|---|---|
| 1 | MR. ROTHSCHILD:  The government offers Government |
| 2 | Exhibit 383. |
| 3 | MR. BRODSKY:  No objection, your Honor. |
| 4 | THE COURT:  Received. |
| 5 | (Government's Exhibit 383 received in evidence) |
| 6 | Q.  Ms. Sonderby -- |
| 7 | THE COURT:  Just let me just understand something. |
| 8 | The first text messages -- grouping of text messages you |
| 9 | extracted when or you took when? |
| 10 | THE WITNESS:  On June 2, 2022. |
| 11 | THE COURT:  And this is what date? |
| 12 | THE WITNESS:  June 10, 2022. |
| 13 | THE COURT:  Okay.  Thank you very much. |
| 14 | MR. ROTHSCHILD:  Thank you, your Honor. |
| 15 | Ms. Sonderby, could you please display Government |
| 16 | Exhibits 381 and 383 side by side. |
| 17 | Q.  Mr. Tappeto, how do you know the phone that you got from |
| 18 | Mr. Niranjan on June 10, 2022 was the same phone that you'd |
| 19 | received from him on June 2, 2022? |
| 20 | A.  It bears the same serial number. |
| 21 | Q.  On both of these chain of custody forms? |
| 22 | A.  Yes. |
| 23 | Q.  We can take that down.  If we just pull back up 383. |
| 24 | Directing your attention to the bottom of this |
| 25 | document, Mr. Tappeto, what's the name under the "released by" |

1    column?

2    A.   Akshay.

3    Q.   What's the last name?

4    A.   Niranjan.

5    Q.   What's the first name you see under received by?

6    A.   Andrew.

7    Q.   Is that you, Mr. Tappeto?

8    A.   Yes, sir.

9    Q.   What does that signify?

10   A.   That I received custody of that iPhone.

11   Q.   We can take that down.

12           Mr. Tappeto after you got Mr. Niranjan's phone on

13   June 10, 2022, what did you do with it?

14   A.   I used Cellebrite to create a collection of the data from

15   the phone.

16   Q.   What type of data did you collect?

17   A.   All of the data.

18   Q.   What did you do with that data?

19   A.   I then generated another report.

20   Q.   What was on that report?

21   A.   That report was just limited to text messages.

22   Q.   What types of messages?

23   A.   iMessages and WhatsApp.

24   Q.   Did you collect signal messages on June 10, 2022?

25   A.   I did not.

N6DQgoe4

1   Q.  Once you had the data from Mr. Niranjan's phone on June 10,

2   2022, what, if anything, did you do with that data?

3   A.  I generated a report.

4   Q.  Around when did you generate the report?

5   A.  I believe it was on June 10 or June 11.

6   Q.  Did you generate a report that included all of the messages

7   that were on the phone except for signal messages?

8   A.  Yes.

9   Q.  What format was that report in?

10  A.  There were a few formats.

11  Q.  What was one of them?

12  A.  Excel.

13  Q.  Have you reviewed that report?

14  A.  I have.

15  Q.  Just so we understand each other, is it okay if I refer to

16  that report as the June 10, 2022 messages report?

17  A.  Yes.

18  Q.  Directing your attention back to the disk that's been

19  marked as Government Exhibit 601, is one of the files on that

20  disk called Government Exhibit 254?

21  A.  Yes.

22  Q.  Have you reviewed that file?

23  A.  I have.

24  Q.  What type of file is it?

25  A.  It's an Excel file.

N6DQgoe4

Q.   Is the data that's on Government Exhibit 254 a subset from

the data of the June 10, 2023 messages report?

A.   Yes.

Q.   How do you know that?

A.   I was able to take a look at both my June 10 message report

and Government Exhibit 254, and I compared the formatting and

layout of the Excel, and it looked the same.  The columns were

the same.  The database files and that source file information

path matched size-wise on both my report and 254.

Q.   Did you do anything else to compare the two documents?

A.   Yes, I also filtered down by participants to Brijesh Goel,

and the rows matched, but there was a discrepancy of 12

messages.

Q.   Can you explain that discrepancy?

        MR. BRODSKY:  Objection, your Honor.

        THE COURT:  Yes, I'm going to sustain an objection to

that.

Q.   Mr. Tappeto all the data on Government Exhibit 254 is also

in your June 10, 2022 messages report?

A.   Yes.

        MR. ROTHSCHILD:  One moment, your Honor.

Q.   Mr. Tappeto, if I heard you correctly before, you said you

filtered down using the name Brijesh Goel on your June 10

messages report?

A.   That's correct.

N6DQgoe4                        Tappeto – Cross

1    Q.   What did that reveal?

2    A.   A subset of messages.

3    Q.   How did that relate to Government Exhibit 254?

4    A.   They were the same messages.

5            MR. ROTHSCHILD:  One moment, your Honor.

6            No further questions.

7            THE COURT:  Thank you.

8            Cross.

9            MR. BRODSKY:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. BRODSKY:

12   Q.   Good afternoon, Mr. Tappeto.

13   A.   Good afternoon.

14   Q.   Your client is Akshay Niranjan, correct?

15   A.   Yes.

16   Q.   And your firm is TransPerfect, right?

17   A.   Yes.

18   Q.   And your firm TransPerfect is being paid by Mr. Niranjan in

19   connection with this matter, correct?

20   A.   That I don't know.

21   Q.   Have you seen the -- withdrawn.

22           MR. BRODSKY:  One moment, your Honor.

23           THE COURT:  Yes.

24   Q.   You do know Mr. Niranjan is the client of TransPerfect in

25   this matter, correct?

1    A.   Yes.

2    Q.   And you do know that Mr. Niranjan turned his phone over to

3    you on June 2, 2022?

4    A.   Yes.

5    Q.   And you know that Mr. Niranjan's law firm -- withdrawn.

6         Mr. Niranjan hired a law firm, correct?

7    A.   Yes.

8    Q.   And that law firm, TransPerfect sends its bills in

9    connection with this matter to that law firm?

10   A.   I don't know.

11        MR. BRODSKY:  May I approach your Honor?

12        THE COURT:  Go ahead.

13   Q.   I'm showing you, Mr. Tappeto, Defense Exhibit 1247 for

14   identification.  If you would take a moment, please, to take a

15   look at that document.  Let me know when you're finished.

16   A.   Finished.

17   Q.   Have you seen TransPerfect's engagement letters before?

18   A.   Yes.

19   Q.   And this is a TransPerfect engagement letter, correct?

20   A.   That's correct.

21   Q.   And you're also familiar with Mr. Niranjan's signature as

22   reflected on the chain of custody reports that you were asked

23   questions about on direct examination, correct?

24   A.   That's correct.

25   Q.   So if you turn to the last page of Defense Exhibit 1247, do

N6DQgoe4                         Tappeto - Cross

1    you recognize Mr. Niranjan's signature on it?

2    A.   Yes.

3    Q.   And you're familiar with the name of the TransPerfect

4    individual David Burdier who signed it?

5    A.   Yes.

6    Q.   And you're familiar, of course, with the law firm that

7    signed it as well?

8    A.   Yes.

9              THE COURT:  Well, the document is not in evidence.

10             MR. BRODSKY:  Your Honor, we offer it.

11             THE COURT:  All right.  Any objection?

12             MR. ROTHSCHILD:  Yes, your Honor.

13             THE COURT:  All right.  Let me see you at sidebar.

14             (Continued on next page)

1          (At the sidebar)

2          THE COURT:  Let me see whether I understand.  The

3    purpose is to show that the Morvillo firm executed the

4    agreement, and that it's an agreement with the Morvillo firm.

5    No?

6          MR. BRODSKY:  Mr. Niranjan signed it as the client.

7          THE COURT:  Right.

8          MR. BRODSKY:  The purpose is that in the agreement,

9    it's clear that the invoices go to the law firm, and that

10    Mr. Niranjan pays for them.

11          THE COURT:  Right.  And the law firm is defined, and

12    they're a signatory to the agreement?

13          MR. BRODSKY:  Yes, sir.

14          THE COURT:  So your purpose is to show that the law

15    firm had signed the agreement?

16          MR. BRODSKY:  My purpose its to show Mr. Niranjan

17    signed the agreement, and that TransPerfect's fees are being

18    paid for by Mr. Niranjan.

19          THE COURT:  Right.  Okay.  So you don't need Morvillo

20    being a party to the agreement.  That's not -- you're not

21    trying to show that.

22          MR. BRODSKY:  No, I don't need that.

23          THE COURT:  I wanted to make sure.  So that could be

24    redacted?

25          MR. BRODSKY:  Yeah.

1          THE COURT:  Any objection?

2          MR. BRODSKY:  I'm happy with it.

3          MR. THOMAS:  No, Judge.

4          THE COURT:  With the redaction of the Morvillo firm,

5    that's fine.

6          MR. BRODSKY:  Your Honor, I don't need to show it.  I

7    could show -- I could ask questions.

8          THE COURT:  Good.  Good enough.  Thanks.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Once in awhile in a trial there is

3    material in a document which may not be relevant, and so that

4    is not part of the exhibit.  It's known as that portion having

5    been redacted, which is a fancy name for covered over.  All

6    right?

7          Now, the fact that a portion of a document is redacted

8    is not something of your concern.  It's something that's done

9    with the Court's approval because a matter may or may not be

10   relevant to a particular.  And so that's all redacted is.

11         But as redacted, you're offering DX-1247, correct?

12         MR. BRODSKY:  Correct, your Honor.

13         THE COURT:  Any objection?

14         MR. ROTHSCHILD:  No, your Honor.

15         THE COURT:  It's accepted as redacted.

16         (Defendant's Exhibit 1247 received in evidence)

17   Q.  We won't put it on the screen because of the redactions to

18   take place, your Honor, so we don't need to put it on.

19         But you're looking at on the screen just yourself,

20   Mr. Tappeto, that Mr. Niranjan signed the agreement as a

21   signatory on June 2, 2022, correct?

22   A.  Yes.

23   Q.  And if I could ask you to turn or ask my colleague to put

24   on the screen for you the page that describes terms and

25   conditions.  And it's probably the fifth page of the document.

1    The next page.

2            And you're only seeing it because of redactions that

3    will take place, but if you would read silently to yourself the

4    first paragraph or the first couple of sentences of that first

5    paragraph that follows invoicing and payment.

6            THE COURT:  I am not sure I understand what you're

7    asking him to read.

8            MR. BRODSKY:  Under paragraph 1?

9            THE COURT:  Yes, I see paragraph 1.

10            MR. BRODSKY:  The first, I would say, four sentences

11    of invoicing and payment.

12            THE COURT:  All right.  Okay.  Thank you very much.

13    Q.  Mr. Tappeto, am I correct that the agreement between

14    TransPerfect and Mr. Niranjan states, "The obligation for

15    payment of TLS's fees is solely the responsibility of client"?

16    A.  That's correct.

17    Q.  And the client, of course, is Mr. Niranjan?

18    A.  That's correct.

19    Q.  If we can scroll back two other pages where it has the

20    pricing for services, you had testified, Mr. Tappeto, that you

21    were a senior digital forensic examiner starting in or about

22    April 2022?

23    A.  Yes.

24    Q.  And I think we have to take down the first -- well, you

25    have the document in front of you, Mr. Tappeto, and it's on

1    your screen.

2              MR. BRODSKY:  Can we publish this page, your Honor?  I

3    don't believe it requires any redactions.

4              THE COURT:  Sure.

5    Q.  Looking at this page of DX-1247, what is your hourly rate

6    as reflected in this agreement?

7    A.  $595.

8    Q.  You're under the senior forensic consulting and analysis

9    per hour?

10   A.  Yes.

11   Q.  You're not the only one at TransPerfect who was involved in

12   this engagement, right?

13   A.  No.

14   Q.  There were multiple other people?

15   A.  Yes.

16   Q.  Approximately how many other people were involved in this

17   engagement on behalf of Mr. Niranjan?

18   A.  No more than a handful.

19   Q.  No more than five?

20   A.  Yes.

21   Q.  Including yourself?

22   A.  Yes.

23   Q.  All right.  And various people doing various tasks over

24   various projects, fair?

25   A.  Yes.

1    Q.  So did your rate go up in 2023 because of inflation like

2    everything else?

3    A.  No.

4    Q.  Let me just summarize here a little bit, and then I will go

5    directly to June 2.

6            Your firm and your work for Mr. Niranjan on June 2,

7    2022 involved phone collection, pulling information from

8    Mr. Niranjan's cellular telephone?

9    A.  Yes.

10   Q.  And you billed for that time, correct?

11   A.  Yes.

12   Q.  As did other people?

13   A.  Yes.

14   Q.  And approximately how many hours altogether was that work,

15   including the reports you ran afterwards?

16   A.  For June 2?

17   Q.  In connection with June 2, so not just the work on June 2

18   but subsequent to June 2, you're running reports, you're doing

19   other work?

20   A.  Probably three to four hours.

21   Q.  There is a notation -- withdrawn.

22           Are you aware of estimates of 10 to 15 hours to pull

23   data and produce a report?

24   A.  No.

25   Q.  Okay.  We will come back to it.

N6DQgoe4                         Tappeto - Cross

1           In connection with pulling your phone, you also

2    communicated with Mr. Niranjan, correct?

3    A.   Yes.

4    Q.   And you communicated with people representing Mr. Niranjan?

5    A.   Yes.

6    Q.   And you billed that time too?

7    A.   Yes.

8    Q.   On June 10, 2022, when you did that work, you also billed

9    Mr. Niranjan for all that work?

10   A.   Yes.

11   Q.   And then there was additional work done in or about

12   November 2022.  Is that fair?

13   A.   That's correct.

14   Q.   And that involved multiple people doing additional work in

15   connection with data, correct?

16   A.   Correct.

17   Q.   And all that time was billed too?

18   A.   Yes.

19   Q.   And the next time you did work was approximately

20   February 2023.  Is that fair?

21   A.   Yes.

22   Q.   And in February 2023, you were collecting audio files from

23   a phone of Aditi Khullar?

24   A.   Yes.

25   Q.   And the name Aditi Khullar appears in your chain of

1  custody, so I thought we might put that up to reference the

2  name.  Government Exhibit 383 in evidence, if we can put that

3  up.

4          This was the collection of the phone on June 10, 2022,

5  right?

6  A.  Yes.

7  Q.  So you had pointed out Mr. Niranjan came to pick up the

8  phone on June 10, 2022 at 2:06 p.m.?

9  A.  Yes.

10  Q.  Then there's another name below on June 10, 2022 at

11  5:22 p.m.  I see your name, Andrew Tappeto, that's correct?

12  A.  Yes.

13  Q.  The name next to it, Aditi Khullar, is the person who

14  picked up the phone at 5:22 p.m.?

15  A.  Yes.

16  Q.  And you were present when Aditi Khullar picked up

17  Mr. Niranjan's phone?

18  A.  Yes.

19  Q.  Now, you've done work in connection with your testimony

20  today since early last week, right?

21  A.  Yes.

22  Q.  You met a number of times with the government, correct?

23  A.  Yes.

24  Q.  You met a number of times with representatives for

25  Mr. Niranjan?

1   A.  Yes.

2   Q.  Did you also talk to Mr. Niranjan over the last week?

3   A.  No.

4   Q.  And you met me approximately last Wednesday, correct?

5   A.  Yes.

6   Q.  For about 45 minutes maybe?

7   A.  Yeah, that's correct.

8   Q.  And for all that -- and then you prepared for your

9   testimony today, correct?

10  A.  Yes.

11  Q.  And that took time, right?

12  A.  Yes.

13  Q.  So since early last week, approximately how much of your

14  time did you spend on this?

15  A.  I don't know.  That -- I don't know.

16  Q.  But for all that time, you're billing the same hourly rate,

17  595 or so an hour?

18  A.  It depends.

19  Q.  It depends.  All right.

20          Is the meter still on today?

21  A.  Yes.

22  Q.  Okay.  So you're being paid by the hour today?

23  A.  Yes.

24  Q.  And Mr. Niranjan is paying those fees?

25  A.  I don't know.  I would assume.

1    Q.  Okay.  The total estimate fees between the time you started

2    work for Mr. Niranjan on June 2, 2022 through today is

3    approximately 50 to a hundred thousand dollars?

4    A.  I don't recall.

5    Q.  Let me go to the collection of the phone on June 2, if you

6    don't mind, and on June 2 -- we could turn to Government

7    Exhibit 381 in evidence.

8         Do I have my understanding correctly in your testimony

9    on direct examination that on June 2, 2022, Mr. Niranjan took

10   this iPhone 11 Pro to your office and handed it to you?

11   A.  Yes.

12   Q.  And there's a name Brijesh there, but you don't know

13   anybody named Brijesh, correct?

14   A.  Correct.

15   Q.  To your knowledge, Brijesh Goel had nothing to do with the

16   collection of this phone, correct?

17   A.  I don't know.

18   Q.  And he signed in the phone to you at 4:35 p.m., right?

19   A.  Yes.

20   Q.  And then you did your data pull, which we'll talk about in

21   a minute, and then he signed it out, picked it back up at

22   6:34 p.m.?

23   A.  Yes.

24   Q.  So about two hours to collect the data in the phone?

25   A.  Yes.

1    Q.  Do we have Defense Exhibit 12 -- actually, I have it.

2              MR. BRODSKY:  May I approach, your Honor?

3              THE COURT:  You may.

4    BY MR. BRODSKY:

5    Q.  I'm showing you, Mr. Tappeto, Defense Exhibit 1248 for

6    identification.

7              Prior to coming to court today, did you -- are you

8    familiar with this document that TransPerfect provided to us?

9    A.  Yes.

10   Q.  And is it fair to characterize this as a reflection of the

11   various data categories that were pulled from Mr. Niranjan's

12   cellphone on June 2, 2022 with counts and a column called

13   deleted?

14   A.  Yes.

15   Q.  Now, the deleted column here does not mean that no data was

16   deleted prior to June 2, right?

17   A.  That's correct.

18   Q.  What it means is that anything deleted before June 2 was

19   not recoverable, correct?

20   A.  Yes.

21             MR. BRODSKY:  So, your Honor, we offer DX-1248.

22             THE COURT:  Any objection?

23             MR. ROTHSCHILD:  No, your Honor.

24             THE COURT:  Received.

25             (Defendant's Exhibit 1248 received in evidence)

1           MR. BRODSKY:  May we publish?

2           THE COURT:  You may.

3  Q.  Mr. Tappeto, there are a lot of different categories here,

4  and, once again, this is an extraction method that was chosen

5  by Mr. Niranjan and his representatives in connection with what

6  you pulled from the phone, correct?

7           MR. ROTHSCHILD:  Objection.

8           THE COURT:  One moment, please.  Rephrase your

9  question, please.

10  Q.  This data as reflected in 1248 -- Defense Exhibit 1248 in

11  evidence reflects the results numerically of what you pulled

12  from Mr. Niranjan's cellphone?

13           THE COURT:  Do you understand the question?

14           THE WITNESS:  Yes.

15           THE COURT:  You may answer.

16  A.  Yes.

17  Q.  And there were multiple ways to pull data from a cellphone,

18  correct?

19  A.  Yes.

20  Q.  And with the technology you used, there are at least three

21  different methods?

22  A.  Yes.

23  Q.  You didn't select which method to use, right?

24  A.  I did.

25  Q.  You did?

```
 1   A.   Yes.
 2   Q.   And you chose a method that was less fulsome than the two
 3   alternative methods?
 4   A.   Yes.
 5   Q.   The other alternative methods would have pulled more data
 6   from the phone?
 7   A.   Possibly.
 8   Q.   Well, the reason why the other two alternative methods are
 9   more fulsome is because they usually cover more data on the
10   phone than the method chosen here?
11   A.   Yes.
12   Q.   Now, directing your attention, for example, to the category
13   of, let's say, chats.  Do you see that category?
14   A.   Yes.
15   Q.   It says 497,700, right?
16   A.   Yes.
17   Q.   Do I have this correct that you pulled 497,700 chats
18   between Mr. Goel and Mr. Niranjan?
19   A.   No.
20   Q.   Well, you filtered the phone running a report later for
21   Mr. Goel and Mr. Niranjan?
22   A.   Yes.
23   Q.   And that filtered report is a subset of the 497,700
24   messages?
25   A.   Yes.
```

1    Q.  And each line is like a message, right?

2    A.  Yes.

3    Q.  So let me see.  Just so it's clear in my mind, there's

4    497,700 chat messages between Mr. Niranjan and lots of other

5    people?

6    A.  Yes.

7    Q.  Some subset of that was between Mr. Goel and Mr. Niranjan?

8    A.  Yes.

9    Q.  Those are the ones you pulled, correct?

10   A.  No.

11   Q.  Those are the ones you put on a report?

12   A.  They were included in the report.

13   Q.  They were included in the report.  Those are the ones on

14   Government Exhibit for identification -- and I'll get this

15   right with all the numbers flying around -- but that was on

16   Government Exhibit 253 for identification?

17   A.  Yes.

18   Q.  But we don't know how many.  You don't remember the total

19   number?

20   A.  No.

21   Q.  Now, after the phone on June 2 was returned to

22   Mr. Niranjan, you don't know what he did with the phone on

23   June 3, right?

24   A.  No.

25   Q.  Or June 4?

N6DQgoe4                          Tappeto - Cross

1    A.  No.

2    Q.  In fact, if we could pull up a calendar --

3           MR. BRODSKY:  Your Honor, I'd like to offer the

4    June -- may I approach, your Honor?

5           THE COURT:  You may.

6           MR. BRODSKY:  Let me show you what's marked as Defense

7    Exhibit 1246 for identification, Mr. Tappeto.

8           I will represent, your Honor, this is the month of

9    June 2022.  We offer it in evidence.

10          THE COURT:  Any objection?

11          MR. ROTHSCHILD:  None, your Honor.

12          THE COURT:  All right.  Received.

13          (Defendant's Exhibit 1246 received in evidence)

14          MR. BRODSKY:  May we publish, your Honor?

15          THE COURT:  You may.

16   Q.  So it was Thursday, June 2 when the phone was obtained from

17   Mr. Niranjan and then returned to him, correct?

18   A.  Yes.

19   Q.  And you weren't with him on June 3, on Friday, correct?

20   A.  Correct.

21   Q.  Or Saturday, June 4?

22   A.  Correct.

23   Q.  And we could say the same thing about June 5, June 6,

24   June 7, June 8 and June 9, correct?

25   A.  Yes.

1   Q.  And you're not here to testify about anything Mr. Niranjan

2   did or did not do with his phone during those days?

3   A.  Correct.

4   Q.  So if on June 8 something happened on the phone, you did

5   not do a collection on June 8?

6   A.  Correct.

7   Q.  Now, there was a mention of signal messages in your direct

8   examination, so I wanted to ask you about that.  Do I

9   understand correctly that at the direction of Mr. Niranjan, you

10  pulled two signal messages from the totality of signal messages

11  on Mr. Niranjan's phone on June 2?

12  A.  Mr. Niranjan and counsel.

13  Q.  And there were more than -- withdrawn.

14          Do I have this correctly that the method you used to

15  pull the data from the cellphone on June 2 did not include --

16  whatever that method was, did not include signal messages?

17  A.  That's correct.

18  Q.  Now signal messages are like an application on somebody's

19  phone, right?

20  A.  Yes.

21  Q.  And signal messages are communication from one person to

22  one or more people over this application?

23  A.  Yes.

24  Q.  And you can change the setting on signal to make messages

25  ephemeral or disappear?

N6DQgoe4                          Tappeto - Cross

1    A.  Yes.

2    Q.  So if you and I had a signal -- if I had a signal app, a

3    signal application on my phone and you had one on yours, and I

4    communicated from me to you, I could set it to 30 minutes, and

5    it would disappear on your phone and my phone?

6    A.  Yes.

7    Q.  Okay.  I could choose the time I wanted.  I could do 30

8    minutes, I could do an hour, I could do two hours?

9            MR. ROTHSCHILD:  Objection.

10           THE COURT:  Overruled.  That's a question.

11   A.  There are specific time frames that you can set.

12   Q.  Approximately how many signal messages were on

13   Mr. Niranjan's cellphone when you conducted your pull on

14   June 2, 2022?

15   A.  I don't know.

16   Q.  You did pull two at the direction of Mr. Niranjan and his

17   representatives?

18   A.  Yes.

19   Q.  That wasn't two you chose; that was just two that was

20   chosen by others?

21   A.  Yes.

22   Q.  Okay.

23           You also found that Mr. Niranjan had on his phone an

24   application called telegram?

25   A.  Yes.

1   Q.  And telegram is like signal a messaging app where two or

2   more people can communicate with one another over the

3   application?

4   A.  Yes.

5   Q.  And telegram has features like disappearing messages?

6   A.  Yes.

7   Q.  Approximately how many messages did you pull from

8   Mr. Niranjan's phone on that telegram application on June 2?

9   A.  None.

10  Q.  How many signal messages did you pull from Mr. Niranjan's

11  phone on June 10?

12  A.  None.

13  Q.  How many telegram messages did you pull from Mr. Niranjan's

14  phone on June 10?

15  A.  None.

16  Q.  All right.  I would like to turn now to the next day that

17  you -- am I understanding correctly after June 2, the next day

18  you met Mr. Niranjan was on June 10?

19  A.  Yes.

20  Q.  If we could pull up Government Exhibit 383 for a moment.

21          Now, can we blow up where -- and this is in evidence.

22  Mr. Niranjan turns over his same iPhone 11 Pro to you, correct?

23  A.  Yes.

24  Q.  Could we blow up the signature block of Mr. Niranjan and

25  Aditi Khullar, that whole block?  Thank you.  Would you

N6DQgoe4                         Tappeto – Cross

1    highlight June 10, 2022 at the top, thank you.

2              The time that Mr. Niranjan turned over his phone to

3    you on June 10, 2022 was 2:06 p.m.?

4    A.   Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. BRODSKY:

3    Q.   Now, you don't know where Mr. Niranjan was between, let's

4    say, approximately 7:00 a.m. and 7:45 a.m. that morning,

5    correct?

6    A.   Correct.

7    Q.   So keeping in mind the time of, let's say, 8:00 a.m., you

8    don't know where Mr. Niranjan was between 8:00 a.m. on June 10,

9    2022, and 2:06 p.m.?

10   A.   That's correct.

11   Q.   You don't have any way of telling whether Mr. Niranjan did

12   anything with his phone between 8:00 a.m. and 2:06 p.m.?

13   A.   That's correct.

14   Q.   So you don't know when you pulled the extraction from the

15   phone on June 10, 2022, you don't know when any particular

16   message that's not on the phone that day was deleted between

17   June 2nd and June 10?

18   A.   That's correct.

19   Q.   Okay.  So on June 10, 2022 -- and you don't question

20   Mr. Niranjan -- I don't want to know the answer.  You don't

21   question him about what he was doing between the hours of

22   8:00 a.m. and 2:06 p.m.?

23   A.   No.

24   Q.   Okay.

25            MR. BRODSKY:  Your Honor, may I approach again?

1              THE COURT:  You may.

2    BY MR. BRODSKY:

3    Q.  I'm showing you what's marked as defense Exhibit 1249 for

4    identification.

5              Prior to coming to court today, Mr. Tappeto -- you

6    recognize this document, correct?

7    A.  Yes.

8              (Pause)

9              THE COURT:  You may continue.

10             MR. BRODSKY:  I'll offer DX1249, your Honor.

11             THE COURT:  Any objection?

12             MR. ROTHSCHILD:  None, your Honor.

13             (Defendant's Exhibit 1249 received in evidence)

14             THE COURT:  Proceed.

15   BY MR. BRODSKY:

16   Q.  Before I put it up side by side with DX1248 in evidence,

17   DX1249 in evidence is, fair to say, a summary of the numerical

18   number of items which were taken from the phone, extracted from

19   the cellular phone of Mr. Niranjan on June 10, 2022?

20   A.  Some of the data categories.

21   Q.  And the reason you say some of the data categories is

22   because at the direction of Mr. Niranjan and his

23   representatives, you only pulled a subcategory of information

24   from Mr. Niranjan's cellular telephone on June 10?

25   A.  No.

1    Q.  You only pulled the text messages?

2    A.  No.

3    Q.  You were able to collect all the items on the phone on June

4    10, 2022, but you limited the report that you created to just

5    text messages?

6    A.  Yes.

7    Q.  When you limited the report that you created on June 10,

8    2022, to just text messages, you did that at the direction of

9    Mr. Niranjan and his representatives?

10   A.  Yes.

11              MR. BRODSKY:  All right.

12              Nicolette, would you please put side by side DX1249

13   with -- in evidence with DX1248, please?  We're testing your

14   screen skills.

15   BY MR. BRODSKY:

16   Q.  Mr. Tappeto, here it seems to say on audio that there's

17   49 -- there we go.

18              Here -- by the way, under Defense Exhibit 1249, which

19   is the smaller chart, right, for June 10th, it says June 10th

20   data categories, that also has the category of deleted, right?

21   A.  Yes.

22   Q.  And just like defense Exhibit 1248 for June 2nd, the

23   category of deleted there just means that when you did this

24   collection and ran this report for text messages, only

25   recoverable deleted items would appear in that column?

1    A.  Yes.

2    Q.  So if it was just like defense Exhibit 1248 for June 2nd,

3    it was unrecoverable deleted, it would not appear?

4    A.  Yes.

5    Q.  All right.  And this report can't tell when a deletion

6    occurred, correct?

7    A.  Correct.

8    Q.  And it doesn't purport or represent when something was

9    deleted?

10   A.  Correct.

11   Q.  All right.  The June 2nd data category for audio, for

12   example, says 512.  The June 10 data category for audio says

13   49.  Do you see the difference?

14   A.  Yes.

15   Q.  Do you know whether or not audio from text messages were

16   deleted from the audio of text messages on defense Exhibit 1248

17   on June 2nd?

18            MR. ROTHSCHILD:  Objection, your Honor, can we have a

19   sidebar?

20            THE COURT:  Let me look for a second.

21            Yes.

22            Ladies and gentlemen, please stand up and stretch.

23            (Continued on next page)

24

25

1          (At the sidebar)

2          MR. ROTHSCHILD:  Your Honor, it seems that the defense

3    is pursuing on cross-examination precisely the sort of

4    comparison between June 2nd and June 10 data that they asserted

5    would be expert testimony and that we agreed we would not

6    pursue with this witness on direct, and did not pursue with

7    this witness on direct.  It's beyond the scope of the direct

8    and precluded by the Court's prior rulings on that issue.

9          THE COURT:  Well, I'm giving the defense a certain

10   degree of latitude because of the circumstances by which

11   Mr. Tappeto comes to the stand which have been discussed on the

12   record of Monday morning's proceedings.

13         What I haven't yet ruled on is whether the questioning

14   in any way opens a door that was previously closed to you.

15         MR. BRODSKY:  Your Honor, may I just --

16         THE COURT:  So the objection is overruled.

17         MR. BRODSKY:  May I just say that the government

18   elicited on direct that -- and Mr. Tappeto said, and it's

19   already out, that messages were obtained on June 10 that were

20   not on June 2nd.  Then the next question was about a

21   discrepancy report and I object -- that's my memory.  I could

22   be wrong.  But that's my general recollection.  Now I am

23   getting older.

24         THE COURT:  No, no, no.

25         MR. BRODSKY:  My memory could be wrong.

1          THE COURT:  And I have no way present, without

2     reviewing the transcript, to confirm or not your recollection.

3     But I --

4          MR. ROTHSCHILD:  So, your Honor, I think the word

5     "discrepancy" was used to refer to the fact that Government

6     Exhibit 254, which is messages from June 10 of 2022,

7     includes -- this was in our letter -- 12 rows that are not on

8     the June 10 report when he filters it for conversations between

9     Brijesh Goel and Akshay Niranjan because there are 12 messages

10     between Akshay Niranjan and an individual whose last name is

11     Goel but is a different Goel.

12          That's why the word "discrepancy" came up.  He was

13     preparing to explain that fact.  It was only with respect to

14     June 10.  There was no comparison between June 2nd and June 10

15     implied in that testimony at all.

16          MR. BRODSKY:  Thank you for that.  What I would say,

17     your Honor, to opening the door, is I would ask you to consider

18     that the challenge we have is that I want to be able to

19     understand why the numbers are different without opening the

20     door.  This is the only witness who extracted the phone on

21     those two dates.  And I don't want to open doors.  But I

22     would -- would the Court have some guidance on whether this

23     line of questioning would open the door.

24          THE COURT:  I really can't give you guidance, but it's

25     a general principle of trial practice that something which is

 1   precluded, as was acknowledged to be precluded on direct

 2   examination, by reason of the nature of the cross, the door can

 3   be opened.  And that is something that I know, as an excellent

 4   trial lawyer of the first order, that you are mindful of and

 5   you have two wise colleagues there to guide you.

 6             MR. BRODSKY:  I have two comments:  One, I'm going to

 7   take that part of the transcript and send it to my mother.  And

 8   the second part I would say is that, as of now, we have not

 9   opened the door.  Is that fair?

10             THE COURT:  I haven't ruled on that.  I haven't ruled

11   on it.  It may be open already.  But the fact of the matter is,

12   I'm going to give both sides an opportunity to argue that

13   point, and so I'm not ruling in realtime on that question.

14             MR. BRODSKY:  Okay.  Thank you, your Honor.

15             THE COURT:  You don't have to thank me.

16             MR. BRODSKY:  I understand.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. BRODSKY:

3    Q.  Mr. Tappeto, when you testified about a subset of messages

4    taken from, I think it was Government Exhibit -- just so I have

5    it right -- 255, do you recall approximately how many messages

6    are on Government Exhibit 255?

7    A.  No.

8    Q.  And, again, you didn't choose that subset, correct?

9    A.  Correct.

10   Q.  Do you know what years those messages are from?

11   A.  No.

12   Q.  What you know about them is that that group of messages was

13   selected by somebody else?

14   A.  Yes.

15   Q.  Who told you which messages to pull?

16   A.  Could you repeat that?  Or rephrase?

17   Q.  Yes.  I'll withdraw that question.  I'll ask a better one.

18            Government Exhibit 255 in evidence, who selected those

19   messages?

20   A.  I don't know.

21            MR. BRODSKY:  One moment, your Honor.  Thank you, your

22   Honor, no further questions.

23            THE COURT:  Thank you, you may redirect.

24   REDIRECT EXAMINATION

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    BY MR. ROTHSCHILD:

2    Q.   Mr. Tappeto, do you recall being asked questions on

3    cross-examination about who TransPerfect's client was for the

4    work you had been testifying about?

5    A.   Yes.

6    Q.   Did the identity of TransPerfect's client impact the work

7    that you did in any way?

8    A.   No.

9    Q.   Impact how carefully you did your work?

10   A.   No.

11   Q.   And do you recall being asked questions on

12   cross-examination about who was paying the bills for the work

13   that you were doing?

14   A.   Yes.

15   Q.   Did the identity of the person who was paying the bills

16   enter into your thought process at any point while you were

17   performing your work?

18   A.   No.

19   Q.   Did it impact the quality of your work?

20   A.   No.

21   Q.   Do you remember being shown the statement of work on

22   cross-examination?

23   A.   Yes.

24   Q.   Is that a document that you participated in creating?

25   A.   No.

1    Q.  Is your signature on that document?

2    A.  No.

3    Q.  Do you set the rates that are charged for your services?

4    A.  No.

5    Q.  And, in fact, did the identity of the client or the amount

6    that TransPerfect was getting paid at all impact your ability

7    to take your June 2, 2022, messages report and take Government

8    Exhibit 253 and satisfy yourself that the data on Government

9    Exhibit 253 is a subset of the data on your June 2, 2022,

10   messages report?

11   A.  No.

12   Q.  And it's a subset that includes messages between Akshay

13   Niranjan and Brijesh Goel?

14   A.  Yes.

15   Q.  Did it at all impact your ability to take your June 10,

16   2022, report, and Government Exhibit 254 and satisfy yourself

17   that the data on Government Exhibit 254 is a subset of the data

18   on your June 10, 2022, messages report?

19   A.  No.

20   Q.  And a subset that includes messages between Akshay Niranjan

21   and Brijesh Goel?

22   A.  Yes.

23   Q.  Is it at all unusual for TransPerfect to be hired by law

24   firms?

25   A.  No.

1              MR. BRODSKY:  Objection.

2              THE COURT:  Overruled.

3    BY MR. ROTHSCHILD:

4    Q.  Do you recall being asked questions on cross-examination

5    about work that you did in this matter after June of 2022, in

6    November of 2022?

7    A.  Yes.

8    Q.  And in February of 2023?

9    A.  Yes.

10   Q.  And did that subsequent work at all impact the work that

11   you had already done in June of 2022?

12   A.  No.

13   Q.  If we can pull back up Defense Exhibit 1248?

14              Mr. Tappeto, you testified that the deleted column

15   here -- what does it signify?

16   A.  The deleted column would be a number other than one if a

17   deleted item was able to be recovered by our forensic tool.

18   Q.  But it doesn't necessarily tell you if files had been

19   deleted from the device prior to your getting the device on

20   June 2nd?

21   A.  No.

22   Q.  And do you see on this document, sir, next to videos the

23   count says 4,415?

24   A.  Yes.

25   Q.  And what does that number signify?

N6D6GOE5                        Tappeto - Redirect

1    A.  That means there are 4,415 videos stored on the phone.

2    Q.  And could we pull up Defense Exhibit 1249?

3          Mr. Tappeto, do you see videos here?

4    A.  Yes.

5    Q.  Now, what does videos on this spreadsheet refer to?

6    A.  These are videos that were sent as attachments to messages.

7    Q.  So different from what videos refer to on the other one?

8    A.  Yes.

9    Q.  What's the number here?

10   A.  1,023.

11         THE COURT:  So that 1,000 number on DX1249 are videos

12   that were an attachment to something else, is that what your

13   testimony is?

14         THE WITNESS:  Yeah.  An attachment to a text message.

15         THE COURT:  All right.  And the 4,000 figure on the

16   prior exhibit, DX1248, that was not attachments.  That was

17   videos on the phone, is that your testimony?

18         THE WITNESS:  That will include attachments, it's all

19   videos stored.

20         THE COURT:  All videos both attachments and those that

21   are just stored on the phone.

22         THE WITNESS:  Correct.

23         THE COURT:  Just trying to understand this.  Thank

24   you.

25         MR. ROTHSCHILD:  Thank you, your Honor.

N6D6GOE5

1    BY MR. ROTHSCHILD:

2    Q.  Again, with respect to government -- Defense Exhibit 1249

3    that's up on the screen right now, deleted does not necessarily

4    tell you if there was data or messages deleted from the phone

5    prior to your encountering the phone on June 10, 2022?

6    A.  That's correct.

7            MR. ROTHSCHILD:  Your Honor, may I approach?

8            THE COURT:  You may.

9            MR. ROTHSCHILD:  Nothing further, your Honor.

10           THE COURT:  All right.  You may step down, sir.  Thank

11   you.

12           (Witness excused)

13           THE COURT:  Ladies and gentlemen, let's take our

14   midafternoon break.  Please do not discuss the case among

15   yourselves or with anyone else.  We'll be back in action in ten

16   minutes, and there's more to come.  Please keep an open mind.

17   Thanks.

18

19

20

21

22

23

24

25

N6D6GOE5

1              (Jury not present)

2              THE COURT:  See you in ten minutes.  Thank you.

3              (Recess)

4              THE COURT:  All right.  Please remain standing for the

5    jury.

6              Get your next witness.

7              MR. NAFTALIS:  While we're getting the jury, we see no

8    reason to inquire with respect to Court Exhibit 2, the note.

9              THE COURT:  Okay.  Fine, thank you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.

3    THOMAS CAROCCI,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. THOMAS:

8    Q.  Good afternoon.  What do you do for a living?

9    A.  I'm an attorney with FINRA.  The financial industry

10   regulatory authority.

11   Q.  What is FINRA?

12   A.  Right.  FINRA is what's called a private self-regulatory

13   organization.  So we regulate the securities industry.  That

14   would be firms and individuals that sell securities such as

15   stocks and bonds to the investing public.  And we're funded by

16   that industry.  It's a self-regulatory body, so we're not the

17   government.

18   Q.  You said you were an attorney at FINRA.  What is your

19   position?

20   A.  I'm an assistant general counsel with the criminal

21   prosecution assistance group.

22   Q.  What does it mean to be an assistant general counsel in

23   that group?

24   A.  Right.  So we assist federal, state, and local prosecutors

25   and investigators with their white-collar criminal cases.  I do

1    not work on any FINRA civil regulatory matters.  I just do

2    criminal assistance.

3    Q.  How long have you been doing that criminal assistance work?

4    A.  Approximately 19, 20 years.

5    Q.  In the course of that work, have you previously testified?

6    A.  I have.

7    Q.  Any ballpark sense of how many times?

8    A.  75, 80 times perhaps.

9    Q.  What sorts of cases?

10   A.  Insider trading, stock manipulation, Ponzi schemes, some

11   money laundering, accounting fraud, options backdating frauds,

12   those types of trials.  White-collar criminal trials.

13   Q.  In the course of that work, have you encountered terms and

14   concepts that come up in the securities industry?

15   A.  I have.

16   Q.  Have you testified about those topics in the past?

17   A.  I have.

18   Q.  I want to turn your attention slightly and focus on a

19   regulatory piece of FINRA.

20           Does FINRA maintain records about those who have

21   licenses issued within the securities regulatory industry?

22   A.  We do.  We maintain a record of every individual in the

23   industry.

24   Q.  I want to show the witness and the parties Government

25   Exhibit 361.

1          Do you recognize Government Exhibit 361?

2   A.  I do.

3   Q.  What do you recognize it to be?

4   A.  It is a FINRA CRD, or central registration depository

5   report.  So this would be a FINRA business record.

6   Q.  Is this record kept in the regular course of FINRA's

7   business?

8   A.  Yes, it is.

9   Q.  Is this an accurate copy of one such report?

10  A.  Yes.

11          MR. THOMAS:  The government offers 361.

12          MR. FORD:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 361 received in evidence)

15          MR. THOMAS:  Ms. Sonderby, if we can page forward to

16  Page 6, please.

17  BY MR. THOMAS:

18  Q.  Mr. Carocci -- I think we've gone too far, Ms. Sonderby.

19  Can we go back one more page, please?

20          Mr. Carocci, do you see at the top of this Page 5 of

21  Government Exhibit 361 the name of the individual to which this

22  report relates?

23  A.  Yes, Brijesh Goel, and then his CRD number, which is his

24  FINRA social security number, for lack of a better word.

25  618-7078, and Brijesh Goel.  So this would be his individual

1  report with FINRA.

2  Q.  Now this is before the jury, can you explain what sort of

3  information can be found in a CRD report like this?

4  A.  It's a way FINRA keeps track of individuals in the

5  industry, what firms they are currently working with, what

6  exams they have passed which would allow them to do certain

7  things within the securities industry, their previous

8  employment background, educational background, and what firms

9  they are with.  So it's kind of just identifying information

10  like that.

11             MR. THOMAS:  Ms. Sonderby, if we can go forward to

12  Page 6, this time?

13  BY MR. THOMAS:

14  Q.  I want to direct your attention, Mr. Carocci, to the center

15  of the page.  There's an office of employment history section.

16  Do you see that?

17  A.  Yes.

18  Q.  What information could be learned in this part of the

19  document?

20  A.  That Mr. Goel was employed with Goldman Sachs from April of

21  2013 till June of 2021.

22             MR. THOMAS:  Ms. Sonderby, if you take off the -- and

23  go to the bottom of the page, please?

24  BY MR. THOMAS:

25  Q.  Mr. Carocci, do you see the section labeled exam history?

1    A.  Yes.

2    Q.  What kind of information can be found in the exam history

3    part of the document?

4    A.  This states what exams individuals have passed that FINRA

5    administers.  FINRA administers exams which, if you pass,

6    you're allowed to do certain things in the industry.  And so

7    this individual, Mr. Goel passed a Series 63, and on the next

8    page a Series 79.

9    Q.  Let's start with the Series 63.  You said it's on this

10   page?

11   A.  Yes.

12   Q.  Where can a jury see that he passed the Series 63 exam?

13   A.  Under grade, it says "passed" and then the exam date was

14   7/27 of 2016.

15   Q.  And in the exam column, is that indicated by the S63?

16   A.  Yes, that stands for Series 63.

17            MR. THOMAS:  Ms. Sonderby, if you can go to the top of

18   the next page, Page 7.

19   BY MR. THOMAS:

20   Q.  Mr. Carocci, to direct your attention to the exam history

21   on this page, do you see S79 under exam on this page?

22   A.  Yes.

23   Q.  What does that signify?

24   A.  The Series 79, which is an investment banking

25   representative exam.  And Mr. Goel passed that, as you can see

1    under "grade" on May 2nd of 2016.

2    Q.  In connection with these exams, does FINRA prepare and

3    publish exam outlines setting forth the content of the matter

4    that will be tested on the exam?

5    A.  We do, yes.

6    Q.  Is that true of the Series 63?

7    A.  Yes.

8    Q.  Is that also true of the Series 79?

9    A.  Yes.

10          MR. THOMAS:  Ms. Sonderby, just show the witness and

11   the parties Government Exhibit 362.

12   BY MR. THOMAS:

13   Q.  Do you recognize Government Exhibit 362?

14   A.  Yes, this is the investment banking representative content

15   outline, the Series 79 outline, content outline.  And it was

16   from 2015, so it was in effect in 2016 when Mr. Goel passed the

17   exam.

18   Q.  Is this a fair and accurate copy of what FINRA published

19   that was in effect at the time Mr. Goel took his exam?

20   A.  Yes.

21          MR. THOMAS:  The government offers 362.

22          MR. FORD:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 362 received in evidence)

25

1              MR. THOMAS:  Ms. Sonderby, if we can publish for the

2      jury?

3      BY MR. THOMAS:

4      Q.  So, Mr. Carocci, can you just explain at a high level to

5      the jury what this document is?

6      A.  Right.  So this would let an individual who is taking the

7      exam now know what is going to be tested on the exam; the

8      rules, the regulations, the products, the procedures that would

9      be tested on the exam so that they can prepare for the exam and

10     hopefully pass the exam when they take it.

11             MR. THOMAS:  Ms. Sonderby, let's skip ahead to Page 24

12     of this document.

13             And if you could enlarge the Section 4.2.2?

14     BY MR. THOMAS:

15     Q.  Mr. Carocci, what do we see here in this enlarged portion?

16     A.  Section 4.2.2, it's insider trading and information

17     barriers.

18     Q.  Is this information that would have been covered by this

19     exam?

20     A.  That's correct.  It's in the content outline.  The exam

21     would have tested an individual's knowledge of those areas.

22     The rules and regulations and laws in those areas.

23     Q.  What competence, if any, with respect to the rules and

24     regulations in this area would a test taker have to demonstrate

25     to pass the exam?

1    A.  Well, that they understood insider trading and securities

2    fraud enforcement, that Rule 10b-5-1, trading on the basis of

3    material nonpublic information in insider trading cases.

4    Employment of manipulative and deceptive devices, it's 10b-5.

5    And then, you know, Section 15F, written procedures designed to

6    prevent misuse of material nonpublic information.  And 155 --

7    10b-5-2, duties of trust or confidence in misappropriation of

8    insider trading cases.

9              MR. THOMAS:  Ms. Sonderby, we can take that down.

10   Let's show the witness and the parties Government Exhibit 363.

11   BY MR. THOMAS:

12   Q.  Mr. Carocci, we talked about the Series 79.  You mentioned

13   earlier there was also a Series 63?

14   A.  Correct.

15   Q.  With that in mind, do you recognize the document in front

16   of you here?

17   A.  Yes.  It's the content outline for the Uniform State Law

18   examination, which is known as the Series 63 exam.

19   Q.  And is this the content outline that was in effect at the

20   time Mr. Goel took this exam?

21   A.  Yes, it was effective 11 of 2010, but it was still in

22   effect in 2016 when he took the exam.

23             MR. THOMAS:  The government offers 363.

24             MR. FORD:  No objection.

25             THE COURT:  Received.

1          (Government's Exhibit 363 received in evidence)

2          MR. THOMAS:  Ms. Sonderby, if you could publish that

3     for the jury and go to Page 2?

4     BY MR. THOMAS:

5     Q.  Mr. Carocci, do you see there's a Section D labeled

6     "Conflicts of Interest and Other Fiduciary Issues"?

7     A.  Yes.

8     Q.  Was insider trading one of the topics covered in this exam?

9     A.  It was.  D6, insider trading is part of this content

10    outline, would have been tested on the Series 63 exam.

11         MR. THOMAS:  Ms. Sonderby, you can take that down.

12    BY MR. THOMAS:

13    Q.  Mr. Carocci, I want to talk to you a little bit about some

14    terms and concepts in the securities industry.  Are you

15    familiar with the phrase "public company"?

16    A.  Yes.

17    Q.  What does it mean for a company to be a public company?

18    A.  That would be a company that has a stock that trades on a

19    stock exchange.  A company such as Apple or Amazon, Microsoft,

20    their stock trades on an exchange publicly and the public can

21    invest in that by buying and selling shares of those stocks.

22    Q.  You mentioned stock exchange.  Could you give the jury some

23    examples of stock exchanges?

24    A.  So one would be the New York Stock Exchange here in

25    New York.  The other would be the NASDAQ stock exchange.  Those

1    would be two pretty big stock exchanges.  So these publicly

2    traded companies are listed on one of these exchanges and they

3    trade on these exchanges.  So the exchanges facilitate the

4    buying and the selling from the investors.

5    Q.  Are you familiar with the term "options" as it's used in

6    the securities industry?

7    A.  Yes.

8    Q.  What is an option?

9    A.  An option is basically a futures contract.  So it's a

10   contract to either purchase or sell shares at a future date at

11   a predetermined price called a strike price.  And you can buy a

12   number of contracts.  So if you buy five contracts, for

13   example, it's generally each contract represents a hundred

14   shares.  So it's the right to buy or to sell 500 shares at some

15   future date at a predetermined price.

16   Q.  Mr. Carocci, I want to break that down to make sure that I

17   get all the pieces there.

18          You mentioned strike price.  Could you explain

19   specifically what a strike price is?

20   A.  Right.  So that would be the price in the contract at which

21   you can buy or sell securities.  If you have what's called a

22   call option, that gives you the right to buy securities in the

23   future, stock in the future, at a predetermined price.  That

24   price being the strike price, whatever that strike price is in

25   the option, in the contract.

1    Q.  Are there other features to options contracts?

2    A.  Yes, the expiration date, so there's a date at which it

3    expires.  So it's either exercised, traded, or expired as of

4    that date.  And you can do short-term or long-term, you can do

5    three months, six months, nine months, a year.  Whatever you

6    want.

7    Q.  So just, again, to make sure I follow along, if the

8    expiration date comes and goes, but the contract isn't

9    exercised, what happens then?

10   A.  Well, you would lose what you paid to enter into that

11   contract if it just expires.  And it will expire if it's out of

12   the money, if you don't trade it.

13   Q.  You just used the phrase "out of the money"?

14   A.  Mm-hmm.

15   Q.  What does that mean?

16   A.  For example, if you enter-- let's say you buy a call

17   option, five call options at a strike price of $20, and the

18   stock, the stock that underlies that option, let's say it's

19   Amazon or something like that, is trading at $15.  Then that

20   option contract, that call option contract is out of the money

21   because you have the right to call it in at $20, but it's only

22   currently trading at $15.

23          So you can buy it in the open market on a stock

24   exchange such as the NASDAQ or the New York stock exchange for

25   $15.  So you wouldn't pay $20 for it, you wouldn't call that

1    in.  It would be out of the money, meaning, your option is not

2    profitable, therefore it would most likely expire, and you

3    would lose the cost of buying that options contract.  It's

4    called a premium.

5    Q.  Are you familiar with the phrase "in the money"?

6    A.  Yes.

7    Q.  What does it mean for an options contract to be in the

8    money?

9    A.  So the same thing, if you had an options or call, you

10   purchased a call, bought a call with a strike price of $20 per

11   share.  And the stock, let's say, is now trading at $25 a share

12   instead of 15.  Now the stock is, or the option is in the money

13   because the stock is trading at $25, higher than the strike

14   price, right?  So you are able to call in, to buy, shares at

15   $20 and they're currently selling in the open market at 25.  So

16   you can buy them at 20, sell them in the open market at $25 a

17   share, and make money.  You make $5 per share.  And that's an

18   "in the money" call option.  An example of one.

19   Q.  In that example you explained you can call in the shares,

20   buy them at that price and then sell them on the open market?

21   A.  Correct.

22   Q.  Is there another way to make money within the money call

23   options?

24   A.  Yes.  Options trade like stocks.  If you buy shares in

25   Apple, another investor is selling them to you.  And the stock

1    exchanges facilitate that transaction.  It's the same with

2    options contracts.  They can be bought and sold between

3    investors.  So if you have an option that's in the money,

4    it's -- it should be worth more than you paid for it if you

5    bought it -- let's say at the time you bought it was out of the

6    money.  You should be able to -- you know, you should be able

7    to find a willing buyer for that options contract.  So instead

8    of letting it expire or exercise, it's trading.

9    Q.  From the perspective of investment strategy, what would

10   buying an out-of-the-money call option be intended to achieve?

11   A.   It would -- if you bought an out-of-the-money call option,

12   that means that the strike price, the price at which you can

13   call those shares in, buy those shares, the contract gives you

14   the right to buy those shares, would be higher than what the

15   stock is currently trading at.  Again, it would be like the

16   stocks trading at $15, you have a call option with a stock --

17   with a strike price of $20, out of the money.

18          You're -- an investor's thought there would be this

19   stock is going increase, right?  It's going to increase to $20

20   or higher.  It's considered -- it's what they call a long

21   position or a bullish position.  You think the stock that

22   underlies that options contract is going to increase in value

23   prior to the expiration date of the option.

24   Q.  Now, we talked a little bit about the expiration dates.

25   Are you familiar with the phrase "short dated"?

1    A.  Yes.

2    Q.  What does it mean for an option to be short dated?

3    A.  It's when the expiration date is relatively near or soon,

4    generally less than a year.  Long dated would be generally over

5    a year or nine months or longer, something longer than a couple

6    weeks or a couple months.

7    Q.  Mr. Carocci, I want to turn your attention to this matter

8    here.  Did you assist in preparing and reviewing a series of

9    summary charts in preparation for your testimony today?

10   A.  Yes.

11   Q.  Can you tell the jury what sorts of records you relied on

12   to prepare your charts?

13   A.  I looked at some brokerage account statements.  These would

14   be statements that showed stock and options trading, similar to

15   a bank account statement, except instead of deposits and

16   withdraws, it shows options, contracts and stocks being bought

17   and sold and money being deposited into accounts.  Trade

18   blotters, which is the record that kind of firms keep to keep

19   track of -- brokerage firms to keep track of the trading.

20           I looked at publicly available, Bloomberg trading data

21   for the stocks.  So what prices the stock traded at, how many

22   shares traded on a daily basis, the volume, what's called the

23   trading volume, how many shares traded on a daily basis.  And

24   press releases.  Trying to think if there's anything else.

25   Q.  The press releases that you looked at, did those include

1  press releases that were appended to form 8-Ks filed by public

2  companies?

3  A.  Yes.

4  Q.  I want to take a couple of those categories of records one

5  at a time before we get to the charts.  So let's start with the

6  account records.

7           MR. THOMAS:  With the Court's permission, I'll read a

8  portion of a stipulation that bears on this issue?

9           THE COURT:  All right.

10          MR. THOMAS:  This is from --

11          THE COURT:  Are you going to offer the stipulation or

12  is it in evidence?

13          MR. THOMAS:  It's not in evidence, I intend to offer

14  the stipulation.

15          THE COURT:  Why don't you offer it, offer the

16  stipulation.

17          Is there going to be any objection to this?  This

18  is --

19          MR. THOMAS:  This is Government Exhibit 503 which

20  relates to E-Trade and Optionshouse records.

21          MR. FORD:  No objection.

22          THE COURT:  Okay.  Go ahead.

23          MR. THOMAS:  From Government Exhibit 503, which I

24  think is now evidence:

25          Number 1.  If called as a witness an employee of

1    E-Trade Financial Corporation would testify as follows:

2    Subparagraph A, Government Exhibits 300 through 303 reflects

3    trading records for the accounts of Akshat Niranjan at E-Trade

4    and Optionshouse, which was acquired by E-Trade.  The

5    timestamp, column S in Government Exhibit 300 is in New York

6    time.

7            Subparagraph C, the records reflected in Government

8    Exhibits 300 through 307 were retrieved from E-Trade's files,

9    were created by a person with knowledge of, or created from

10   information transmitted by, a person with knowledge of the

11   information shown, or created at or near the time the

12   information became available to E-Trade, and were created and

13   maintained by E-Trade as part of its regularly conducted

14   activities.

15           The government offers Government Exhibits 300 through

16   303 on the basis of the stipulation.

17           THE COURT:  Any objection to the exhibits?

18           MR. FORD:  No objection.

19           THE COURT:  Received.

20           (Government's Exhibits 300 through 303 received in

21   evidence)

22   BY MR. THOMAS:

23   Q.  Now just to show the jury what you have in mind when you

24   talk about account records, can we show the witness Government

25   Exhibit 301, which is now in evidence?

1          Mr. Carocci, now that the jury can see Government
2    Exhibit 301, can you tell us what we're looking at here?
3    A.   Right, this is an E-Trade account statement for
4    Mr. Niranjan.  This particular page is the first page of the
5    January 1st –– January 2018 monthly brokerage account
6    statement.
7    Q.   What kind of information can you find in a brokerage
8    account statement like this?
9    A.   So it would show the trades for that month, the buy and the
10   sells, the positions, the current positions, meaning, the
11   current holdings of stock or options contracts in the account.
12   Deposits, withdrawals from the accounts, that type of stuff.
13   Q.   Now, you mentioned earlier –– Ms. Sonderby, we can take
14   this down –– that you also relied on data from Bloomberg?
15   A.   Yes.
16   Q.   Let's show the witness and the parties Government Exhibit
17   364.  Do you see Government Exhibit 364?
18   A.   Yes.
19   Q.   And let's show the witness and the parties Government
20   Exhibit 366.
21          Have you had a chance to review 366?
22   A.   Yes.
23   Q.   And show Government Exhibit 368.
24          Have you had a chance to review that?
25   A.   Yes.

1  Q.  Are each of these exhibits, Governments Exhibits 364, 366,

2  and 368, outputs from Bloomberg's price volume market reports?

3  A.  Yes, it's Bloomberg data that's on Bloomberg.

4  Q.  This is publicly available market quotations?

5  A.  Correct, right.  It's the closing price for the

6  corresponding date and the trade volume.  Back when there were

7  newspapers, it used to be reported in every newspaper every

8  day.

9  Q.  Mr. Carocci, did you yourself compare that the data

10  reflected on 364, 366, and 368 accurately reflected what is

11  available publicly in Bloomberg?

12  A.  Yes.

13          MR. THOMAS:  The government offers 364, 366, 368.

14          MR. FORD:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibits 364, 366, and 368 received in

17  evidence)

18  BY MR. THOMAS:

19  Q.  Now, we have 368 up, so let's leave 368 up and show it to

20  the jury.

21          Mr. Carocci, now that the jury is with us, can you

22  explain what kinds of information can be found in this sort of

23  Bloomberg data?

24  A.  Right.  So this is for Patheon NV.  It's the price and

25  volume data for April 3, 2017, through May 31st of 2017.  So

1    for each date, there's a closing price, which is the price at

2    4:00 o'clock Eastern, when the New York Stock Exchange and

3    NASDAQ closed.  The last sale is the closing price, and that's

4    generally what's reported, like I said, in newspapers, all the

5    financial websites, that closing price.  And then the daily

6    trading volume is how many shares exchanged hands.

7            So, again, this is for the stock, which is -- would

8    underlie like an options contract, if there's an options

9    contract on it.  But this is for the stock, the ownership

10   interest in the company.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. THOMAS:  (Continued)

2    Q.  You talk about options contracts.

3         So, Ms. Sonderby, why don't we take this down and show

4    the witness and the parties only Government Exhibit 365.

5         Do you recognize 365?

6    A.  Yes.

7    Q.  Is this Bloomberg data for options contracts for a specific

8    ticker?

9    A.  Yes.  This is for Calgon Carbon Corporation, and it is the

10   call options data for the corresponding date.  It has the date,

11   the price and the volume.

12        MR. THOMAS:  The government offers 365.

13        THE COURT:  Any objection?

14        MR. FORD:  No objection.

15        THE COURT:  Received.

16        (Government's Exhibit 365 received in evidence)

17   Q.  Mr. Carocci, could you tell the jury what sort of

18   information can be found on this record?

19   A.  Right.  It has the date and then the price of the options

20   contract.  So if you look at September 6 of 2017, the price is

21   30 cents the contract, and the volume is 394 contracts.

22   Q.  Mr. Carocci, I want to direct your attention to the header

23   row here where it says 10/20/17, $15 call options?

24   A.  Correct.

25   Q.  Can you explain to the jury what that is?

1    A.  Yes.  So that is a description of the call options.  The

2    expiration date is 10/20/17.  So that's first, right.  And you

3    can see that options were bought on 9/6, September 6,

4    September 7, September 8, but they're all for 10/20/17

5    expiration at $15 which is the strike price, $15.  And they're

6    call options, so it would give the option holder the right to

7    call in those shares at $15 per share at, you know, prior to

8    October 20 of 2017.

9    Q.  Mr. Carocci, in the price column, there are prices on some

10   of these days that are pennies, you know, portions of a dollar

11   or less.  Is that common for options contracts?

12   A.  Yes.  You know, each contract is worth one hundred shares,

13   so that would be the -- it's just kind of the price per share.

14   Q.  So the price here reflects the price per share?

15   A.  That's correct.

16   Q.  And what sorts of variables impact the price that an

17   options contract itself would trade at?

18   A.  Well, whether it's whether in the money or out of the money

19   or close to the money, how close it is to the money would have

20   an effect on the price.  And then, you know, what is happening

21   with the company, just like a stock, you know, if there's news

22   about the company, it could affect the options price as well,

23   both positively or negatively, depending on the nature of the

24   news.

25   Q.  If a call option went from out of the money to in the

1    money, what effect, if any, would you expect there to be on the

2    call option price?

3    A.   Well, that would generally -- investors would have seen

4    positive information about the company or something they

5    interpreted to be positive about the company because the price

6    would have increased, right?  It would have increased from out

7    of the money to in the money.  And we said an out of the money

8    stock option is when the strike price is higher than the

9    current trading price, so the stock price would have increased,

10   so the investors would have felt positively about the stock to

11   drive the price up.

12   Q.   Mr. Carocci, we're looking here at Calgon Carbon call

13   options for a specific date range for a particular contract.

14   Did you obtain similar information for other tickers in this

15   case?

16   A.   Yes.

17   Q.   Show the witness and the parties only Government Exhibit

18   367.

19   A.   Yes.

20   Q.   Let's also show the witness and the parties Government

21   Exhibit 369.

22   A.   Yes.

23   Q.   Mr. Carocci, do Government Exhibits 367 and 369 also

24   contain publicly quoted Bloomberg price information for call

25   options with respect to particular tickers for a specified

1    time?

2    A.  Yes.

3              MR. THOMAS:  The government offers 367 and 369.

4              MR. FORD:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibits 367 and 369 received in

7    evidence)

8    Q.  My colleagues were looking at me like I quoted the wrong

9    number, and hopefully we cleared it up.  We can take this down,

10   Ms. Sonderby.

11             You also mentioned that you relied on press releases?

12   A.  Yes.

13   Q.  I think I had asked you if some of those press releases

14   were appended to something called a Form 8K?

15   A.  Yes.

16   Q.  Can you explain to the jury what a Form 8K is?

17   A.  It's a Securities Exchange Commission form that public

18   companies file with the SEC, Securities Exchange Commission,

19   whenever there is a material event to investors, investors

20   might have interest in.  And they file this 8K, and the SEC

21   puts that up on their website, which is called their Edgar

22   Database, and so it's widely distributed to the investing

23   public at the same time.

24   Q.  **Mr. Carocci, I want to turn now to the charts that you**

25   **prepared.  On the desk in front of, you there should be a**

 1    **binder.  I would ask you to flip into the exhibits in that**

 2    **binder and look at Government Exhibits 400, 401, 404, 405, 406,**

 3    **407, 409, 410, 412, 413, 414 and 415.  Did you find those**

 4    **exhibits, sir?**

 5    A.  I did.

 6    Q.  Are those copies of the charts that you prepared and

 7    assisted in preparing?

 8    A.  Yes.

 9    Q.  Are each of those charts fair and accurate to your

10    knowledge based on the underlying information?

11    A.  Yes.

12    Q.  Would they assist you in testifying today?

13    A.  Yes.

14          MR. THOMAS:  The government offers Exhibits 400, 401,

15    404, 405, 406, 407, 409, 410, 412, 413, 414 and 415.

16          MR. FORD:  We have no objection to the numbers up to

17    414, but can we be heard on 415?

18          THE COURT:  All right.  Let me see you at sidebar.

19          (Continued on next page)

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  I'm happy to hear the objection.  I'm just

3    going to recommend to both sides that if you anticipate an

4    objection to an exhibit you expect to be offered, that you flag

5    it to me before court or on a break or the like.

6          But go right ahead.

7          MR. FORD:  Thank you, your Honor.

8          The issue with 415 which deals with trades in Sprint

9    Corporation in our bill of particulars, as your Honor knows, we

10   asked for and received the particular trades that the

11   government alleged were going to be at issue in this case, and

12   we were explicitly told that the trades were starting 4/5/2018.

13   This chart has trades from 10/25/17, suggesting that the

14   government is now adding in additional trades that they

15   previously represented would not be in.

16         THE COURT:  Let's find out.

17         MR. THOMAS:  Your Honor, we don't intend to argue

18   anything improper about the earlier trades.  Mr. Carocci was

19   asked to summarize all the trading in Sprint.  This is a

20   summary chart of the trading in Sprint.

21         MR. FORD:  As long as the government will make clear

22   there's no allegations of improper trading from --

23         THE COURT:  Well, they're not going to make an

24   allegation of improper trading, period.

25         MR. FORD:  Okay.

1          THE COURT:  And you can say they've never made an

2    allegation of improper trading as to these particular trades in

3    your summations.

4          MR. FORD:  Very good.  Thank you, Judge.

5          MR. NAFTALIS:  Your Honor, I don't remember if it's in

6    our bill of particulars.  I don't know if this is going to be

7    an issue with this witness.

8          MR. FORD:  I have a copy of the bill of particulars at

9    the table.

10          THE COURT:  Why does this have to be adjudicated now?

11          MR. FORD:  It doesn't.

12          THE COURT:  I think that's what Mr. Naftalis is

13    suggesting is that subject to confirmation against the bill of

14    particulars, they don't intend to argue that the trades you

15    referred to were improper trades.

16          MR. THOMAS:  That's correct, your Honor.  We intend to

17    adhere to the bill of particulars and to the letter that we

18    sent the Court.  This is the only chart about Sprint that this

19    gentleman will offer.

20          THE COURT:  I understand.  Thank you.

21          MR. FORD:  Thank you.

22          (Continued on next page)

23

24

25

1          (In open court)

2          THE COURT:  You may continue.

3          MR. THOMAS:  Thank you, your Honor.

4    BY MR. THOMAS:

5    Q.  Mr. Carocci, before we get to anything visually

6    interesting, I wanted to start with some basic charts.  In the

7    accounts that you looked at, did you find trading in a company

8    stock known as Lumos?

9    A.  Yes.

10   Q.  Could we show the witness, the parties and the jury

11   Government Exhibit 410.

12          Could you orient us as to what we're looking at here

13   in Government Exhibit 410?

14   A.  This is a Lumos Network Corporation trading summary.  Their

15   symbol is LMOS.  The left hand column is the date that the

16   option contract was bought.  You see transaction type is

17   options contract.  Description is, again, the symbol LMOS

18   stands for Lumos Networks.  The expiration date is April 21,

19   2017.  Strike price is $17.50.  And the C means it's a call

20   option.  And it was a buy in the Niranjan account.  It was a

21   buy of 60 contracts at 20 cents a share for the purchase price

22   of $1,224.09.  So that would be the line.  So then the rest of

23   the contracts are listed.

24   Q.  Just to take the first row here.  It says February 14, '17,

25   and a description of a contract is April 21, 2017.  I had asked

1  you earlier about short dated or long dated.  Could you say

2  whether this contract is one or the other?

3  A.  I would say short dated because it's -- it was bought on

4  February 14, 2017, and the expiration date is, you know, a

5  little over two months later, April 21 of 2017.

6  Q.  If you go over to the quantity column, the quantity is 60?

7  A.  Right.

8  Q.  What's the significance of the quantity here?

9  A.  That's the number of contracts.  Each contract generally

10  represents a hundred shares.  So it's 60 contracts.

11  Q.  I've been asking you here about.  Lumos did you find

12  trading in these accounts related to a company named

13  PharMerica?

14  A.  Yes.

15  Q.  Can we show the witness Government Exhibit 413 and actually

16  publish for everyone.

17        What are we looking at here, Mr. Carocci?

18  A.  So this is the PharMerica trading summary.  Their symbol is

19  PMC, and, again, on the far left-hand column, you have the

20  date.  That's the date the options contract was bought in the

21  Niranjan account.  Under description, if you look at the

22  description, it's PMC, which is PharMerica Corporation.  The

23  expiration date is June 16, 2017.  The strike price is $30 per

24  share.  And it is a call option.  So it would give the

25  individual the right to call in shares, to buy shares.  They

1    bought the call option, and the number of contracts was 22

2    contracts.

3    Q.  Mr. Carocci, big picture, does Government Exhibit 413

4    summarize the trading in the accounts you looked at for

5    PharMerica Corporation securities?

6    A.  Yes.

7    Q.  Did you look in those accounts to see whether there was

8    also trading in the stock of a company named Patheon?

9    A.  Yes.

10   Q.  Can we show everyone Government Exhibit 412.

11          Mr. Carocci, does Government Exhibit 412 summarize the

12   trading in the accounts you looked at in the securities of

13   Patheon

14   A.  Yes, it does.

15   Q.  Just to make sure everyone can take away the full

16   significance of the chart, in the bottom row there's a total

17   row.  Do you see that?

18   A.  Yes.

19   Q.  There's a red figure under amount purchased?

20   A.  Yes.

21   Q.  And a black figure under amount sold, and then a figure

22   labeled total P/L?

23   A.  Right.  So the amount purchased is the total amount that

24   was spent on buying options contracts, and the exercise of an

25   option contract in Patheon in the Niranjan accounts that

1    totaled $272,840.  And the amount that those contracts in

2    shares were sold for was $304,653.03 for a total profit of

3    $31,812.74.  It's the amount purchased minus the amount sold

4    for the total profit.  That's what was -- that's the summary of

5    the buys and sells of contracts and stock in Patheon.

6    Q.  Did you look in the account to see whether there was

7    trading in the securities of Spirit?

8    A.  Yes.

9    Q.  Can we show everyone Government Exhibit 414.

10            Does 414 summarize the trading in the Niranjan account

11   in the securities of Spirit Airlines?

12   A.  Yes, it does.

13   Q.  Did you look in the account to see whether there was

14   trading in the securities of Sprint?

15   A.  Yes.

16            MR. THOMAS:  Your Honor, we offer now again Government

17   Exhibit 415 on the basis of the sidebar.

18            THE COURT:  Any objection?

19            MR. FORD:  No objection.

20            THE COURT:  Thank you.  Received.

21            (Government's Exhibit 415 received in evidence)

22   Q.  We show the witness and the jury Government Exhibit 415.

23            Does 415 summarize the trading and secures of Sprint

24   corporation in the accounts you looked at?

25   A.  Yes, it does.

1   Q.  And did you look in the accounts to see whether there was

2   trading in Calgon Corporation?

3   A.  Yes.

4   Q.  Show everyone Government Exhibit 409.

5           Now, Mr. Carocci, again to draw your attention to

6   Government Exhibit 409, does this summarize the trading in

7   Calgon Carbon Corporation securities in the Niranjan account?

8   A.  It does.  It starts with the option contracts bought on

9   September 6, 2017, and it goes through the assignment of an

10  options contract on November 17 of 2017.

11  Q.  Now, to look at the first row, September 6, 2017, the

12  description is CCC, October 20, 2017, $15?

13  A.  Correct.  So it was an options contract in CCC.  Expiration

14  date of October 20, 2017.  Strike price of $15.  It was a call

15  option.  And it was bought for the eleven contracts were bought

16  at 35 cents a share.

17  Q.  Mr. Carocci, again, in your view, would this be a short

18  dated or a long dated call option?

19  A.  It would be a short dated because it's a little over a

20  month.

21  Q.  And with respect to Calgon Carbon trading, how much money

22  did the account use to purchase Calgon Carbon securities in

23  this time period?

24  A.  About $53,853.54 was the amount of the purchase of the

25  options contracts, and of the purchase of 2500 shares on the

1    exercise of one of those contracts.

2    Q.  How much in proceeds was this account able to sell those

3    shares for on the market?

4    A.  For $300,200.16 for a profit of $246,367.62.

5    Q.  Now, Ms. Sonderby, we can take this down.

6          Mr. Carocci, I'm going to walk through a few visual

7    charts.  Let's start with Government Exhibit 404.  I want to

8    take you pack to trading in Lumos.  Mr. Carocci, could you

9    explain to the jury what we're looking at here on Government

10   Exhibit 404?

11   A.  Yes.  So this is Lumos Networks Corporation.  It's a chart

12   that shows the daily closing price and the trade volume for

13   Lumos stock and the Niranjan trading in that stock from

14   February 1 through April 28 of 2017.

15   Q.  Now, here there are -- there's a line in blue.  Could you

16   tell the jury what that signifies?

17   A.  So the line in blue is the closing price line.  So that's

18   the price line.  And if you look at the right hand axis, it's

19   the price axis.  So for, you know, you know -- so, for example,

20   the -- you know, the price is trading a little over, it looks

21   like, $15 a share on February 14, that black dot.  So that

22   would be the price line, and the price goes up to approximately

23   $18 per share and then higher across.

24   Q.  There is a reddish salmon-colored set of bars along the

25   bottom.  Could you tell the jury what those are?

1    A.   That's the trading volume for the corresponding date at the

2    bottom of the chart, the horizontal axis on the bottom of the

3    chart, which is the same for price.  That would be the daily

4    trading volume of the stock, how many shares traded hands of

5    Lumos stock.

6    Q.   And you have annotations with dates along the graph.  Could

7    you walk the jury through what you've annotated here?

8    A.   Correct.  So on February 14 of 2017, the Niranjan account

9    buys 120 contracts with an expiration date of April 21, 2017,

10   with a strike price of $17.50, and they're call options.  So

11   they have the right to call in those options at $17.50 a share.

12        Now the stock is only trading at a little over $15 a

13   share, not lower than $17.50 a share, so those are out of the

14   money stock options, call options, out of the money call

15   options.  So it's a long position.  It's bullish.  Someone that

16   would buy that would think the stock price is going to increase

17   in value to higher than $17.50.

18   Q.   Did that happen?

19   A.   It did.  It did happen.  There was a -- on the same date

20   there was a corresponding sell of call options for the same

21   expiration date, April 21 of 2017 at $25.  So that is what's

22   called a bull spread call, basically.  You know, we can get

23   into that, but the stock did increase to $18 a share.  It did

24   go higher than $17.50 a share, so the options contract did go

25   into the money.

1  Q.  I'm going to break this apart and make sure everyone

2  follows along.

3        On February 14, the Niranjan account made a bet that

4  the stock would go up

5  A.  Higher than $17.50.

6  Q.  Higher than 17.50?

7  A.  Right.

8  Q.  Did that happen?

9  A.  That happened, yes.

10  Q.  How much longer after the initial stock trade on the 14th

11  did that occur?

12  A.  About six days.

13  Q.  Why did the stock go up?

14  A.  The stock went up, on February 20, about six days later,

15  Lumos announced a $950 million merger agreement with EQT at $18

16  per share.  So EQT made an offer for Lumos at $18 a share.

17  Once that happened, the stock price went up from a little over

18  $15 a share to close to $17 a share.

19        And you can also see the spike in trading volume.  The

20  trading volume was roughly -- on February 17 was roughly about

21  60,000 shares for the day.  And then on February 20, which was

22  the next trading day -- that was President's Day weekend, so

23  there was no trading on that Monday, so it's three days -- was

24  6.4 million shares.  So now the trading volume went from 60,000

25  to 6.4 million, and the stock price increased from around $15 a

1    share to a little below $18 a share.

2    Q.  If I heard correctly, is it right that not only did the

3    stock price go up but many more people traded in the stock

4    around the time of that merger?

5    A.  Correct.  Correct.  It was seen as positive news, as you

6    can imagine, because somebody is now offering $18 per share for

7    a stock that's trading around $15 a share.  EQT offered $18 a

8    share.

9    Q.  And was the Niranjan account able to turn this trade into a

10   profit with respect to Lumos?

11   A.  Yes, because the call options went from out of the money to

12   in the money because the stock price went over $17.50 a share.

13   Q.  Now earlier in discussing this chart, you mentioned the

14   phrase, bull call spread?

15   A.  Yes.

16   Q.  Could you explain what that means?

17   A.  That's just a strategy where you buy a call in a stock, a

18   call option in a stock at the same time you sell a call option

19   on a stock, meaning you write a call option in a stock with the

20   same number of contracts.  Here it was 120 contracts.  And the

21   same expiration date.  The expiration date here was 4/21/17.

22   It just has a higher strike price.  The one that was sold is a

23   higher strike price of $25.  This allows you to reduce your

24   costs of buying the initial call option.  You -- when you buy a

25   call option, you pay a premium.  When you write a call option,

1    meaning sell a call option to somebody else, you receive a

2    premium, and so that generally can reduce your costs.  And if

3    the stock price goes up and comes in the money, you can make

4    money on the spread between those two.

5    Q.  I'm turning your attention to the trading in Patheon.

6    Let's show the jury Government Exhibit 406.

7         What are we looking at here on Government Exhibit 406?

8    A.  Right.  So it's the same type of chart.  It's Patheon, the

9    daily closing price and trading volume from April 1 through

10   May 31 of 2017, and has trading in the Niranjan brokerage

11   accounts in options contracts.

12   Q.  Once again, you've annotated the chart along the way.

13   Could you walk the jury through your annotations?

14   A.  Yes.

15        So on April 25, the Niranjan account buys 75 contracts

16   with an expiration date of 5/19/2017, $30 call options.  Then

17   on May 3, the Niranjan account buys 20 contracts.  5/19

18   expiration, also $30 call options.  So they have a total of 95

19   contracts that expire on May 19, 2017 at $30 -- a strike price

20   of $30.  These call options are currently -- when he bought

21   them currently out of the money, right?  It's a strike price of

22   $30, and you can see from the blue line that the stock is

23   trading a little over $25 per share.  So the strike price is

24   higher than the closing price, the price at which the stock is

25   trading at.  Therefore, it's out of the money when the call

1  options are purchase

2  Q.  If you continue to go forward, what happens on May 15 as

3  annotated in your chart?

4  A.  Right.  Then on May 15, Patheon announces a $7.2 billion

5  merger agreement with Thermo Fisher Scientific at $35 per

6  share.  So at $35 per share, that's above the exercise -- the

7  strike price of $30 per share.  So now the options increase in

8  value, and at $35 a share, they'd be in the money.  And the

9  Niranjan account sells five of the 95 contracts on May 15.

10        And then on May 19, the Niranjan account exercises 90,

11  the remaining 90 contracts are exercised, and they buy 9,000

12  shares because, remember, each contract is worth a hundred

13  shares, so there's 9,000 shares.  He buys 9,000 shares at $30

14  per share, and you immediately turn around and sell them at

15  what the stock is trading at, $33.60 a share.  So the profit is

16  approximately $3.60 a share because he had the right under the

17  options contract to buy them at $30, but it's trading at $33,

18  $35, so it's in the money.  So he sells what he had the right

19  to buy and makes a profit of approximately $3.60 a share times

20  the 9,000 shares.

21  Q.  Mr. Carocci, if I understand you correctly, would it be

22  right that on April 25, the trade placed in the Niranjan

23  account effectively bet that the price would go up to $30?

24  A.  That's correct.  As with the previous chart Lumos, there

25  were trades that are bullish.  It is a bet that the stock price

will increase in value because they purchased out of the money

call options.  So that is a bet that stock price will increase

prior to the expiration of May 19.

Q.  Here the expiration was a matter of weeks from the date the

trade was placed?

A.  That's correct.  It was a matter of weeks, you know, before

the trade, and four days after the announcement of the merger

at $35 per share.  So it's similar to Lumos in that out of the

money call options were bought.  Shortly thereafter, they

became in the money because of a merger announcement and became

profitable.

Q.  Let's show the jury Government Exhibit 405.  During this

time period, was there any change in the price of the options

contract itself?

A.  Yes.  So the option contracts that were the 75 that were

originally bought in the Niranjan account on April 25 were

approximately 32 cents a share.  Then the ones on May 3, the 20

additional contracts that were purchased were at approximately

20 cents a share.  So it went down between April 25 and May 3.

        And then on 5/15, it increased dramatically because

there was an announcement that Thermo Fisher was buying Patheon

at approximately $35 a share, which was much higher than what

the shares were trading at.  So the call options increased from

approximately 32 cents, 20 cents a share to $4.60 a share, a

22 percent increase between May 3 and May 15 of 2017.

1    Q.  Ms. Sonderby, we can take that down.  I want to show you

2    Government Exhibit 401.  This can be published to the jury.

3          Mr. Carocci, what are we looking at here?

4    A.  This is for the Calgon Carbon Corporation, the daily

5    closing price and trading volume August 1 through November 30,

6    2017 for the Niranjan account.

7    Q.  Does this similarly show the price of Calgon Carbon equity

8    securities with the blue line?

9    A.  Yes, so that is the closing price for their common stock.

10   You know, it's approximately $12, $13 a share when the Niranjan

11   account buys call options at $15.  But the blue line is the

12   stock price line, yes.

13   Q.  And the reddish line again is the trading line in the

14   security?

15   A.  Yes.  And you can see the red line at the bottom is a daily

16   trading volume.  You can see right before the merger

17   announcement, it increased from about 383,000 shares on

18   September 19 to 24 million shares on the day the merger was

19   announced.

20   Q.  Once more you've annotated this chart.  Could you walk the

21   jury through the annotations?

22   A.  Yes.  So on September 6, the Niranjan account buys 361

23   contracts that expire 10/20/2017 at a strike price of $15.  The

24   stock price that day is closing at approximately $13 a share.

25   So the options are out of the money.  The expectation is the

1    stock will increase in value.  It's a bull.  It's a long

2    position.

3            Then on September 11, the Niranjan account buys an

4    additional 29 contracts with the same expiration of October 20,

5    2017.  The same strike price $15 a share.  And they're also

6    still out of the money because the stock is not trading at $15

7    a share; it's trading below $15 a share.

8            Then on September 19, the Niranjan account buys an

9    additional 25 contracts with 11/17/2017 expiration date.

10   Strike price of $15.  Still out of the money.  And it also

11   sells a corresponding call option with the same expiration but

12   a higher strike price of $20.  That's what we're calling the

13   bull spread option, right, where they're minimizing -- they're

14   receiving a premium for selling that call option -- for writing

15   that call option, but they're limited to a $20 gain because

16   of -- or $5 a share gain, the 15 minus the 20 because they

17   would have to basically sell those 2,500 contracts at $25.

18   Q.  Mr. Carocci, why don't we break that apart a little bit.

19   A.  Yes.

20   Q.  Do I hear you correctly that it costs money to buy a call

21   option?

22   A.  Correct.  If you buy a call option, it costs money.

23   Q.  But you are paid money to write a call option?

24   A.  Correct.

25   Q.  So what you were saying with respect to September 19

1    trading is that the Niranjan account both pays money to buy 25

2    $15 call options.  And is paid money to write these $20 call

3    options?

4    A.  Correct.

5    Q.  Why, again, would somebody both buy and write options for

6    the same security?

7    A.  Well, it can reduce your cost, right?  Because you're

8    buying and then you're writing.  So you're receiving -- you're

9    paying money, then receiving some money to offset the cost.

10   And the downside to that is you would not be able to profit

11   from a price increase over $20 per share because you would have

12   to make good on that call option.  If the price of the stock

13   you know, went above $20 per share, that option would be called

14   in, and you would have to sell those shares to the individual

15   you wrote the option to.

16   Q.  Here your chart annotates that Calgon Carbon announced a

17   merger on the 21st?

18   A.  Correct.

19   Q.  Did the market react to that news?

20   A.  Yes, the stock price, you know, increased from

21   approximately $13 a share to approximately $21.40 per share,

22   almost a $21.50 per share price.  And the -- so when the stock

23   price went up, the options became in the money.  The $15 call

24   options he bought became in the money because it was trading

25   higher than $15.

1    Q.   Was the Niranjan account able to turn this trading into

2    profits?

3    A.   It was.  So it sold the 390 call options on September 21,

4    the day of the merger was announced, and then the additional 25

5    call options were exercised at a later date.  The interesting

6    thing -- this is like the other ones, as far as out of the

7    money options, call options were purchased prior to the merger

8    announcement and became in the money after the merger

9    announcement.

10        The other thing about this one is when you look at

11   GX-301, which is the E*Trade account, the balance in the

12   E*Trade account on September 1 was about $646.

13        On September 5, there was a $15,000 wire into the

14   account.  That $15,000 was then used to buy the 361 contracts

15   on September 6 and the 29 additional contracts on September 11.

16        Then on September 19 or 20th, there was a $5,000

17   deposit into the account.  And the additional call options were

18   bought on the 19th.

19        So the beginning of the month there's $646 account

20   balance in the account.  $20,000 deposited into the account.

21   Almost all that money is used to buy call options in CCC.  It's

22   the only position in the account between September 5 and

23   September 21.  There is no other stock held in the account.

24   There's no other options held on the account between

25   September 5 and September 21.  There is one bet, and it's that

1    Calgon is bullish, long, it's going to go up in value.  All the

2    money in the account is invested in that.

3    Q.  Mr. Carocci, I want to turn your attention to Government

4    Exhibit 400.

5    A.  Yes.

6    Q.  Could you remind the jury what sort of information is

7    reflected on this kind of chart?

8    A.  Yes.  So this is the Calgon Corporation daily closing price

9    and trading volume for the 10/20/2017 call -- $15 call options.

10   Q.  What happens to the price of the Calgon Carbon call options

11   in the period here?

12   A.  It increases from approximately 35 to 40 cents a share, 45

13   cents a share, which the Niranjan account is buying the call

14   options at, to approximately $6.40 on the date that the merger

15   was announced September 21 of 2017, which was an increase of

16   approximately 1,500 percent.

17   Q.  Mr. Carocci, did you have occasion to total up the profits

18   from the trading in the Lumos, Patheon and Calgon Carbon

19   securities?

20   A.  Yes.

21   Q.  Can we show the witness Government Exhibit 407?

22          What are we looking at here?

23   A.  Just a profit analysis from the Niranjan accounts for these

24   three stocks:  Lumos, Patheon and Calgon.  The blue represents

25   the Calgon portion of the profits, approximately $246,346.62.

1    The orange is the Patheon profits of $31,812.74.  And the small

2    gray area is the Lumos profits on the options contracts of

3    $1,862.68.

4                  MR. THOMAS:  Nothing further, your Honor.

5                  THE COURT:  All right.  Cross-examination.

6    CROSS-EXAMINATION

7    BY MR. FORD:

8    Q.  Good afternoon, Mr. Carocci.

9    A.  Good afternoon.

10   Q.  Adam Ford.

11   A.  Nice to meet you.

12   Q.  Can we pull up Government Exhibit 303 in evidence, please.

13                 Mr. Carocci, this was the same account statement that

14   you were asked about on direct examination.  Do you remember

15   that?

16   A.  Yes.

17   Q.  And I just want to be clear.  The name on this account is

18   Akshat Niranjan.  Is that correct?

19   A.  Yes.

20   Q.  And is it fair to say that -- you described -- strike that.

21                 On direct examination, you testified that you examined

22   a series of trading account statements in connection with your

23   work, correct?

24   A.  Yes.

25   Q.  Is it fair to say that the name on each and every one of

1    those trading account statements was Akshat Niranjan?

2    A.  Yes.

3    Q.  There were no account statements that you reviewed in the

4    name much Akshay Niranjan, correct?

5    A.  I don't believe so, no.  I think they were all Akshat,

6    right, A-K-S-H-A-T?

7    Q.  Yes.

8            And there were no account statements in the name of

9    Brijesh Goel.  Isn't that correct?

10   A.  That's correct.

11   Q.  And you never saw any evidence on any of these trade

12   records that reflected Mr. Goel having any beneficial interest

13   in any of these accounts.  Isn't that correct?

14   A.  I didn't see the beneficial interest besides Mr. Niranjan.

15   Q.  And to be clear, Akshat Niranjan?

16   A.  Right, I believe that's right.

17   Q.  Okay.  And so just to be clear, for everything that you

18   just testified to where things are being referred to as the

19   Niranjan accounts, you were referring to Akshat Niranjan's

20   account, correct?

21   A.  Yes.

22   Q.  Now, let me take you to Government Exhibit 407 in evidence.

23           MR. FORD:  I apologize, your Honor.  I think with

24   might have a Wi-Fi issue.  I'm told we're getting the circle.

25           Thank you for that.

1   Q.  Mr. Carocci, this was a chart that the government showed

2   you, and I just want to be clear on something.  You have up on

3   the upper right total profits of $280,000.  Do you see that?

4   A.  Yes.

5   Q.  To be clear, what you mean there is total gross profits.

6   Isn't that correct?  Let's -- I'll withdraw it.

7         You examined six trades in connection with your work.

8   Isn't that correct?

9   A.  Stocks or trades?

10  Q.  I'm sorry, stock, stock symbols.

11  A.  Symbols, I believe six, yes.

12  Q.  These were the six you just testified to on direct

13  examination?

14  A.  Yes.  Mmm-hmm.  Yes.

15  Q.  In fact, three of those lost money.  Isn't that correct?

16  A.  That's correct.

17  Q.  And then just to remind everyone, so those were the trades

18  in PharMerica, which is on Government Exhibit 413, and I will

19  represent to you, you had a $13,460 loss.  Do you see that?

20  A.  Yes.

21  Q.  I apologize.  If we could pull up 413 as well.  Sorry.  So

22  everyone can follow along.

23         Do you see Government Exhibit 413?

24  A.  Yes.

25  Q.  This was the analysis you had done in PharMerica

1    Corporation, correct?

2    A.  Yes.

3    Q.  And the first trade in PharMerica corporation was May 10,

4    2017.  Is that correct?

5    A.  Yes.

6    Q.  And the last trade in PharMerica was June 26, 2017.  Is

7    that correct?

8    A.  Yes.

9    Q.  And at the end of the day, the trades that were placed in

10   Akshat Niranjan's account in PharMerica resulted in a $13,460

11   loss.  Is that correct?

12   A.  Yes.

13   Q.  Can we pull up Government Exhibit 415 in evidence?

14          Now, on this chart, the trading was from –– in Sprint

15   Corporation, there was some trading?

16   A.  Yes.  Mmm–hmm.

17   Q.  Let me just direct your attention to the trade starting

18   April 5, 2018.

19   A.  Okay.

20   Q.  And they continue until September 7, 2017?

21   A.  Yeah, this is the last stock sale.  Yes.

22   Q.  And the total for all of that was $17,445?

23   A.  The loss.

24   Q.  Total loss.

25   A.  Yes.

N6DQgoe6                          Carocci - Cross

1    Q.  All right.  And now let me direct your attention to

2    Government Exhibit 414.

3              And the first trade in Spirit Airlines in Akshat

4    Niranjan's account was May 24, 2018.  Do you see that?

5    A.  Yes.

6    Q.  And the last one was July 10, 2018?

7    A.  Yes.

8    Q.  So -- and that resulted in a $278 loss?

9    A.  Yes.

10   Q.  Okay.  So now -- so the total loss -- not going to test

11   your math.  I'm fine with rough numbers, but from the three

12   series of trades we just looked at, there was a $13,460 loss.

13   Remember that?

14   A.  Yes.

15   Q.  There was a $17,445 loss, correct?

16   A.  Yes.

17   Q.  And $278 loss.  So is that?

18   A.  Approximately $31,000.

19   Q.  About $31,000 in loss?

20   A.  Give or take.

21   Q.  So now if we could go back to Government Exhibit 407.

22             On the upper right-hand column, you have total profit

23   of $280,000 for the three trades you listed, correct?

24   A.  Yes.

25             THE COURT:  Stocks, you mean.

N6DQgoe6                              Carocci - Cross

1   A.  Stocks.

2   Q.  I apologize.  Stocks.  Yes.

3           So if you were to add in the $31,000 in losses, you'd

4   have a total profit of about $250,000 in Akshat Niranjan's

5   trading account.  Is that fair?

6   A.  That's correct, about $250,000 if you counted all six

7   stocks.  This chart just relates to the three --

8   Q.  Just the three.  Yes.  Which brings me to another thing,

9   because you have -- just so we're clear on this now that it's

10  in evidence, you say Niranjan accounts profit analysis for

11  Niranjan account September 2016 to September 2018, but just to

12  be clear, this is only in these three stocks, correct?

13  A.  That's correct.

14  Q.  You're aware that there was trading in these accounts in

15  other stocks.  Is that correct?

16  A.  That's correct.

17  Q.  Okay.  And just to be clear on that last point.  The

18  Niranjan accounts, there was trading in stocks other than the

19  six stocks that we've been discussing here today?

20  A.  I did see other trading, right.

21           (Continued on next page)

22

23

24

25

 1  BY MR. FORD:  (Continued)

 2  Q.  But you did not do an analysis on any of these other

 3  stocks; is that true?

 4  A.  No.  I only did the analysis on the six I was asked to do.

 5            MR. FORD:  Okay.  No further questions.

 6            THE COURT:  Redirect.

 7            MR. THOMAS:  No, your Honor.  Nothing further.

 8            THE COURT:  You may step down.

 9            (Witness excused)

10            THE COURT:  Call your next witness.

11            MR. ROTHSCHILD:  Government calls Nita Shah.

12            THE COURT:  All right.

13   NITA SHAH,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16            THE COURT:  All right.  You may inquire.

17            MR. ROTHSCHILD:  Thank you, your Honor.

18  DIRECT EXAMINATION

19  BY MR. ROTHSCHILD:

20  Q.  Good afternoon, Ms. Shah.

21  A.  Good afternoon.

22  Q.  How old are you?

23  A.  71.

24  Q.  Where were you born?

25  A.  In Calcutta, India.

1   Q.   How far did you go in school?

2   A.   I have a master's degree.

3   Q.   In what?

4   A.   In English literature, English literature.

5   Q.   Where did you get your master's from?

6   A.   From the University of Calcutta, India.

7   Q.   When did you move to the United States, Ms. Shah?

8   A.   Around '85.

9   Q.   1985?

10   A.   Yes.

11   Q.   What do you do for work?

12   A.   I'm a translator and an interpreter.

13   Q.   What languages are you a translator and an interpreter for?

14   A.   Hindi, Gujarati, and Bengali.

15   Q.   Around when did you start working as an interpreter and

16   translator in the United States?

17   A.   Around 2000.

18   Q.   When you started out, where were you working as an

19   interpreter and translator?

20   A.   That time, I was working with various agencies and as a

21   freelancer, and also with the Department of Justice, Department

22   of Homeland Security, and a lot of private law firms.

23   Q.   After working as a freelancer, what did you do next?

24   A.   I had various jobs, including working as a case manager

25   with FEGS, FEGS, as well as the Children's Aid Society.  And

N6D6GOE7                          Shah - Direct

1    eventually in 2012, from 2012 to 2018, I worked with the

2    Department of Homeland Security, immigration -- immigration

3    services.

4    Q.  When you say you worked for the Department of Homeland

5    Security, you mean as an interpreter and translator?

6    A.  Yes.

7    Q.  After working as an interpreter and translator for the

8    Department of Homeland Security, what did you do next?

9    A.  I retired, so I'm just freelancing now.  But most of those

10   agencies.

11   Q.  Freelancing as an interpreter and translator?

12   A.  Yes.

13   Q.  And what sorts of organizations do you provide

14   interpretation and translation services for?

15   A.  Pretty much the same, like the Department of Justice and

16   Homeland Security and other private agencies.

17   Q.  Are you a court-approved interpreter and translator?

18   A.  Yes, I am.

19   Q.  Do you hold any other certifications?

20   A.  I am a PRO, which is a peer-certified -- thing with

21   Proz.com, P-R-O-Z.com.  PRO, that's the name of the

22   certification, a peer-certified organization.

23   Q.  And a peer-certified organization for interpreters and

24   translators?

25   A.  Yes.

1   Q.  You mentioned one of the languages for which you serve as

2   an interpreter and translator is Hindi, right?

3   A.  Yes.

4   Q.  When did you first learn Hindi?

5   A.  Right from my first grade.

6   Q.  Approximately how many years have you been fluent in Hindi?

7   A.  I'd say 65, 64, 65 years.

8   Q.  Have you prepared transcriptions of Hindi and translations

9   from Hindi to English that have been used in court before?

10  A.  Yes, I have.

11  Q.  And just so we understand each other, what do you

12  understand a transcription to mean?

13  A.  Transcription is you get an audio tape, you translate, and

14  then you write that down in the source language as well as the

15  translated language, which is usually English.  So from -- if

16  it's in Hindi, then you transcribe that into Hindi.  And

17  alongside that, you provide translation into English.

18  Q.  Ms. Shah, as part of your work, did you participate in the

19  process of providing transcription and translation services for

20  the government in this case?

21  A.  Yes, I did.

22  Q.  And were you contracted to provide those services through a

23  translation agency?

24  A.  Yes.

25  Q.  What's the name of that agency?

1    A.  ILS, International Language Services.

2    Q.  Do you have an understanding as to whether the government

3    is paying ILS for your services in this case?

4    A.  Yes.

5    Q.  And what's that understanding?

6    A.  That ILS is contracted through the government agency, and

7    they contracted me.  That means the agency contracted me to

8    work on this project.

9             MR. ROTHSCHILD:  May I approach the witness, your

10   Honor?

11            THE COURT:  You may.

12   BY MR. ROTHSCHILD:

13   Q.  Ms. Shah, I've handed you a disc that's marked for

14   identification as Government Exhibit 600.  Do you recognize

15   that?

16   A.  Yes.

17   Q.  Does that disc contain the audio files that you used in

18   your work in this case?

19   A.  Yes.

20   Q.  How do you know that?

21   A.  I have my initials there.

22   Q.  Approximately how many times did you listen to the audio

23   files?

24   A.  At least four times, four to five times.

25   Q.  And what work product did you generate as a result of your

N6D6GOE7                          Shah - Direct

1    work in this case?

2    A.   I looked at the transcripts, edited them, reviewed them,

3    and wherever it was necessary, I filled in some blanks.

4    Q.   And is that with respect to Hindi transcription; so in

5    other words, words that are written in Hindi language?

6    A.   Hindi as well as the English translation.

7    Q.   So your services covered the Hindi transcription, the

8    English language transcriptions, as well as translations from

9    Hindi into English; is that correct?

10   A.   Correct.

11   Q.   And there should be a binder on the stand, Ms. Shah.  Do

12   you see that?

13   A.   Yes.

14   Q.   And it should have documents that have been marked for

15   identification as Government Exhibits 2-T through 4-T,

16   Government Exhibit 6-T through 13-T, and Government Exhibits

17   15-T through 18-T.  Can you take a moment and just flip through

18   those documents and look up when you're done?

19   A.   Yes.

20   Q.   Do you recognize those, Ms. Shah?

21   A.   Yes.

22   Q.   What are they?

23   A.   These are the transcripts from those -- from that audio.

24   Q.   How do you know?

25   A.   My initials are on them.

1   Q.  And are those transcripts fair and accurate transcriptions

2   and translations of the corresponding audio files?

3   A.  Yes, they are.

4   Q.  And is that with respect to both the Hindi and the English?

5   A.  Yes.

6   Q.  And with respect to the translations from Hindi into

7   English?

8   A.  Yes.

9   Q.  And just so we understand, the government exhibit marked

10  Government Exhibit 2-T, does that correspond to an audio marked

11  Government Exhibit 2?

12  A.  2, yes.

13  Q.  Similarly, 3-T corresponds to Government Exhibit 3?

14  A.  Correct.

15  Q.  And so on and so forth?

16  A.  Right.

17          MR. ROTHSCHILD:  One moment, your Honor.

18          THE COURT:  All right.

19          MR. ROTHSCHILD:  Your Honor, subject to future

20  connection and relevance, the government would offer Government

21  Exhibit 4-T, Government Exhibit 6-T through 13-T and Government

22  Exhibit 15-T through 18-T.

23          THE COURT:  Any objection?

24          MS. PRASAD:  We don't object, but we do object, your

25  Honor, to the portions that have been designated as snippets.

1        THE COURT:  Okay.  Well, the portions that have been

2   designated and marked as exhibits are received into evidence.

3        (Government's Exhibit 4-T, 6-T through 13-T, and 15-T

4   through 18-T received in evidence)

5        MR. ROTHSCHILD:  Thank you.

6   BY MR. ROTHSCHILD:

7   Q.  One final question.  You said you reviewed some transcripts

8   and filled in some gaps.  Did some other individuals besides

9   you work on the translations in this case?

10  A.  Yes, they did.

11  Q.  Did you provide final sign-off on the transcripts and

12  translations in this case?

13  A.  Yes.

14  Q.  Your testimony is that they are fair and accurate

15  transcriptions and translations of the corresponding audio

16  files?

17  A.  Yes.

18       MR. ROTHSCHILD:  No further questions, your Honor.

19       THE COURT:  All right.  Cross-examination, whenever

20  you're ready.

21  CROSS-EXAMINATION

22  BY MS. PRASAD:

23  Q.  Good afternoon, Ms. Shah.

24  A.  Good afternoon.

25  Q.  Anjula Prasad on behalf of Brijesh Goel.

N6D6GOE7                         Shah - Cross

1           Can we pull up Government Exhibit 15-T.  Go to Page 2,

2   please.

3           So, Ms. Shah, you see the text in Box 2 there?  You

4   see the bottom line there, before it says "I have gotten a

5   subpoena.  I...delete"?

6   A.  Yes.

7   Q.  Ms. Shah, what does dot, dot, dot mean?

8   A.  It means there's a pause.

9   Q.  Were there words between "I" and "delete"?

10  A.  No.

11  Q.  No words?

12  A.  There's just dot, dot, dot.

13  Q.  Does do the dot, dot, dot mean there were possibly words

14  between "I" and "delete"?

15  A.  Not from looking at the Hindi part, no.

16  Q.  So are you saying, Ms. Shah, that that sentence is I --

17  delete?

18  A.  Exact -- no.  That is the reason why the dots are there in

19  the English part, to show -- to make it clearer.

20  Q.  I'm sorry.  I'm not clear.  Ms. Shah, to make what clear?

21  That there's a pause there?

22  A.  If you said that without the dots in the English part, like

23  I delete, that would make no sense.

24  Q.  Correct.  So I'm not clear here, Ms. Shah.  Are you saying

25  that "I delete" is not a sentence?

1   A.  I'm merely trying to explain that if we did not put in

2   those three dots and you just said "I delete" in English, that

3   would not make any sense.

4   Q.  So you're saying, Ms. Shah, that there's something in

5   between "I" and "delete," because "I delete" makes no sense; is

6   that right?

7   A.  I'm not saying that there should be something, because the

8   way it's said in Hindi is different.  It does not mean that the

9   person is saying "I delete," which is the reason why those dots

10  are there.

11  Q.  So the dots mean a pause?

12  A.  It's just to make people understand the difference between

13  "I delete" and that -- because it doesn't make sense to say "I

14  delete" because he's not deleting, at least that's not what

15  he's saying.

16  Q.  So is it possible that could say "I should delete" or "I

17  should not delete"?

18  A.  No.  I'm not going to put anything of that sort because

19  that's not what is said in the Hindi portion.

20  Q.  Okay.  So you don't actually know if that says "I should

21  delete" in English or "I should not delete"; that's not clear

22  from this?

23          MR. ROTHSCHILD:  Objection.

24          THE COURT:  Overruled.  Go ahead.

25  A.  Precisely for that reason.  There is no "I should" or

1    "would" or anything in there, the English portion.

2    Q.  Okay.  So it's your testimony that this sentence says I

3    dot, dot, dot delete; is that right?

4    A.  Yes.

5    Q.  But it could say "I should" or "I should not delete"?

6    A.  I would not speculate on that, ma'am.

7              MR. ROTHSCHILD:  Objection.

8              THE COURT:  You have the answer.

9    BY MS. PRASAD:

10   Q.  Ms. Shah, when were you first hired to work on this

11   translation of the recordings?

12   A.  I was hired to review back in June of last year, 2022.

13   Q.  And you were hired as a Hindi expert?

14   A.  I was asked to review that, yes.

15   Q.  Were you reviewing the recording?

16   A.  Yes, as well as the transcript because the transcripts were

17   given to me.

18   Q.  Do you know who had made that transcript?

19   A.  No.

20   Q.  So you simply reviewed the transcript.  Did you listen to a

21   recording as well?

22   A.  Yes.

23   Q.  Okay.  Were you given two recordings at that time,

24   Ms. Shah?

25   A.  I do not recollect.

1   Q.  Okay.  So Ms. Shah, as a Hindi expert, did you take the

2   transcript and then edit the Hindi portions into English?

3   A.  No.  I listened to the audio and read the English portion,

4   the translated portion, and made changes if and when necessary.

5   And if I found that there was something in the English portion

6   that I did not hear, I deleted that, or corrected it as

7   required.

8   Q.  In the English portion?

9   A.  And in the Hindi portion, if -- as and when required.

10   Q.  So as a Hindi expert, do you usually translate English or

11   transcribe English recordings, Ms. Shah?

12   A.  Well, there have been times when I've just been asked to

13   transcribe the Hindi recordings into the Hindi language, Hindi

14   script, and there have been times when I also had to translate.

15   So it depends.

16   Q.  So what did you do here?

17   A.  In this case, I pretty much looked at the transcripts that

18   were given to me, and I check them for accuracy, both for Hindi

19   as well as English.

20   Q.  So were you hired again in 2023?

21   A.  Yes.

22   Q.  In connection with these recordings?

23   A.  Yes.

24   Q.  And did you again listen to the recordings?

25   A.  I did.

1   Q.  Were you given the transcript that you had created last

2   year?

3   A.  I do not know if that was the original transcript that I

4   was given, but I was given the transcript as well as the audio

5   recordings.

6   Q.  So you don't recall if it was the same transcript that you

7   had created last year that you were editing this year?

8   A.  I don't recall.

9   Q.  So, Ms. Shah, you said that you recognize these exhibits

10  that we just -- these snippets, these transcripts, because it

11  has your initials on it?

12  A.  Yes.

13  Q.  Can we go to the first page?

14          So your initial there means that you worked on this

15  transcript; is that correct?

16  A.  By worked, I mean I reviewed or edit it.  I did not do the

17  full transcript.

18  Q.  I see another initial there.  Do you see that?

19  A.  Yes.

20  Q.  Next to yours.  Do you know what that says?

21  A.  I don't know whose that is.

22  Q.  Let's blow it up.

23          Does that say "AN"?

24  A.  I don't know.

25  Q.  Do you think someone reviewed this transcript as well?

N6D6GOE7                        Shah - Cross

1   A.  I have no idea.  I will not speculate.

2   Q.  But you put your initials there --

3   A.  Yes, on the left side of my initials.  That's all I can

4   talk about.

5   Q.  But you initialed this after you reviewed the transcript?

6   A.  Right.

7   Q.  So it's quite possible that "AN" reviewed the transcript as

8   well?

9   A.  I don't know.

10  Q.  Ms. Shah, I would like to direct you to Government Exhibit

11  11-T in evidence.

12           Can we turn to Page 3, please?

13           Ms. Shah, I'd like to direct you to Box 8.

14  A.  Which one?

15  Q.  Box 8.

16  A.  Box 8.  Okay.

17  Q.  So you see the text there?

18  A.  Yes.

19  Q.  "But then, should I delete any messages."

20           And there's an U/I after that.  Can you tell me what

21  the U/I is?

22  A.  Unintelligible.

23  Q.  Does that mean you can't hear anything?

24  A.  Yes.  Or it's all garbled.  Yes, that's pretty much that.

25  Q.  Do you know for about how long that U/I, that

1   unintelligible portion is?

2   A.  No.

3   Q.  And then looking right below that at Box 9, the text there

4   says "yeah."  Do you see that?

5   A.  Yes.

6   Q.  And with Goel there as a speaker, so that means that

7   Brijesh Goel said "yeah"?

8   A.  Yeah.

9   Q.  Okay.  So the way that this is written, Ms. Shah, am I

10  correct that the "yeah" follows the unintelligible portion?

11  A.  Correct.

12  Q.  So, in fact, the "yeah" does not follow, "but then should I

13  delete any messages"; does it?

14  A.  He says that, and then the portion that it says U/I is

15  something that we could not hear or understand, and then the

16  next person's answer "yeah."

17  Q.  In fact, Ms. Shah, you don't actually know if Brijesh is

18  saying "yeah," to the sentence above with "should I delete the

19  message."  You don't know that, do you, "should I delete any

20  messages?"

21  A.  I would not necessarily say that he said "yeah" to the

22  portion that we could hear because there's a U/I there.

23  Q.  So, in fact, we don't really know what he's saying "yeah"

24  to; do we?

25  A.  Yes.

1            MS. PRASAD:  Okay.  Thank you, Ms. Shah.  That's all

2    we have.

3            THE COURT:  Redirect?

4            MR. ROTHSCHILD:  Very briefly, your Honor.

5    REDIRECT EXAMINATION

6    BY MR. ROTHSCHILD:

7    Q.  Ms. Shah, do you remember being asked a few questions on

8    cross-examination just now about the word "delete" in several

9    messages?

10   A.  Yes.

11   Q.  Were those the only instances of the word "delete," as far

12   as you can recall, or were there other instances of the word

13   "delete" in these recordings that you listened to?

14   A.  There could have been some.

15   Q.  Could we pull up what's in evidence as Government

16   Exhibit 11-T and go to Page 7?

17           And, Ms. Shah, could you read what's in Row 37?

18   A.  Fuck, this we need to delete.  [U/I] any trade?

19   Q.  And, Ms. Shah, just to clear up any confusion, you

20   mentioned that you did some work in this case in June of 2022;

21   is that right?

22   A.  Correct.

23   Q.  And you were provided some draft transcripts to review and

24   edit in certain ways back then; is that right?

25   A.  Yes.

N6D6GOE7

1  Q.  And then you said you reengaged in 2023 at some point; is

2  that right?

3  A.  Yes.

4  Q.  And you were provided, again, some draft transcripts and

5  your task was to review them for accuracy; is that right?

6  A.  Yes.

7  Q.  And you can't recall whether the drafts that you got in

8  2023 were the same drafts that you had seen last in June of

9  2022, right?

10  A.  Right.

11  Q.  But today, your testimony is the transcripts that are

12  sitting there in front of you are fair and accurate

13  transcriptions and translations of the corresponding audio

14  files; is that right?

15  A.  Yes.

16          MR. ROTHSCHILD:  One moment, your Honor.

17          Nothing further, your Honor.

18          THE COURT:  All right.  Thank you very much.  You may

19  step down.

20          (Witness excused)

21          THE COURT:  Please call -- well, it's two minutes to.

22  I usually make the parties call the next witness, but maybe I'm

23  in a very good mood.  I'll suspend that, and we'll find our

24  next witness tomorrow morning.

25          Ladies and gentlemen, I feel like I've known you

N6D6GOE7

1    forever, and you are probably feeling like you've been sitting

2    in this courtroom forever.  But go home, I know you have a lot

3    of things — laundry, family, e-mails, texts, birthday cards,

4    whatever may be — to tend to.  I hope you have a very pleasant

5    evening.

6         And let's do what we did this morning, which is get a

7    good start at 10:00 o'clock.  And, again, do not discuss the

8    case among yourselves or with anyone and keep an open mind.

9    There's more to come.

10         Thank you.

11         Oh, ladies and gentlemen, you don't have to be seated

12    in the box.  This will take one second, but everyone come out

13    for one second.  Please come out for one second.

14         I just wanted to instruct you that you need to leave

15    your notebooks in the jury room and do not take them home with

16    you.

17         Thank you.  That's all.  Have a pleasant even.

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  When do you expect to put Mr. Niranjan on?

3          MR. ROTHSCHILD:  Tomorrow, your Honor.

4          THE COURT:  Well, I have your request under

5     advisement.  In principle, does the government have any

6     objection?  The request was that the defense receive a

7     document, which potentially could be used, extracted or

8     redacted from the actual records.

9          MR. ROTHSCHILD:  I think we do, your Honor.  I think

10    the purpose -- my understanding the purpose of the exercise

11    that the Court undertook *in camera* was to review the documents

12    and to convey to the defense any information that could be

13    helpful.  I think the Court has done that.  And the fact that

14    the defense would prefer to have particular documents at hand

15    to cross-examine our witness as opposed to others, I don't

16    think that calls for the production of this document.

17         THE COURT:  Well, I will take that under advisement.

18    I understand the positions of both sides.

19         MR. THOMAS:  Judge, perhaps tomorrow morning we could

20    begin a few minutes early.  We expect there may be a dispute

21    about some issues related to the cross of Mr. Niranjan.  We

22    hope to work them out tonight, but I'm a realist.

23         THE COURT:  I'll be here.  So we can go on the record

24    at 9:30, if necessary.  Let's see what happens.  Let's be

25    optimistic and hopeful that peace will reign.

N6D6GOE7

1          MR. THOMAS:  Yes, Judge.  Thank you.

2          (Adjourned to June 14, 2023, at 9:30 a.m.)

3                              *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3    WENDY GORMAN

4   Direct By Mr. Naftalis . . . . . . . . . . .80

5   Cross By Mr. Ford  . . . . . . . . . . . . 137

6   Redirect By Mr. Naftalis . . . . . . . . . .146.

7    ANDREW TAPPETO

8   Direct By Mr. Rothschild . . . . . . . . . 148

9   Cross By Mr. Brodsky . . . . . . . . . . . 169

10  Redirect By Mr. Rothschild . . . . . . . . 198

11   THOMAS CAROCCI

12  Direct By Mr. Thomas . . . . . . . . . . . 205

13  Cross By Mr. Ford  . . . . . . . . . . . . 248

14   NITA SHAH

15  Direct By Mr. Rothschild . . . . . . . . . 254

16  Cross By Ms. Prasad  . . . . . . . . . . . 261

17  Redirect By Mr. Rothschild . . . . . . . . 269

18                   GOVERNMENT EXHIBITS

19  Exhibit No.                          Received

20   500, 100 through 141, 143  . . . . . . . . .97

21   334  . . . . . . . . . . . . . . . . . . 108

22   332  . . . . . . . . . . . . . . . . . . 114

23   331  . . . . . . . . . . . . . . . . . . 125

24   333  . . . . . . . . . . . . . . . . . . 129

25   381  . . . . . . . . . . . . . . . . . . 151

1    255    . . . . . . . . . . . . . . . . . . . 163

2    383    . . . . . . . . . . . . . . . . . . . 165

3    361    . . . . . . . . . . . . . . . . . . . 207

4    362    . . . . . . . . . . . . . . . . . . . 210

5    363    . . . . . . . . . . . . . . . . . . . 213

6    300 through 303    . . . . . . . . . . . . . 220

7    364, 366, and 368    . . . . . . . . . . . . 222

8    365    . . . . . . . . . . . . . . . . . . . 224

9    367 and 369    . . . . . . . . . . . . . . . 227

10   415    . . . . . . . . . . . . . . . . . . . 234

11   4-T, 6-T through 13-T, and 15-T through 18-T  261

12                    DEFENDANT EXHIBITS

13   Exhibit No.                              Received

14   1260    . . . . . . . . . . . . . . . . . . 142

15   1269    . . . . . . . . . . . . . . . . . . 144

16   1247    . . . . . . . . . . . . . . . . . . 174

17   1248    . . . . . . . . . . . . . . . . . . 182

18   1246    . . . . . . . . . . . . . . . . . . 186

19   1249    . . . . . . . . . . . . . . . . . . 192

20

21

22

23

24

25